# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELLIOT MCGUCKEN, AN          §
INDIVIDUAL,                  §
                             §   NO. 1:22-CV-00905-GHW
    PLAINTIFF,               §
                             §
VS.                          §
                             §
SHUTTERSTOCK, INC., A        §
DELAWARE CORPORATION;        §
AND DOES 1-10,               §
                             §
    DEFENDANTS.              §

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

REMOTE AND VIDEOTAPED DEPOSITION OF
THOMAS BLAKE MADDREY
NOVEMBER 16, 2022

REMOTE AND VIDEOTAPED DEPOSITION OF THOMAS BLAKE MADDREY, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above styled and numbered cause on Wednesday, November 16, 2022, from 10:05 a.m. to 6:24 p.m., before TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of Texas, reported remotely by computerized stenotype machine in Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Job No. 219154

A P P E A R A N C E S


FOR THE PLAINTIFF:
    Scott Burroughs, Esq.
    DONIGER / BURROUGHS
    247 Water Street
    New York, New York 10038




FOR THE DEFENDANTS:
    Elaine Nguyen, Esq.
    Eleanor Lackman, Esq.
    Rebecca Benyamin, Esq.
    MITCHELL SILBERBERG & KNUPP
    437 Madison Avenue
    New York, New York 10022




ALSO PRESENT:
    Brent Jordan, Videographer

I N D E X

                                                    PAGE

APPEARANCES................................     2

  THOMAS BLAKE MADDREY

EXAMINATION
    BY MS. NGUYEN...........................     6


CORRECTION PAGE...........................    282
SIGNATURE PAGE............................    283
REPORTER'S CERTIFICATION..................    284

                    E X H I B I T S

NO.              DESCRIPTION                   PAGE
Exhibit 1        Expert Report of Thomas
                 Maddrey
                 (No Bates - 55 pages)          13
Exhibit 2        Article, Press Release:
                 ASMP Promotes Thomas
                 Maddrey to Chief Legal
                 Officer
                 (No Bates - 3 pages)           30
Exhibit 3        Article, Copyright in the
                 Age of Social Media
                 (No Bates - 1 page)            82
Exhibit 4        Expert Report of Thomas
                 Maddrey in Rebuttal to
                 Defendant Shutterstock
                 Inc.'s Expert Steve Heck
                 and Supplemental Expert
                 Report
                 (No Bates - 54 pages)         220
Exhibit 5        Flickr screenshots
                 (MCG000426 - MCG000429)       229
Exhibit 6        Twitter post
                 (No Bates - 1 page)           235
Exhibit 7        Getty Images License
                 Summary
                 (No Bates - 1 page)           272

Page 4

E X H I B I T S (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | Getty Images License Summary (No Bates - 1 page) | 273 |
| Exhibit 9 | Getty Images news photo listing (No Bates - 3 pages) | 275 |
| Exhibit 10 | Getty Images License Summary (No Bates - 1 page) | 276 |

CONFIDENTIAL - T. MADDREY - 11/16/2022

THE VIDEOGRAPHER:  Good morning, Counselors.  My name is Brent Jordan.  I am a certified legal videographer in association with TSG Reporting, Inc.

Due to the remote nature of this deposition, I will not be in the same room with the witness.  Instead, I will record this videotaped deposition remotely.  The reporter, Tamara Chapman, also will not be in the same room and will swear the witness remotely.

Do all parties stipulate to the validity of this video recording and remote swearing, and that it will be admissible in the courtroom as if it had been taken following Rule 30 of the Federal Rules of Civil Procedures and the state's rules where this case is pending?

MR. BURROUGHS:  Yes.

MS. NGUYEN:  Yes.

THE VIDEOGRAPHER:  Thank you.  This is the start of Media No. 1 of the videotaped deposition of Thomas Maddrey, taken in the matter of Elliot McGucken v. Shutterstock, Inc., et al., filed in the United States District Court, Southern District of New York, Case No. 1:22-CV-00905.

CONFIDENTIAL - T. MADDREY - 11/16/2022

This deposition is taken on November 16th, 2022, at approximately 10:05 a.m. My name is Brent Jordan. I'm the legal video specialist from TSG Reporting, Inc., headquartered at 228 East 45th Street, New York, New York. The court reporter is Tamara Chapman, in association with TSG Reporting.

Will counsel please introduce yourselves for the record.

MS. NGUYEN: This is Elaine Nguyen with Mitchell Silberberg & Knupp. Here with me is Eleanor Lackman, also with MSK, and Rebecca Benyamin, and we represent Shutterstock.

MR. BURROUGHS: And Scott Burroughs. I represent the plaintiff in this matter, Dr. Elliot McGucken.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

THOMAS BLAKE MADDREY, having been first duly sworn, testified as follows:

EXAMINATION

BY MS. NGUYEN:

Q.   Mr. Maddrey, how are you today?

A.   I'm doing well. How are you?

CONFIDENTIAL - T. MADDREY - 11/16/2022

those are all the areas that I believe are my areas of expertise.

Q.    Okay.  And on Page 2 of your CV, under work and professional experience, it says that you work as general counsel and head of national content in education for the American Society of Media Photographers.

Can you describe your responsibilities as general counsel and head of national content in education?

A.    Certainly.  And for -- in response to your previous question, just last week my title changed to chief legal officer and head of national content in education.  And in this role, I work in two dimensions.

The first is with the members and -- so who are photographers, videographers, filmmakers YouTubers.  Pretty much all visual content creators are members of ASMP.  And I meet with them and answer questions that they have related to business issues and legal issues.  And in that side of the role, I -- I film many webinars, live events, town halls, things where members are able to -- to ask questions and get answers about the things that

CONFIDENTIAL - T. MADDREY - 11/16/2022

they're facing.

On Tuesdays, we do a member-only legal and business clinic where members can come for 15 minutes and speak one-on-one with me and we do anywhere between eight, sometimes up to ten member queries a week in the one-on-one type format as well.

That is one half of the role.

The other half of the role is an advocacy role where I am working -- specifically my area of emphasis, I -- I would say is an amicus briefing where I write, either as counsel of record or co-author, many amicus briefs at courts throughout the country, from District Court levels all the way up to the Supreme Court on cases that affect photographers and visual content creators.

And in that advocacy role as well, I do work with our -- our lobbyists in Washington, D.C., where we work with the copyright office and we work with any organization or any division of the government that has an impact on photographers like the National Park Service or others like that.

So that is a -- a nutshell encapsulation, but I think that does adequately describe the two

CONFIDENTIAL - T. MADDREY - 11/16/2022

main areas of my role.

Q.    Thank you.

And just to circle back on your statement that your title has changed to chief legal officer. Are there any other edits that need to be made -- made to your CV to make it current?

A.    Between the time of submission and now?

Q.    Yes.

A.    I spoke with Whitney Levandusky from the U.S. Copyright office at the Texas Bar Entertainment Law Institute conference that was last Friday.  That would be something that I would add to a CV were I'm submitting it today.  But I believe that the title change in that particular speaking engagement would be the only two things that -- that I would be adding since the time I submitted this.

