# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELLIOT MCGUCKEN, <br><br> Plaintiff, <br><br> v. <br><br> SHUTTERSTOCK, INC., a Delaware corporation, and DOES 1-10, <br><br> Defendants. | CASE NO. 1:22-CV-00905-GHW |

## REBUTTAL REPORT OF STEVE HECK

**I.    Background**

1.      I submit this report to address certain material in the October 4, 2022 report of attorney Thomas Maddrey (the "Maddrey Report").

2.      My qualifications and compensation are detailed in my report of October 4, 2022. In addition to what I referenced before, and pertinent to the testimony below, I led the technical team that implemented the subscription functionality on iStockphoto, and as a result was in countless executive meetings where we discussed and decided on pricing strategy.

3.      In addition to reviewing the Maddrey Report and exhibits, I have reviewed the following additional new materials beyond those reviewed for my initial report:

- Documents Bates-numbered MCG000753-754; MCG000756-761; MCG001312-1316; MCG002363-2481; MCG003379-80; STK001139; STK001382-1395; and STK006491-6502;

- Deposition Transcript of Elliot McGucken ("McGucken Depo. Tr."), pp. 243-285; and

- Various additional pages from gettyimages.com and asmp.org, as well as specific

EXHIBIT

3

URLs cited below.

## II.     Summary of Observations and Opinions

4.      While Mr. Maddrey is a lawyer, I am not. Therefore, I will not opine on the many legal conclusions asserted in the Maddrey Report. However, as to certain points about the industry, I believe that many of the conclusions he draws are unfounded. First, the assessment of "damages" is premised on apples-to-oranges comparisons, fundamental flaws, and disregard of both the types of licenses issued and the way licensing works in the stock marketplace. If Shutterstock is found to be liable for its unknowing licensing to third parties (rather than the liability lying with the licensees themselves), then the "damages" are at most, the price paid for the licenses here, which is a total of $2,131.60. Second, it does not appear that Mr. Maddrey is aware of how stock platform technology and process works. His views regarding reviews and the operation of APIs, for example, are incorrect.

## III.    Maddrey's Assessment of Pricing, on Which He Bases his Damages Conclusion, is Fundamentally and Deeply Flawed

5.      The Maddrey Report's overall assessment of pricing and value (pp. 17-20) is very flawed, including that it relies heavily on "apples to oranges" comparisons between the types of photographs and uses at issue here, and the types of photographs and uses covered by Getty Images' licenses. Having worked at Getty Images for many years, including on licensing, I know the key aspects of their licensing models intimately, but even someone familiar with the licensing industry should understand the difference between pricing for landscapes accessible to millions of people who may have a decent camera and some editing tools, and a hours-old shot of a Super Bowl-winning touchdown, or the arrival of an Emmy winner at an exclusive after-party.

6.      First, the Maddrey Report's analogies fail completely because Dr. McGucken's

2

images are not "editorial" images. Rather, I would characterize them as nature photography, which would fall into the Getty Images creative library.  In the industry, "editorial" images are images of current events and broadly fall into categories of news, sports, entertainment or archive (historical events). Images of the war in Ukraine, the MLB playoffs, the 60th New York film festival, the Oscars® after-parties, and images from key events in Black history would be examples of editorial events and related images. Generally, editorial images are valuable in documenting a particular moment in time. An excerpt from a preview from Getty Images' Editorial page is shown here:



7.      I believe that Mr. Maddrey is conflating "editorial use" and "editorial content". The former describes the very particular use cases in which an image marked as "editorial use only" may be used. The industry standard definition allows for image use in news articles, archives, publications, documentaries, non-fiction books, and public service content. All

commercial uses such as advertising or promotion are strictly prohibited.[1] "Editorial Content," on the other hand, is an industry-standard categorization term describing the nature of the content within the image. Generally, images are categorized either Editorial or Creative in order to provide an easy way for platform customers to find the right type of imagery quickly. This is why "Editorial" and "Creative" show up in the top-level navigation on the major platform web sites and applications (see screenshots above and below).



An image-buying customer is usually looking for a specific type of content for a project. For example, if a designer is looking for a stock image of a model-released man kicking a soccer ball for a sporting goods advertisement, she goes to Creative. If she is a publisher looking for a photo of Ronaldo scoring a goal at a Manchester United game, she goes to Editorial. As stated earlier, nature or landscape images almost always end up in the Creative category (also referred to as "collection") rather than Editorial which as noted above predominately contains images of current events like NFL games, Television Awards shows, Ukrainian war photos, etc.