Q.    Thank you.

So on your CV, it says you work with more than 4,000 professional commercial photographers to provide guidance on copyright licensing contracts and other industry-specific topics.  How would -- in your role, you provide guidance to photographers in what ways?

A.    Sure.  So I mentioned one of them, which

CONFIDENTIAL - T. MADDREY - 11/16/2022

like that.  So yes, on Tuesday mornings, I speak one-on-one, and I would say throughout the week, I probably interact one-on-one with members about various issues via email or via phone, you know, another dozen times on an average week.

Q.   Okay.  Was that -- would you say -- if you can -- I guess out of 100 percent, how much is that -- how much percent -- how many -- how much percent does that take up your time, speaking to photographers one-on-one, either through email or your office hours?

A.   Solely speaking in the one-on-one setting, I would say -- I would approximate 20 to 25 percent of my time is spent interacting with photographers directly in a one-on-one setting.

Q.   And you mentioned that you provide guidance on licensing.  Can you sort of elaborate on that?

A.   Sure.  Sure.  In my career I was a commercial editorial major fine arts photographer for many years.  And in those roles I often had to engage in licenses with clients myself.

And so I understand what our members face when they're looking at licensing issues.  And so

you'll find a couple different avenues where we offer guidance on licensing. One is in the document templates, where we offer guides on things like that. Another is in the videos that we create.

And then often licensing questions are -- are brought to us by photographers who are either learning the ropes when it comes to how to write a proper license or they are encountering something new.

For example, they may have -- they may have found themselves licensing their work to one client over and over again, but now a new client comes in and is looking for significantly different terms.

We'll often get questions about, you know, hey, what -- what is the general idea when -- when you're going international for the first time in your license or what do you have to look out for in those cases.

So I would say those are the types of guidance we offer related to licenses.

Q. Does your advice depend on any specific type of license?

A. I'm not sure that I understand the

CONFIDENTIAL - T. MADDREY - 11/16/2022

particular assignment but on my own volition, take images and then later sell those images, either to publications or to individuals, either in a fine art context or another context.

And in professional photography, there are many dividing lines, but I think one dividing line is the commercial versus editorial-type distinction.

Q. Okay. And at Tom Maddrey Images, did you have any employees?

A. I do not recall.

Q. Okay.

A. Possibly one.

Q. Primarily run by you, would that be fair --

A. Correct.

Q. -- to say?

A. Yes.

Q. Have you ever worked for a stock photography company before?

A. I've never worked for a stock photography company, no.

Q. Are you familiar with Getty Images?

A. I am familiar with Getty.

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.    Yes.

Q.    A professional photographer, rather.

Can you tell me why you stopped working as a professional photographer?

A.    Sure.  I found law school to be demanding, such that I didn't want to continue a photography career at the time.  That was a specific -- a specific decision that I made at that time.

Q.    Okay.  And you mentioned earlier that you have personal sort of thoughts as to uploading images onto these big three platforms or stock photo agencies.  Is there -- because there's competition?

A.    I'm sorry.  You cut out there for a second.  I didn't hear the question.

Q.    Sure.  So you mentioned that sometimes you advise -- or you -- rather -- withdrawn.

You stated that -- you know, I'm going to withdraw that question.  We'll get to it later.

Okay.  Do you have any experience analyzing stock photos?

A.    Accessing stock photos?

Q.    Analyzing.

A.    Analyzing stock photos.

Page 62

CONFIDENTIAL - T. MADDREY - 11/16/2022

I have experience analyzing photographs, and since any photograph could be uploaded to a stock photo site, that would be the connection that I would make.  I don't have any experience analyzing what a specific stock photo would be.  I'm not sure exactly what that would be.

Q.    Do you have any professional experience analyzing pricing of stock photos?

A.    My professional experience analyzing pricing, again, of photographs.  Stock is simply a form of licensing a photograph.  And so the license that a stock agency provides to its customers is no different, in form and substance, than the license that is used for any photographs.

So, yes, I would say I have experience in -- professional experience in analyzing stock photo licenses.

Q.    And where does that experience come from?

A.    It comes primarily from my time as a photographer, my time teaching photographers in the Eclipse Photography Institute and other venues.  And then my time working with photographers and creators in all the years since.

Q.    Okay.  Do you have any professional

Page 69

CONFIDENTIAL - T. MADDREY - 11/16/2022

there certainly was at the University of Texas at Dallas when I was getting my business degree. And I have since taken CLE classes as an attorney that have economics focuses, but they're not academic classes like the kind we're discussing.

Q. Are they -- are any of those classes that you just referred to relate -- do they relate specifically to photography?

A. No, I don't know of any photography-specific classes certainly that were offered by the institutions I attended.

Q. Have you taken any classes in accounting?

A. I would have taken accounting classes at the -- when I was getting my business degree, yes.

Q. And would that be at the University of Texas at Dallas?

A. Yes.

Q. And did you take any classes -- accounting classes specific to photography?

A. No.

Q. Okay. Have you taken any classes in finance?

A. I believe that there were classes in finance at the University of Texas at Dallas.

CONFIDENTIAL - T. MADDREY - 11/16/2022

Q.   And did you take any classes in finance specifically relating to photography?

A.   No.

Q.   Okay.  Outside the context of litigation, have you ever been paid to conduct financial evaluations?

A.   Can you describe more fully what "financial evaluations" means?

Q.   Any sort of a valuation -- let's say valuation of photography.

A.   Yes.

Q.   Can you elaborate on that, please?

A.   Sure.  In my consulting business, I've worked with photographers and estates outside of the context of litigation to assist them in understanding the market and what the value of their works are.  And I would -- and I have -- I have conducted, based on your definition, financial analysis in -- in -- in those contexts as well.

Q.   And would that be in print photography or digital photography?

A.   Both and including, outside of photography, my -- I have worked with clients who are in the fine art world, in mixed media and in

CONFIDENTIAL - T. MADDREY - 11/16/2022

paintings as well, all of those areas.

Q.    And is that still something that you do?

A.    It is.

Q.    Okay.  And when did you start doing these things?

A.    I -- I started my consulting business shortly -- shortly before I went in-house at ASMP.

Q.    And I guess, you know, what percentage would you say of your work is to conduct these financial evaluations?

A.    Close to 100 percent of my work in the consulting business has a financial evaluation component, but the consulting business is only a small part of the work that I do.  My primary job is what we discussed at length at ASMP.

Q.    And when you say "component," what do you mean?  Like, you're saying almost 100 percent has some sort of financial component.

A.    Without running down every client that's hired me on the consulting side, I can say that the majority of those that I can recall currently have had some element of asking me my opinion about the value of the work at issue, whether that work was in an archive or otherwise.

CONFIDENTIAL - T. MADDREY - 11/16/2022

person who was my co-founder who was building websites and would talk to me about it.  But I don't personally have experience in -- in programming languages.