8.      The Maddrey report also confuses Getty Images content with iStockphoto content. As to the damages assertions that relate to Getty RF licenses, it is important to understand the difference between GettyImages.com and iStockphoto.com, and the Maddrey

---

[1] From my lay understanding based on my familiarity with the distinction that image platforms make, this content usually implicates concerns about potential legal claims where commerciality makes a difference, such as right of publicity/right of privacy (use of people's likenesses for commercial purposes) or trademark law (use of brands in a way that might suggest endorsement rather than in a descriptive/commentary way). "Editorial" use – the classic example being news and commentary use – does not carry the same concerns as I understand it, and images containing people's likenesses without model releases, for example, are available for editorial (but not commercial) licensing on these platforms.

Report fails to notice this distinction. Although both are owned by the parent company Getty Images, iStockphoto – which allows for contributors in the general public to submit – is considered the lower-end brand as witnessed by the dramatically lower price points for the same types of licenses. The major difference between the two (other than price) is the higher image quality and professional curation of the images on the Getty Images site. Of course, this is somewhat subjective, but Getty has built a reputation for quality and employs very senior Creative professionals to curate this collection, ensuring that it content there is modern, fresh, relevant and of the highest aesthetic quality. This is a stark contrast to the iStock/Shutterstock method, where anyone can submit images that meet bare minimum requirements with a 10-20-second review by a contract worker.

9.      There is no indication that McGucken's work would be invited or accepted to even be on Getty Images' site. At times in the past, Getty has mined Flickr's site for potential new photographers to include in their higher end collections, but there is no indication that this has happened here, or that any other agency has represented McGucken or even approached him to do so.

10.     Another major difference is the inclusion of Editorial content which does not appear on iStockphoto. Including Editorial on Getty Images allows them to offer a customer a very flexible "ultra pack" which can be used to license and download an Editorial image, high-quality Creative image, or Video asset with a single transaction. Ultra packs are essentially subscriptions for 1 to 5 assets that cut across all types of media. As you would suspect, a 1-pack is more expensive per asset than a 5-pack.

11.     There is also the added dimension of asset size in ultra pack pricing. In Mr. Maddrey's damages claims, he assumes three things incorrectly. Firstly, as noted above, that

5

McGucken's images would have been accepted to the Getty Images site at all. There is no proof that this would be the case. Secondarily, if they were accepted, they would have been placed into the wrong collection; in reality, they would have been added to the Creative collection, NOT the Editorial collection. Thirdly, if they were placed in Creative and licensed under the "ultra pack" model, they would have always garnered the highest possible license price of $499 dollars which represents "large images" option. However, as shown below, there are several less-expensive options if the project needs do not require highest resolution images or a prospective licensee wants to buy multiple images at a time:

So, even if McGucken's images were accepted, they never would have generated the highest price every time and likely would have leaned towards the lowest price given that most of the uses we know about were for digital blog or web site use. It is not normal consumer behavior to knowingly overpay for something the consumer would not ultimately use. For instance, I will rent the less expensive "SD" version of a movie versus a more expensive HD version if I plan on watching it on my phone on a plane. As another example, someone who wants a personal license for software would never pay a corporate rate. This is why various price tiers exist: to help allow

6

those who just need an image for a blog post will not be priced out of the market because the price is too high, or a creator leaves money on the table because a use that could command a $499 price because of the quality and size ends up selling for too little.

12.   When one drills down further into the pricing for even brilliant landscapes, for example, it is clear that Mr. Maddrey's examples are apples-to-oranges.  The $499 price he claims applies to the Standard Licenses in this case (the very vast majority of the uses here, i.e., 875 of the 938 downloads) applies to a-la-carte uses of *large* images as shown here:



The use shown here for $499 (before discounts) covers uses that can be expanded to a large size of over 20 by 13 inches, much larger than the types of digital uses made in nearly all of the instances here. STK001382-1395. When the user clicks on "extra small," however, the story is different, as shown below:



13.     This "extra small" size allows for use up to 7 by 4.7 inches, certainly as large as anyone might need for a use on a standard website. Even on the higher-quality Getty Images site, the price is only $50 for a RF license. Therefore, Mr. Maddrey's comparison does not reflect

anything close to how pricing works in the industry. Even just the above shows that the suggestion that anyone would pay $499 for a digital use of an image like those used in this case is wrong (as is the $15,000 quote, which reflects a buy-out (discussed below) or very large-scale fine-art use, if that). In this context, McGucken's actual two-figure pricing (for example, $12.50 per image) is more closely aligned with the how the market works. MCG002363-2481.