Q.    Did you ever -- you said that you had some coding experience to build an app.  Did you ever build an app?

A.    I did not.

Q.    Do you have sufficient computer language experience to build anything?

A.    I don't believe so.

Q.    Okay.  We're going to go back to Exhibit 1, which is still in the chat.  Exhibit 1 being your expert report.  And we're going to go to Page 2 of Exhibit 1, which is your expert report. You can let me know when you're there.

A.    Page 2 of my expert report or Page 2 of the PDF file?

Q.    Of your expert report.  So on the top left, it says Page 2 of 34.

A.    Okay.  Got it.

Q.    Okay.  So it says here on the bottom of this page:  Each week I review, edit, and discuss licenses for photographers in my photo career as

CONFIDENTIAL - T. MADDREY - 11/16/2022

well as my professional career.  I have worked on more than 1,000 licenses in the photographic industry.

What kind of work have you done specifically?

A.    I've written many licenses for myself when I was a photographer and I have edited and/or viewed many licenses in my role at ASMP and I've discussed many licenses with the ASMP members.  Each week since I started working with ASMP, I believe I have spoken about licenses with at least one member.

Q.    So when you say that you wrote licenses at ASMP, you had mentioned earlier that you don't do specific sort of licenses for member photographers. So what do you mean by you wrote licenses?

A.    So I mentioned the document library where we have our templates.  Inside the document library, you'll find a variety of licenses, social media license or a general license.  Those are licenses that I write that are templates.

Q.    Okay.  Are those the only type of licenses that you write, would you say, social media -- can you list them?

A.    I could not list exactly what's in the

CONFIDENTIAL - T. MADDREY - 11/16/2022

Q.    Okay.  How many times?

A.    I would have to look at my expert report, but fewer than ten.

Q.    Fewer than ten.

Would six sound like the right number to you?

A.    I believe so.

Q.    Okay.  And what was the nature of the expert testimony that you were asked to provide in those cases, if you recall?

A.    The nature of the testimony was different in different cases, but I've been asked to testify related to industry standards, copyright matters, valuation of works.

Q.    What --

A.    -- those general topics.

Q.    -- industry standards?

A.    The photography industry.

Q.    Okay.  Do you recall those cases at all, the names of those cases?

A.    I believe they're in my expert report.

Q.    Okay.  How many of those cases that we just talked about were you retained as an expert on damages calculations?

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.    I wouldn't know.

Q.    Let's go to Page 4 of your expert report, 4 of 34.

A.    Uh-huh.

Q.    Do you see Number 2 it says:  Prior -- Roman numerette (sic) 2:  Prior testimony?

A.    Yes.  Yes.

Q.    Does this reflect -- refresh your recollection as to the nature of the expert testimony you were to provide in these cases listed?

A.    It refreshes my recollection as to the cases.  I am not -- I would not be comfortable saying exactly what I testified to in any of the things, I don't have my reports here for them.

Q.    Okay.  And looking at this list, can you tell me how many of these cases you were retained as an expert on damages calculations?  And just to note there's one more case on Page 5 of 34.

A.    I will say at least four.

Q.    Okay.  Which four?

A.    The four that comprise the bottom four of the list.  Seliger v. Breitbart News, Seliger v. Oath, McGucken v. Newsweek, and Itasca v. Shutterstock.

CONFIDENTIAL - T. MADDREY - 11/16/2022

Q.    Okay.  And what sort of damages calculations were you tasked with evaluating?

A.    I would not --

Q.    You don't recall --

A.    -- feel comfortable talking about that without seeing my reports.

Q.    Okay.  Do you recall the general nature of damages that you were asked to opine on?

A.    I was asked to opine as to what the value of the various damages would be given the specifics of the case.

Q.    Did they deal with photography?

A.    All of those dealt with photography, yes.

Q.    Did they deal with licensing?

A.    I don't recall which ones dealt specifically with licensing.

Q.    Did they deal with any metadata handling?

A.    I don't recall.

Q.    How about watermark usage?

A.    I don't -- I don't recall which of the listed cases specifically included watermarking.

Q.    Okay.  Have you appeared in any cases as an expert that's not listed here?

A.    There is one case that I submitted a

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.    No.

Q.    Do you remember the party names?

A.    Again, I don't -- I don't feel comfortable guessing at that.  I --

Q.    Sure.

A.    -- I'm more than happy to provide that. I just don't want to --

Q.    Sure.  No, I understand.

And when did you submit this report?  You said after -- after this particular report that we're talking about was submitted.  Do you recall when?

A.    Three to four weeks ago.

Q.    Three to four weeks ago.  Okay.

Are there any other cases not listed here that you were -- that you appeared as an expert? No.  Is that right?

A.    (Nods.)

Q.    Okay.  Of the times that you have been retained as an expert, what percentage of those times were you retained on behalf of the plaintiff?

A.    All of them.  All of them.

Q.    And just to clarify, I'm referring to everything listed under Roman Numeral II here, and

CONFIDENTIAL - T. MADDREY - 11/16/2022

the case that your -- you just disclosed that you

wrote a report two to -- or three or four weeks ago.

Okay.

A.    Yes, that is correct.

Q.    Okay.  And so all of them you said are on

behalf of the plaintiff.  Right?

A.    All of them are on behalf of the

photographer, who happens --

Q.    The photographer?

A.    Yes.

Q.    And was it -- is it against companies,

typically?

A.    Looking at the list here, it looks like

some are.  At least one is not.

Q.    Okay.  And which one is not?

A.    Scott Gunnells versus Michael Joseph

Teutul, et al.

Q.    Okay.  And how about the case that you

just said that you have been -- have recently been

retained to write a report for?  Is that also

against a company?

A.    I believe it's against a company, as well

as additional individuals.  But, again, I don't know

exactly how it -- how the caption is.

Page 91

CONFIDENTIAL - T. MADDREY - 11/16/2022

in this case?

A.    Yes.

Q.    Okay.  For all seven of these cases were you retained to provide testimony?

A.    Yes.

Q.    Okay.  In all seven of these cases were you deposed?

A.    Only in one.

Q.    And which one would that be?

A.    That's a fine question.  I don't recall exactly without looking at my records.

Q.    Okay.  Did you provide any testimony in court?

A.    No.

Q.    Why?  Why?  Why not?

A.    All the cases that I've been involved in so far have -- have ended before trial, and I haven't had the opportunity to provide testimony in court.

Q.    Ended in what manner?

A.    I don't know.  I know that my -- my supposition is settlement in -- in all of these, although I am not sure the disposition of them.

Q.    Okay.  In any of the cases that you've

Page 92

CONFIDENTIAL - T. MADDREY - 11/16/2022

rendered an opinion, has that opinion ever been excluded by the court?

A.    No.

Q.    Has it ever been adopted?

A.    No.

Q.    So is it fair to say that your expert report -- withdrawn.

So you mentioned that these cases that you worked on all ended at some point before trial. You said you suppose that it's been settled, these cases.

Do you know for a fact if all of these cases were settled?