14.    Contrary to Mr. Maddrey's assertion, editorial images generally garner a higher average price per image than the vast majority of creative stock images that are licensed under the RF model, because many images that one thinks of as "Editorial" require access and permission to cover events. This access can represent a significant expense to the platform and can take the form of multi-year deals with sports leagues (the NFL, Premiere League, MLB), publishing companies (Conde Nast), and events operators (e.g., the Tony, Grammy, and Oscar Awards), which deals cost millions of dollars in revenue share or cash outlay. In addition, Getty Images employs its own staff photographers to cover these events, incurring significant travel, equipment, and editing expense in addition to photographer salaries. These editorial images also have a much shorter lifespan than creative images. As an image ages, it is far less likely to be licensed. For example, this year's MLB playoff images may be very popular in October 2022, but nobody will be licensing or even looking at them come Christmas.  All of these factors require that companies like Getty Images must command a higher price for editorial images.

15.    The McGucken images that were licensed through the Shutterstock platform were largely nature photographs of locations that did not require special access, permission, or multi-year contracts with corporate entities. They also have longer licensing lifespans, as images of famous cliff faces change at a geological pace, unlike sporting events that change by the minute.

16.    The Maddrey Report also confuses general industry pricing models. As discussed

in my prior report, RF (royalty-free) is now the industry standard. The rights-managed model that McGucken describes is largely nonexistent in the industry because of lack of customer demand and drastically reduced revenues under that model. The industry operates under the RF model with very few (only a handful) of exceptions in which buyouts (in other words, where the image is never to be sold or licensed again) are required.  Further, I cannot believe that Dr. McGucken could sell 325 exclusive rights-managed licenses given that he has evidently sold only one, and platforms who reach hundreds of thousands of image buyers likely do not sell 325 rights-managed licenses in a year.[2] Also, the fact that McGucken makes his images freely available on Flickr would make it difficult to issue a legitimate "exclusive" license.

17.     Any claimed injury relating to exclusivity also does not exist. None of the licenses that Shutterstock granted were exclusive. Accordingly, there is zero cost to the photographer as it pertains to future non-exclusive licensing opportunities, such as the Getty Editorial RF license as described in the report. In other words, Dr. McGucken could still attempt to submit the images in question to Getty Images for consideration of inclusion in their collection for future licensing opportunities. That said, I believe it would be highly unlikely that Getty Images would include them in their editorial collection because they are not editorial content, as explained above.

18.     The Maddrey Report also appears to calculate profits for the platform based on a full subscription that may include hundreds of images having nothing to do with McGucken. However, subscriptions do not include a single image: Shutterstock offers 10 images for $49, and $199 subscriptions that allow up to 750 images.[3] This pricing reflects the marketplace that I

---

[2] This change has been reported publicly as well.  See https://www.stockphotosecrets.com/news/getty-images-drops-rm.html.

[3] In this case, 322 downloads were on 750 images/month subscriptions; 144 were on 350 images/month subscriptions; 57 downloads were on 50 images/month subscriptions; and 80 were on 10 images/month subscriptions. Only two were on plans were the customer purchased one image. STK001139.

described in my prior report. In fact, if one wants to know the market value of the licenses, we have that market value from the fact that despite the volume of images and the relatively low price, the images were licensed for an aggregate of $2,131.60. This *is* the market price, and considering the competitors in the market and the transaction costs saved by the subscription, there is no reason to believe that Dr. McGucken would have been able to garner a larger price. Instead, it seems that the $12.50 per image referenced on p. 18 of the Maddrey Report is more accurate than what Mr. Maddrey speculates Dr. McGucken could get for the uses at issue here.