A.    I do not know.

Q.    Okay.  But you're assuming that they were.  Is that right?

A.    A more -- a more accurate response would be that I know these cases ended, period.  I -- I have no -- I -- I --

Q.    You know that they didn't go to trial?

A.    -- I'm sure that someone informed me.  I know that they didn't go do trial.  I know that my job was over in the various cases, so...

Q.    Understood.  Can you tell me when you

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.      The first time I spoke with someone?  No, I don't.

Q.      Okay.  Have you ever been retained by Doniger/Burroughs on any other matter, other than this one?

A.      I have.

Q.      Which ones?

A.      I will tell you the ones that I know for sure, and then the ones that I am actually unclear on.

Q.      Okay.

A.      Elliot McGucken versus Newsweek --

Q.      Let's start with the ones that you know for sure.

        (Reporter admonishment.)

A.      -- Elliot McGucken versus Newsweek.

Q.      Okay.

A.      Mark Seliger versus Oath.  And Mark Seliger versus Breitbart.

Q.      Okay.

A.      And I don't recall the firms involved in any others that are listed here.

Q.      Okay.  Has -- have you been referred to any other entities by -- to be an expert through

CONFIDENTIAL - T. MADDREY - 11/16/2022

Doniger/Burroughs?

A.    I don't know.

Q.    Okay.  And have you been retained by Doniger/Burroughs -- rather, have you been -- ever been retained to be an expert on any actions relating to Elliot McGucken?

A.    I'm sorry.  Can you repeat that?

Q.    Sure.  I know this is quite an obvious answer, but can you tell me which of the cases that you've been retained as an expert for relating to Elliot McGucken?

A.    Certainly.  Elliot McGucken versus Newsweek, LLC, et al. was --

Q.    Okay.

        (Simultaneous speaking.)

A.    -- the case.

Q.    Any other cases?

A.    No.

Q.    Can you tell me what Elliot McGucken v. Newsweek, LLC involved?  What was the nature of that case?

A.    The general nature of the case included the use and display of Mr. McGucken -- Dr. McGucken's image on a website.  And without

CONFIDENTIAL - T. MADDREY - 11/16/2022

looking at my expert report, I think that's the extent of my comfort with talking about the general nature of the case.

Q.    Sure.  Do you recall how many images were at issue in that case?

A.    I do not.

Q.    Okay.  And you mentioned -- did you -- withdrawn.

Did you testify in any capacity in that case?

A.    I submitted an expert report.

Q.    Were you deposed?

A.    I was not deposed.

Q.    Okay.  And do you recall specifically if this particular case was settled?

A.    I don't recall specifically.

Q.    Okay.  When were you first contacted by anyone in connection with acting or possibly acting as an expert witness in this case?

A.    I wouldn't know a date.

Q.    Do you recall if it was -- strike that.

Do you recall who contacted you?

A.    I do not recall who contacted me for this case, no.

CONFIDENTIAL - T. MADDREY - 11/16/2022

industry standard set of definitions.  I will start there.

Q.   Okay.

A.   Second, I think there are different sources and resources that photographers use to define these categories --

Q.   Okay.

A.   -- and --

Go ahead.

Q.   Sure.

Do you know if stock photography platforms use that same definition?

A.   Oh, I don't know what the -- each stock photography platform uses.

Q.   You're not familiar with that?  Does it differ in any way, if you know?

A.   I wouldn't.

Q.   Okay.  And just sort of narrowing it a little bit more.  Can you tell me what editorial use means?

A.   So editorial use is use in magazines, newspapers, sometimes textbooks, other avenues that -- that are very specific in nature and generally noncommercial, nonadvertisement.

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.     Well, certainly.  The photographer, at every turn, decides who their client is and what market they wish to place their work, when they wish to place their work, at what size they wish to place their work.  They get to choose what images to put there.  They get to decide what images to show which client.

That's the heart of the -- the industry, is that the photographer is the one who gets to set the terms of the image if they can find their willing buyer.

Q.     If they can find a willing buyer.  So is it something that's more subjective?

A.     Well, it's business.  So I would -- I would contend that the photographer's price, the photographer's determination as to what their image is worth is based on their photography business.  And then we can drive back to economics and talk about raising the prices and fewer clients or lowering prices and more clients.  I mean, those are not photography-specific ideas.

Q.     So it boils down, if it's fair to say, that a photographer can really just set his own prices as to what he believes his own work is worth?

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.      And maybe I'm misunderstanding the question, but, yes, of course.  That's the heart of -- of business, just as I set my prices and anyone sets their prices in whatever they happen to do.

Q.      Sure.  And that's -- just to be clear, that's the industry standard, that photographers do this?

A.      Well, again, I don't think it's industry-specific.  I think a business owner, which most photographers are, will set their prices based on their evaluation of their business in the market.

Q.      So I guess my question here is, is there some sort of threshold?  Like is it infinite, is it -- is there a minimum, is there a maximum?  Like how do you -- how do you determine what's considered fair, other than arbitrarily naming a price?

A.      I think you look at your experience and the prices you've been able to license your work for.  You look at the people who create work that's similar to you and the prices that they sell their work for.

And then you talk as many -- as many -- for example, ASMP members have chapters all

CONFIDENTIAL - T. MADDREY - 11/16/2022

over the country, and they discuss what's happening in their local markets.

Pricing is something that's incredibly market-specific when it comes to location.  So I hope that answers your question.

Q.    Yeah.  And just for clarification purposes, do you know around how many members are -- there are for ASMR -- I'm sorry -- ASMP?

A.    So, I believe right now we have slightly over 4,000 members.

Q.    Okay.  So in your report on Page 17, if we can turn there, five variables that determine license fees.  Do you see that?

A.    There are five listed, yes.

Q.    Are there more variables that are not listed?

A.    Yes.  So the sentence prior to the five variables is "some of the many variables include," and then I listed five.

Q.    And these are the predominant variables. Is that fair to say?

A.    I think it's fair to say that these variables are often found in almost all rights-managed licenses, yes.

Page 125

CONFIDENTIAL - T. MADDREY - 11/16/2022

Q.   Okay.  Are there any common other relevant variables that are not listed here?

A.   This is not an exhaustive list and there are certainly other variables that go into a license agreement, but I wouldn't feel comfortable enumerating them without --

Q.   Can you provide me some examples?

A.   Sure.

Q.   Common examples, if that makes it easier to sort of narrow the universe.

A.   Absolutely.  One second.  Let me look at what I wrote.

Another example that we often see is whether the work can be broadcast.  And this could include a variety of different media.  That's different from what I have listed here, whether it's a magazine, or a periodical, or a billboard, or something like that.  Broadcast rights are separate rights.

That opens up a whole other line of variables that we talk about when we talk about placing images in motion pictures, or documentaries, or commercials.  That's a separate avenue.

And I think that -- well, I'll stop there

Page 126

CONFIDENTIAL - T. MADDREY - 11/16/2022

because I think there are -- there are as many variables that could go into a license fee as the two parties wish to include, but I think those are many of the main ones.

Q.    Okay.  So going back to these five predominant ones, as I call them.

Do these variables apply to platforms' licensing?