19.     Further, contrary to the Maddrey Report's conclusions, there is no indication that McGucken's images were the impetus for a customer to purchase a subscription. First of all, his 325 images among a search of a 450-million image library represents an infinitesimally small percentage of the library that the customer has access to via a subscription. Secondarily there is no proof that his images were the first image downloaded on the subscription, or that more than one or two images from McGucken were downloaded under a given subscription, either of which might possibly be an indication that one of his images was the impetus for subscribing. If Maddrey could cite any instances where the first image in a subscription was a McGucken image, I could look more closely into this aspect, but based on what is provided in the report, I can only conclude that this is speculation designed to inflate the price in yet one more way. Because of all of the obvious flaws in his pricing analysis, and without any evidence identified, I cannot put any credence in the conclusion. Nor have I ever heard of a situation where someone bought a package of hundreds of images because a particular photographer or specific photograph was on an RF stock site. Finally, I understand from reviewing portions of his deposition transcript that McGucken makes roughly half a million of his images available on the very popular site Flickr, as well as on his own sites, but he earns only a few hundred dollars per

11

year from arms-length licensing. McGucken Depo. Tr. 243:6-285:13. This suggests to me that his images do not and would not drive subscriptions that can cost as much annually for a single customer as McGucken earns from all his licensing in a year.

20.      It is worth noting that it is unclear what Mr. Maddrey is referring to regarding licenses for images that are "no larger than 200 pixels on the longest side" (p. 8). If there is any market for such image uses at all, it is certainly not common in the stock industry. 200 pixels (or around 2.5 inches) is quite small and would severely limit how the image could be used, and therefore dramatically diminish its value. As noted above, Getty Images characterizes seven inches (2100 px) on the longest side to be "Extra Small." 200 px is what might be used for a "thumbnail," which I have never heard of carrying any kind of measurable price or licensing value. Thumbnails are normally used solely for demonstration purposes, such as how TinEye keeps thumbnails in its archives to show what a photograph online looked like.

21.      Then there are McGucken's "quality" arguments. As noted in my prior report, there is nothing particularly unique about his images, including as it relates to price/valuation. Therefore, the conclusions regarding the Epson "Pano Awards" (p. 9) are irrelevant. To start, it does not appear that Dr. McGucken has ever won the grand prize in this or any other of the many, many creative photography contests open to professionals and/or amateurs.[4] What is relevant to value is his actual demand and sales records. His deposition testimony indicates that the market demand for his images is quite small considering that he routinely gives images away,

---

[4] These competitions include the Sony World Photography Awards and the International Photography Awards, generally considered to be the world's leading photography competitions, and hundreds of others, including the World Press Photo Awards, the Pulitzer Prize, the American Photography Open, Arnold Newman Prize, Communications Arts, the Taylor Wessing, the Deutsche Borse, Tokyo International Foto Award, Smithsonian Magazine Photo Contest, Natural History Museum Wildlife Photographer of the Year, Fine Art Photography Awards, Prix Virginia International Photography Prize for Women, Istanbul Photo Awards, Prix Elysée, ZEISS Photography Award, Monochrome Awards, and literally hundreds of others. Notably, in a search of the website of Mr. Maddrey's employer, ASMP (asmp.org), I did not find the Epson International Pano Awards discussed at all (or even mentioned except in one link), while other contests are.

and for digital uses (which make up the vast majority of the uses in this lawsuit), his pricing is in the two digits per image. And even despite these low prices and his extensive advertising of his images on Flickr and his own websites, he has hardly any licenses.  McGucken Depo. Tr. 243:6-285:13. Where he has sold images for higher prices, they involve very large, complicated-to-process "fine art" prints that may be several feet long. For digital uses of landscape photographs, stock and non-stock photographs compete with each other.

22.     In addition, even if he was a very famous photographer or one of the most technically proficient in the world, this has little relevance to commercial success in photography, especially in terms of selling on stock platforms. The vast majority of customers of these platforms have no knowledge of the photographer nor do they particularly care who took the shot. Images are licensed for projects with varying needs for content composition and style. Very rarely, if ever, does a customer license an image because it was taken by a particular photographer. Rather, they license it because the image meets the needs of their project.

23.     I also understand that Dr. McGucken has sued several Shutterstock licensees. The Maddrey Report fails to apportion responsibility for the total that each of Shutterstock and the licensee is supposed to be responsible for. However, it is my view that the price under the license reflects the market value, and that there is no reason to believe that the licensee is sublicensing any of the images to others. Rather, they are paying a single price for the ultimate use, of which Shutterstock retains a portion and remits the rest to the artist.