A.    They apply to platforms' licensing when the image is not a royalty-free image, when it's a rights-managed image, yes.

Q.    Okay.  So on Page 17, right under those five variables, you state:  This license is in a format that is often seen in a normal course and scope of the business and professional photography.

Do you see that?

A.    I do see that.

Q.    Okay.  What license are you referring to here?

A.    I'm referring to the license I referenced in the previous sentence, which is --

(unintelligible) --

(Simultaneous speaking.)

Q.    The $15,000 one?

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.   Yes.

Q.   Do you happen to know who was on the end of that license?

A.   I do not.

Q.   Okay.

A.   Well, I do not as I sit here today.  I don't recall.

Q.   Sure.  Did you ever recall?  Did you ever know at any point?

A.   I don't recall if I even recall.  I recall viewing the license.

Q.   If you ever knew.  If you ever knew.

A.   Right.  I don't -- I remember viewing the license and reviewing the license, but I don't recall if at that point I knew who the license was with or not.

Q.   Understood.  It says:  This license is in a format.

What format are you referring to?

A.   I'm referring to the way the license described the licensing terms.  The actual format of the license on the page was similar to the format that many licenses I see come across my desk look like.  It was in the same outline, in the same

CONFIDENTIAL - T. MADDREY - 11/16/2022

vernacular as what is commonly seen.

Q.    Okay.  And you then say:  It is often seen in the normal course.

What do you mean by "normal course"?

A.    That some license agreements are 20 pages long and look very much like contracts and -- like, by long form contracts, you know, with multiple pages of clauses and subclauses.

The normal course and scope of a photo license of the type that I'm describing is often one page, maybe two pages.  And the normal -- when I refer to "normal," what I'm referring to is baseline, simple, direct, not the 20-page license agreement, but the one- or two-page license agreement.

Q.    Okay.  And what do you mean by "scope of professional photography business?"  What is the scope?

A.    So when I talk about course and scope, what I'm talking about is how photographers run their businesses and how photography businesses operate in relation to the industry as a whole.

And so if someone comes up with a license form that is totally out of left field, the clients

CONFIDENTIAL - T. MADDREY - 11/16/2022

won't recognize all the details.  The photographer may miss details themselves.

So there's often -- not always, certainly -- but often a form that these licenses take.  What I'm referring to in the normal course and scope is that the license that I viewed fit the mold of a commonly seen license in the photo industry.

Q.    Okay.  And what's the basis for this particular statement?

A.    The basis is my experience both writing licenses for myself, for my clients at my law firm, and reviewing many, many licenses in my day job at ASMP.

Q.    And how -- do you still write licenses for yourself?

A.    No.  I'm no longer a -- a -- I no longer license my work professionally.

Q.    Okay.  Is it your belief that Dr. McGucken could have licensed each image for $15,000?

A.    It's my belief that Dr. McGucken provided a license indicating that he has licensed his work for $15,000.  I find Dr. McGucken's work to be of

CONFIDENTIAL - T. MADDREY - 11/16/2022

very high quality, such that if that were the price that he determined in the market, I see no reason why he couldn't license his work for the established rate.

Q.    And what's the basis of that opinion?

A.    The basis of my opinion that his work is of high quality is my experience and education and in the realm of photography, both evaluating images, judging images, analyzing images for their technical and creative qualities.

And my basis for the fact that Dr. McGucken could garner the prices he garnered is based on the fact that he garnered that price in a license that was provided in the documents that were produced in this case.  And I have to -- I have to take that production and my conversation with him as evidence of the fact that that's an accurate license.

Q.    Does the size or reputation of the licensee have anything to do with the price?

A.    Certainly.

Q.    In what way?

A.    Well, the -- if the -- if the photographer is a high stature or very famous, the

CONFIDENTIAL - T. MADDREY - 11/16/2022

work will be licensed at a higher dollar amount.

And by size, I'd ask for some clarification. Are you talking about the size of the image file, the size of the final print, or...

Q.  Size of distribution, let's say.

A.  Oh, yes. The -- the -- the circulation or the distribution of the publication absolutely makes a difference.

Q.  Do you know who George Steinmets is?

A.  I'm not -- I'm not comfortable saying yes or no to that. I'm familiar with the name, but nothing beyond that.

Q.  Okay. Do you know who Ansel Adams is?

A.  Yes.

Q.  Okay. Would you equate Dr. McGucken's work to Ansel Adams?

A.  Dr. McGucken and Ansel Adams both take nature photographs. That is one equation.

Q.  So you think that they're on the same par, same --

A.  No. I didn't -- I didn't say that. I think Ansel Adams is a recognized master of photography. And often one of the photographers that nonphotographers are aware of who has increased

CONFIDENTIAL - T. MADDREY - 11/16/2022

stature throughout -- throughout the public.

Q.    So your belief that $15,000 for a licensing fee for Mr. McGucken, do you think that that's considered a fair market value for that particular image for Dr. McGucken?

A.    I think that particular license -- and I will answer this question, but I'll note that I'm not looking at the license, and I'm more than happy to look at it if you wish for me to.

That particular license, I believe, was an exclusive license.  Exclusivity is a critical part of the value of a license and why one license might be significantly more than the other.

Licenses for images by people well less known than even Dr. McGucken will go for tens or hundreds of thousands of dollars, given their exclusivity and given the use.

Q.    And what does that -- if it's not someone as famous, let's say, as Dr. McGucken, how do you differentiate between the pricing than if they're sort of similar -- if someone that's less famous than Dr. McGucken can sell for $10,000, let's say?

A.    The way that I have always approached licensing is by looking at the value to the end

CONFIDENTIAL - T. MADDREY - 11/16/2022

user.  That is the starting point.  If a company hires me to photograph something, and that is going to be the centerpiece of a multinational ad campaign, then suddenly a million dollars doesn't seem like much money.

If a very small company is going to engage in a license for a one-quarter-inch, 500-pixel-wide image on an interior web page, well, then a million dollars seems like a lot of money.  It's all based on how the image is used and what the value to the client is.

Q.   Okay.  And is it fair to say that you then consider what a willing buyer would pay when conducting that analysis?

A.   Absolutely.

Q.   Okay.  You had mentioned earlier that the $15,000 license was a license in a format that's often seen in the normal course and scope of business of professional photography.  And those are typically, you know, short one- to two-page licenses.  Is that right?

A.   Yes.  Often those are short, one- to two-page licenses, yes.

Q.   Do they tend to be longer?

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.     I guess.

Q.     Would that change your opinion?

A.     The length of the license doesn't change my opinion as to its value.  It's the terms that are included in the license --

Q.     Okay.

A.     -- that are more important.

Q.     So it's your opinion, then, that the $15,000 license that you referred to here has standard license terms.  Would that be fair to say?

A.     They are standard license terms.  The terms that are used are standard terms often found in licenses, yes.

Q.     Okay.  Have you compared pricing in general with images on stock platforms?

A.     I am aware generally of prices on stock platforms.  I have not done a comparison in particular of different stock platforms.