## IV.     Maddrey's Technological Assessments Are Impossible to Reconcile with Fact

24.     The Maddrey Report draws numerous conclusions about how online photography platforms work. Many of his conclusions have no support, and in many cases, they demonstrate a remarkable misunderstanding of how technology works.

25.     First, the Maddrey Report claims that Shutterstock employees review images and

in doing so "make[] an explicit connection between the quality of its collection and the revenue generation that flows from their images[.]" (See p. 9.) This is not supported by Shutterstock's review guidelines nor is it how any other major platform operates. As I explained previously in my report, the review process is very brief by virtue of the scale at which they operate. These reviewers, who are often contractors of the platform, must review thousands of images every day, so the notion that they are carefully scrutinizing and categorizing images is incorrect. The review process generally is very brief – no more than 10-20 second per image – as there is simply no time to do an in-depth analysis of the subjective quality of an image. Rather, the major platforms are simply looking for technical competency (for example, is it in focus, well-exposed, etc.) and standards compliance (hate speech, pornographic or discriminatory material, the appearance of third-party copyrights or trademarks, use of faces without model releases, etc.). Nobody is making a subjective judgment of creative quality, nor do any decisions made affect the price at which the image will be sold.  As the Maddrey Report basically ends up insisting by showing examples of flat pricing, the prices are based on size and category, and generally run on general subscriptions, not a la carte or in any other manner where prices are set or fluctuate on a per-image basis.

26.     The Maddrey Report also refers to "steps and processes" issued by ASMP (at p. 6), an organization with which I was previously unfamiliar but which appears to be primarily an advocacy group for photographers' legal rights. ASMP appears to have around 4000 members comprised primarily of commercial photographers, as compared to Professional Photographers of America, which has around 34,000, for example. Whatever the guidelines are, and while they may be good advice for photographers on how to deal with infringement issues, they are not controlling in the stock industry and have no bearing on how potential infringement cases are

handled by the individual stock platforms. Also, I understand that while Dr. McGucken was aware of various of his claimed images on the Shutterstock platform since at least 2018, he sent a DMCA takedown notice as to only one image. As a result, he acted inconsistently with these "steps and processes" in 99.6% of instances of alleged image use in this case.

27.     Finally, the description of the API (p. 12) is just impossible to reconcile with fundamental standards of technology. It is a mischaracterization to say that "unlimited copies" of images can be made through Shutterstock's API. As I discussed in my prior report (at ¶¶ 24-26, 34), any access to an non-watermarked, high-resolution image requires that a license has been issued through the API partner and that license is recorded in the Shutterstock system, which is what will send the licensed image to the customer. In other words, the image is not supplied "outside of Shutterstock" and the API users do not have access or display the collection; at best, they may retain valueless, non-saleable thumbnails on non-public-facing URLs for operability purposes (for example, to avoid the lag of an entity that operates where Shutterstock does not (such as China, where HelloRF/ZCool operate)[5] from that entity pulling data from halfway around the world relating to millions of images just to turn up results of a prospective customer's preliminary search). (See p. 13 of Maddrey Report.)  The user searching via an API is not seeing anything different than what they would see by searching Shutterstock's site because the API is a means of talking to that site; it is not a reproduction of that site.  This is one reason why, when Shutterstock removes an image from its platform, a person searching the API user's site should not be able to locate that image via the API user's site either.

28.     With respect to watermarks, I will refer back to my opinions made at Paragraphs 15, 18, and 36 of my initial report. The comments regarding whether this is alternating

---

[5] See hellorf.com and zcool.com.cn.

"copyright management information" appears to me to be a legal conclusion, but including as noted in my prior report, most photographers take steps to prevent easy downloading (unlike what Dr. McGucken does in setting his hundreds of thousands of images on Flickr/SmugMug to be downloadable in a variety of resolutions), and they also are aware that platforms separate certain non-visible metadata for a variety of legitimate reasons.

29.     My analysis is ongoing, my opinions may change, and this report may be updated if new facts become known. In addition, I may be asked to review, evaluate, and comment on additional options or conclusions that may be offered by Dr. McGucken or Mr. Maddrey at a future date.

Dated: October 18, 2022

Steve Heck

16