Q.     Okay.  On Page 18 of your report, 18 of 34.

A.     Uh-huh.

Q.     Let me see if I can find it.  You say in the second full paragraph that:  Getty Images is the industry standard for both editorial and commercial

CONFIDENTIAL - T. MADDREY - 11/16/2022

image licensing.

Do you see that?

A.   I do.

Q.   Can you tell me what you mean by industry standard?

A.   Getty Images is, I believe, still the largest platform for images and also is one of the longest-tenured platform for images and how they price their work is often how other stock companies will price their work.  And when looking at rights-managed images and licenses, it is difficult to go outside of the bounds of -- of Getty on the rights-manage side without -- without drawing additional attention to -- to your pricing.

Q.   Okay.  And then you say:  Getty will sell you a royalty-free editorial use license of an image for $499.

Where did you get this 499 from?

A.   I got it from the Getty Images' website.

Q.   Okay.  Do you know if the price is dependent on anything or is it a flat rate?

A.   It's (unintelligible) --

(Simultaneous speaking.)

Q.   If the price -- do you know if the price

CONFIDENTIAL - T. MADDREY - 11/16/2022

assumption?

A.    That's my -- that assumption as to the relationship between the two types of licenses is based on my experience working in the industry and working with photographers.  The fact that rights-managed licenses are generally worth more is based on, as you can see in my report, some calculations on the -- on -- on an image, so...

Q.    Okay.  Do you have a sense of what percentage of licenses issued by Shutterstock are rights-managed versus royalty-free?

A.    I don't know that any -- well, I know that Shutterstock has some custom licenses.  But I don't know that any of Shutterstock's primary licenses are rights-managed at all.

Q.    Okay.  And what's the basis of that knowledge?

A.    Reading the license agreements that have been produced from Shutterstock and examining the Shutterstock website.

Q.    Okay.  So public information.  Is that fair to say?

A.    Correct.

Q.    Okay.  So in your report you give

CONFIDENTIAL - T. MADDREY - 11/16/2022

examples of two licenses available on Getty Images, 499 prints for standard editorial use and 14,695 for the five-year advertising use for print, display, or TV.  Is that right?

A.    That's correct.

Q.    Okay.  Can you tell me where you got this information?

A.    I got it from the Getty price image -- the Getty image price calculator that you can get at gettyimages.com.

Q.    So the website.

Why did you use this pricing?

A.    Why did I use this pricing?

Q.    Yeah.

A.    Well, for the royalty-free license, I used the pricing because that's the flat rate that Getty charges for a full-size image.

For a larger amount, I used the pricing based on an advertising rate which has a limited duration of five years.  I did that based on what Dr. McGucken's license that was produced showed, even though they're not exactly comparable, they're comparable in a way that allows us to see what a rights-managed license would look like from Getty.

Page 168

CONFIDENTIAL - T. MADDREY - 11/16/2022

statement?

A.    No, I don't, as I sit here at the moment but I hadn't noted the -- the footnote there so...

Q.    Okay.  And you also said:  This results in additional value of 4 -- $4.90 for at least some of the agreed 938 licenses.

A.    Yes.

Q.    Do you see that?

A.    I do.

Q.    But then you say there is not enough data to fully understand how Shutterstock derived profits.

A.    That -- that's correct.

Q.    So what is this calculation -- what's the conclusion of this particular Shutterstock profit calculation?

A.    That Shutterstock derived some amount of profit from -- Shutterstock itself derived some amount of profit from having Dr. McGucken's work on its site.

Q.    But you don't have enough data to determine how much?

A.    That's correct.

Q.    Okay.  And then here it says in the next

CONFIDENTIAL - T. MADDREY - 11/16/2022

paragraph:  On the other hand, a user who wishes to be able to download 750 images in the calendar year and wants to realize additional savings by paying the full yearly contract upfront would pay $3,999.

A.    Yes.

Q.    Do you see that?

A.    I do.

Q.    Okay.  What is the basis for this conclusion?

A.    That is likely -- I don't recall specifically what the basis is, but it would have been based on the materials I reviewed.

Q.    Okay.  Do you recall what you reviewed for these particular numbers?

A.    I would have reviewed what the cost was on the Shutterstock website for a prepaid one-year 750-image download package.

Q.    Okay.  And do you have any reason to believe that a customer purchased a subscription because of Dr. McGucken's images?

A.    No, I have no specific reason to --

Q.    Okay.  And do you believe that -- do you have any reason to believe that more than one or two of Dr. McGucken's images were downloaded under a

CONFIDENTIAL - T. MADDREY - 11/16/2022

given subscription?

A.    Well, I think we established that 938 images were downloaded at some point.

Q.    Right.  But I'm saying under a subscription, do you have any --

A.    Oh.  I did not see any data produced that indicated that.

Q.    In your experience and your knowledge in the industry, do people usually purchase subscriptions on stock sites because it was -- because a specific image was available on that stock site?

A.    I think that some people do, but I would not have any way to know the ratio of people who purchased for one image or purchased for other reasons.

Q.    And you said some people do.  Is that your expert opinion?

A.    That is my expert opinion, yes.

Q.    Okay.  Do you have any knowledge as to whether people purchase subscriptions on stock sites because of a particular photographer?

A.    I have no knowledge of that, nor -- nor an opinion on that.

TSG Reporting - Worldwide    877-702-9580

Page 184

CONFIDENTIAL - T. MADDREY - 11/16/2022

conclusion?

A.   Sure.  In the documents produced there were documents that very clearly were instructing both Shutterstock reviewers and Shutterstock contributors on what factors must be present for images to pass muster to make it onto the Shutterstock platform.  From those documents is where I rendered this.

Q.   So those documents that you're identifying now are the only support that you have for this particular statement.  Is that fair to say?

A.   The documents that indicate that Shutterstock employees must -- must do these things, yes, that is the basis for this opinion, yeah.

Q.   Did you speak with anyone at Shutterstock with respect to these --

A.   I did not.

Q.   -- documents?  Okay.

"Shutterstock's volitional conduct in this process is clear."

What process are you referring to?

A.   The review and approval process.

Q.   Okay.  And what's your familiarity with this -- with Shutterstock's review process?

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.    Well, my familiarity is based on the documents that I reviewed.

Q.    So your reading of those particular documents.  Is that fair to say?

A.    And I believe -- I would have to look at the documents produced to -- to see if there were any deposition materials included.

Q.    Okay.  Do you have any knowledge about review and approval process for Getty Images?

A.    No.

Q.    Do you have any knowledge with respect to the review and approval process for Adobe Stock?

A.    No.

Q.    Have you ever opined on review of content in any expert report?

A.    I believe that I have opined on review of content in a -- in another expert report, yes.

Q.    Can you elaborate on that, please?

A.    Sure.  I believe in the other matter that I was retained as an expert where Shutterstock was the defendant, I also opined on their review process.

Q.    Okay.  And are you referring to the Itasca v. Shutterstock action?

CONFIDENTIAL - T. MADDREY - 11/16/2022

Q.    Okay.  We're just going to go for probably another ten minutes, if that's okay, and then we'll take a break, because I know we've been going for a little more than an hour.

But you state that:  These acts of volitional conduct, coupled with the purpose of that conduct being designed for revenue generation is akin to many photographer representative reps that are part of the professional photography industry.

Do you see that?

A.    I do.

Q.    And these reps, are they the agents that we were talking about earlier today?

A.    Yes.

Q.    Okay.  And you mentioned that those particular reps have some sort of photographic background.  Photography background, rather.

A.    I would say -- I would say the reps generally will work with one group of people.  So photographers' reps generally have experience in the photography industry.

Q.    Okay.  And that particular representative works with, let's say, a photographer.  Is that right?

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.    Uh-huh, yes.

Q.    Okay.  And is that rep typically paid?

A.    The rep generally makes money either in a flat-fee-type situation if the rep is more of a business coach, or in a commission-type situation where the rep makes money based on a percentage of whatever the photographer is paid for the work.

Q.    Okay.  And this process -- well, let's take it a step back.

You say that "these reps are hired by photographers to," and then you enumerate four different things.  Right?  Do you see that?

A.    I do.

Q.    Are those their only functions?

A.    No.

Q.    Okay.  What other functions do they have?

A.    I think in general reps do offer things like industry experience and advice.  And some reps will have services for business coaching or helping photographers with their business outside of the four functions that are enumerated.

I'd say the four functions that are enumerated are the core of what most reps do, although I -- there are a number of other services

CONFIDENTIAL - T. MADDREY - 11/16/2022

reps provide.

Q.   Okay.   So you say that these reps, they review a photographer's portfolio.   Right?

A.   Yes.

Q.   And this could be -- this could vary. Like this could be thousands of photos, hundreds of photos.   Is that right?

A.   That is correct.

Q.   Okay.   And then you say that they provide feedback on these images.   Do you see that?

A.   I do.

Q.   Is that based on their photography experience?

A.   I would say that's based more on their understanding of the photography market and what sells and what doesn't.

Q.   Okay.   So they have some sort of specialized knowledge with respect to the photography business or the industry.

Would that be fair to say?

A.   The industry or photographs, yes.

Q.   Okay.   And then, three, they select images to retain and display in the portfolio.

Is that right?

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.    Yes.

Q.    Okay.  And how -- how do they typically do that?

A.    I believe that many reps will identify what would be considered the strongest images in a given collection of images to help the photographer create the strongest portfolio possible.

Q.    Okay.  So it sounds like they make real evaluations to bolster the photographer's sort of repertoire or portfolio.  Is that right?

A.    Yes.

Q.    Okay.  And then it says:  In turn, present that portfolio to potential clients, who then pay for the photographer's services.

Do you see that?

A.    I do.

Q.    Okay.  And then after all of this, which is four things of you were saying many potential factors or responsibilities, they get paid a portion of the fee collected by the photographer or a flat fee for their services?

A.    Yes.

Q.    Is that right?  Okay.  So do you know how much they're paid?

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.    I don't believe that there is even a standard for -- for this.  It's based on --

(Simultaneous speaking.)

Q.    Or how much a rep is paid?

A.    It's based on the services they provide the photographer.

Q.    Okay.  And would that service be hourly? Would it be -- how is it typically structured in the industry?

A.    I don't think that there is a, quote, industry standard for photographers' reps in different segments of the industry.  There may be standards, such as a purely commercial advertising photographer's rep often would be paid on a contingency or commission-type basis, whereas other photographers' reps probably work more in the flat fee arena.

I've heard of all of those type of pricing structures, and I don't think there is one standard.

Q.    Okay.  So these photographer reps, it sounds like it's a pretty intensive process with the photographer.  Is that accurate to say?

A.    I think.  It certainly can be, yes.

CONFIDENTIAL - T. MADDREY - 11/16/2022

Q.    And it seems very individualized photographers.  Is that accurate to say?

A.    Yes.

Q.    Okay.  Can you tell me, from your professional experience and knowledge, how Shutterstock reviews and approves their images?

A.    Well, I'd refer to the paragraphs above, where they're advising the contributors as to what images sell and what images make money, which I think is directly akin to what a photographer's rep does.  They help the photographer make money. That's the goal.

Q.    Okay.

A.    The way they do that is by identifying the factors and the images that help the images be the strongest.  And so that's where they look at what -- as I quoted here, quality, versatility, and unique images.  I think those are all things that photographers' reps would look for as well.

Q.    And how do they advise?  What do you mean by "advise"?  Do they have a one-on-one conversation with photographers?

A.    It's my understanding they don't have a one-on-one conversation with photographers.  It's

CONFIDENTIAL - T. MADDREY - 11/16/2022

review process at Shutterstock.

Q.   Do you know if the review -- the reviewers for the review and approval process have any specialized knowledge?

A.   I -- I can't recall whether there's specific evidence cited that they have specialized knowledge.  I do believe there was documents that indicate they had specialized training but not --

(Simultaneous speaking.)

Q.   Okay.  And what training would you understand that to be?

A.   I wouldn't be able to cite that without reviewing the -- the documents that are presented.

Q.   Okay.

MS. NGUYEN:  I think this is a good time for a break as promised.  So we can come back in ten minutes if that works for you or works for everyone.

THE WITNESS:  Okay.  Thank you.

THE VIDEOGRAPHER:  Off video at 4:11 p.m.

(Break.)

THE VIDEOGRAPHER:  Back on video at 4:22 p.m.

CONFIDENTIAL - T. MADDREY - 11/16/2022

and production budgets of less than $10,000.  There are likely other terms and conditions in the standard license agreement, but I don't have that in front of me.

Q.    Okay.  And is that basis -- is that opinion based on the Shutterstock blog that you're referring to here?

A.    That would be one document, as well as the website, as well as other documents produced. And then, I mean, frankly I'm --

Q.    Your understandings of the Shutterstock --

A.    Yeah.

Q.    -- workings is based on the Shutterstock website.  Is that a fair statement?

A.    Yes.  Yes.

Q.    Okay.

A.    Let me correct that real quick and say that my understanding of the Shutterstock license parameters are based on the Shutterstock website.

Q.    Have you licensed any -- any images off the Shutterstock website before?

A.    I have, actually.

Q.    Okay.

Page 218

CONFIDENTIAL - T. MADDREY - 11/16/2022

A.      But --

Q.      Do you --

A.      -- I don't recall when.  I did realize that I had a Shutterstock login from my time, I think, back in the Eclipse Institute or shortly thereafter, so it would have been early 2010s.  But I have no idea what I licensed.

Q.      So a long time ago.  Is that fair to say?

A.      A long time ago.

Q.      Okay.  But you haven't licensed anything in the last, let's say, ten years?

A.      No, not from Shutterstock.

Q.      Okay.

THE STENOGRAPHER:  I just -- this is the last time I'll speak up.  I just want to make a statement for the record that I've let you guys know a couple of times that I'm -- I just worry that I'm not getting something important.  You guys are kind of -- you're just getting on top of each other both.  You're equally offending.  So I just wanted to caution you and make a statement for the record, and then I'll just be quiet over here.

MS. NGUYEN:  Thank you, Tamara.  I'll try to slow down.  I sometimes forget.  So if you

Page 244

CONFIDENTIAL - T. MADDREY - 11/16/2022

Q.    Okay.

A.    -- this is based on the quote from the deposition above where I'm reiterating the point in my previous report based on the quote that was presented.

Q.    Okay.  And -- and how do you know that the process is not automated or slight, in your words?

A.    By looking at the documents that were produced and the deposition testimony, I'm presuming since I'm citing to it here, that this function includes people involved in the mix.

Q.    And do you know what those people do?

A.    As I sit here, I don't recall specifically what they do based on what documents I reviewed.

Q.    And it says, on Page 14 of your rebuttal report under B1, right in the middle of the first paragraph, it says:  The 200 reviewers are employees of Shutterstock and are given guidelines which they are to holistically apply to the photos in front of them.

Do you see that?

A.    I do.

CONFIDENTIAL - T. MADDREY - 11/16/2022

Q. Okay. How do you know that these 200 reviewers are employees of Shutterstock?

A. Well, it looks as if I cited to the deposition testimony, but I don't have that directly in front of me.

Q. Okay. If you go back to Page 9 of 20, it says: Shimmin states that "Shutterstock has about 200 remote reviewers across all the queues."

A. Sure.

Q. So how do you know that they're employees?

A. Oh, I'm using employees as they're performing a service and getting paid by a company. I'm not using employee as a term of art as compare to contractor of some sort.

Q. I see.

A. I was simply saying they work for Shutterstock.

Q. Okay. So "employee" might be a misnomer?

A. I making an assertion as to their -- their worker classification status. I was simply saying they work for Shutterstock.

Q. Okay. Do you know anything about these reviewers, their -- for instance, do you know their

CONFIDENTIAL - T. MADDREY - 11/16/2022

backgrounds, their skills, their qualifications?

A.    No, I do not.

Q.    How much time do the big three platforms spend on review, if you know?

A.    I do not know.

Q.    Okay.  Let's go to Page 10 of your rebuttal report.  Page 10 of 20.  It says:  That inability to license the work, however, is not equivalent to an inability to find or download the image.

Do you see that?

A.    I do.

Q.    Okay.  Do you -- are you familiar with the term "edge caching"?

A.    No.

Q.    Do you know what "deindexing" means?

A.    No.

Q.    Okay.  Do you know whether a search for an image not for sale or licensed on the Shutterstock website is possible?

A.    I don't know.

Q.    Okay.  You then go on to say: Unfortunately, it is a reality that affiliates and the public can access images large enough to fulfill

CONFIDENTIAL - T. MADDREY - 11/16/2022

Q.    Okay.   You mentioned that you put up some videos on YouTube, right, for guidance?

A.    Videos on the ASMP site.

Q.    Okay.   Do you put up any image -- or any videos on YouTube at all?

A.    Yes, we put videos on YouTube.

Q.    Okay.   Do you know if YouTube gets any revenues from those posts?

A.    We -- our account is not a monetized account.   We don't get revenues.   I presume YouTube does get revenue, yeah.

Q.    Okay.   Do you know if YouTube is protected by the safe harbor provisions of the DMCA?

A.    I believe that if YouTube is compliant with its requirements, it would be protected.

Q.    Okay.   Let's go to Page 11 of your rebuttal report.

A.    Okay.

Q.    It says in the middle paragraph:  If a photographer takes the time to, one, find the infringing image in the sea of images on the internet; two, takes the time to draft a statute-complying notice; and, three, submits it following the procedures outlined by the platform in

CONFIDENTIAL - T. MADDREY - 11/16/2022

the law, it should be the case that the laborious process would give a presumption of validity and the account should be terminated subject to reinstatement.

Do you see that?

A.    I do.

Q.    What is a, quote/unquote, statute-compliant notice?

A.    The DMCA has specific provisions for the takedown notices that a -- a copyright holder can supply, and those notices need to be compliant with a statute and the provisions of the statute.

Q.    In order to be a valid DMCA notice.  Is that right?

A.    Yes.

Q.    Okay.  And why do you call this process laborious?

A.    Because it is an almost unwinnable game of Whack a Mole for a photographer to try to find all the places that they have been infringed.  And many photographers find that they spend more of their time in a week sending takedown notices than they do actually doing photography work, and it's been described to me as laborious on more than one

CONFIDENTIAL - T. MADDREY - 11/16/2022

occasion, including coincidentally today.

Q.    Okay.  And the DMCA, though, requires you to identify the particular image and URL in order to be compliant with the DMCA notice.  Is that right?

A.    I don't have the specific provisions in front of me, but I believe so, yes.

Q.    Okay.  Do you know whether Dr. McGucken sent DMCA notices to Shutterstock that are DMCA compliant?

A.    I do not know.

Q.    Do you know if he sent -- if -- any DMCA notices at all for any of the images in this action?

A.    I do not --

Q.    Okay.

A.    -- know.

MR. BURROUGHS:  Before you go on to the next topic, can we take a quick five-minute break?

MS. NGUYEN:  Sure.  Actually, now would be good -- would be a good place to stop for a five-minute break.

THE VIDEOGRAPHER:  Off video at 5:47 p.m.

(Break.)

Page 284

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELLIOT MCGUCKEN, AN        §
INDIVIDUAL,               §
                         §   NO. 1:22-CV-00905-GHW
    PLAINTIFF,           §
                         §
VS.                      §
                         §
SHUTTERSTOCK, INC., A     §
DELAWARE CORPORATION;     §
AND DOES 1-10,           §
                         §
    DEFENDANTS.          §

REPORTER'S CERTIFICATION
DEPOSITION OF THOMAS BLAKE MADDREY
TAKEN NOVEMBER 16, 2022

I, TAMARA CHAPMAN, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, THOMAS BLAKE MADDREY, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to ELAINE NGUYEN;

That a copy of this certificate was served on all parties and/or the witness shown herein on December 1, 2022.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

was requested by the deponent or a party before

Page 285

the completion of the deposition and that the

signature is to be returned within 30 days from date

of receipt of the transcript.  If returned, the

attached Changes and Signature Page contains any

changes and the reasons therefor;

was not requested by the deponent or a party

before the completion of the deposition.

I further certify that I am neither counsel for,

related to, nor employed by any of the parties in

the action in which this proceeding was taken, and

further that I am not financially or otherwise

interested in the outcome of the action.

Certified to by me this 1st day of December, 2022.

_Tamara Chapman_

Tamara Chapman, CSR, RPR-CRR
CSR NO. 7248; Expiration Date: 12-31-22
TSG Reporting, Inc.
Firm Registration No. 615
Nationwide - Worldwide
Phone: (877) 702-9580
info@tsgreporting.com
www.tsgreporting.com