# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **ELLIOT MCGUCKEN,** an individual | ) | **Case No. 1:22-CV-00905-GHW** |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **SHUTTERSTOCK, INC.,** | ) | **EXPERT REPORT OF** |
| a Delaware corporation, and | ) | **THOMAS MADDREY IN REBUTTAL** |
| | ) | **TO DEFENDANT SHUTTERSTOCK** |
| **DOES 1-500,** | ) | **INC.'S EXPERT STEVE HECK and** |
| | ) | **SUPPLEMENTAL EXPERT REPORT** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | **SUBMITTED OCTOBER 18, 2022** |

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 2 of 20

## INTRODUCTION

I have been engaged by Plaintiff Elliot McGucken ("Plaintiff") to provide expert testimony in the above-captioned matter brought by Plaintiff against Defendants Shutterstock, Inc., *et. al.* (collectively, "Shutterstock", or "Defendants"). Plaintiff has asked me to opine on issues related to the photographic industry, professional photographic licensing, copyright infringement, image valuation, and industry standards related to the same.

The opinions below are based on my experience as a commercial, editorial, and fine art photographer, as an attorney specializing in copyright law, in my role as General Counsel & Head of National Content and Education for the American Society of Media Photographers, and as a frequent author, speaker, and presenter on matters relating to professional photography, licensing, and copyright matters.

I have been provided a copy of the Expert Report of Steve Heck[1], retained expert for Defendant Shutterstock, Inc. I have reviewed the opinions therein and respectfully submit this Rebuttal Report to the Expert Report of Steve Heck.

Additionally, since the submission of my Initial Expert Report in this matter on October 4, 2022, I have been provided with the transcript of Shutterstock Inc's corporate representative in this matter, Heather Shimmin.[2] I also received six sets of further document production by Shutterstock. I further submit this Supplemental Expert Report in this matter to fully incorporate opinions related to her testimony and these additional materials.

Subject to the above, if I were to be called upon as a witness in this case, I would, based on my qualifications and experience, make the following statements:

## I.      MATERIALS CONSIDERED

In preparing this Expert Report (the "Report"), I have evaluated and base the opinions herein on the materials and documents listed in **Appendix 1**.

---

[1] The Expert Report of Steve Heck is attached to this report as **Appendix 2**.
[2] The 30(b)(6) deposition of Heather Shimmin took place on September 20, 2022.

## II.    DISCUSSION AND OPINIONS

My report today will be split into two primary sections: II.A. will be my Rebuttal Report to the Expert Report of Steve Heck, and II.B. will be my Supplemental Expert Report in this matter incorporating the new information present in the deposition testimony of Heather Shimmin and other newly produced documents.

### A.   Rebuttal Report to the Expert Report of Steve Heck

Defendant Shutterstock Inc.'s expert Steve Heck has an experience in "digital photography platforms", having worked for Getty Images for 22 years.[3] In this matter, he was asked to opine on "the industry category of large-scale, online image licensing platforms, as well as aspects pertaining to it, such as general processes pertaining to the contributor onboarding process, content and metadata processing and management, interactions with third parties through affiliate relationships and application programming interfaces (APIs), handling of unauthorized uses that may come to the platform's attention, and general pricing of content in the stock photography industry."[4]

In summary, Heck provided the following opinions[5]:

(i)    Shutterstock's processes and procedures pertaining to the onboarding of contributors, handling and processing of files (including watermarking) and metadata, content review and policing, and processes pertaining to copyright claims – including in as it pertains to McGucken's claimed images that were uploaded to Shutterstock's contributor platform – are technologically justified and consistent with the practices of its major competitors;

(ii)   McGucken's suggestions that the presence of metadata or the appearance of images themselves places Shutterstock on notice of infringement, are unsupported assertions that are misaligned with the increasing volume of material that legitimate artists supply to platforms, technological and legal requirements (such as protection against disclosure of personal identifying information or the transmission of hidden malware), and the complicated nature of copyright ownership and licensing;

---

[3] Heck Expert Rpt. at 1.
[4] *Id.* at 2.
[5] *Id.* at 2-3.

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 4 of 20

(iii)    Shutterstock's API and affiliate relationships do not result in the transmission of full-sized, unwatermarked images to them, and platforms do not control what an API user or affiliate may do with thumbnails or other small demonstration copies; and,

(iv)    Shutterstock's licensing structure is simple and hands-off, and its pricing is competitive with its competitors' prices.

I will address each opinion, as well as additional material in the report, in turn.

*(1)   Background of the Online Stock Photography Industry.*

In his report, Heck begins by outlining the current state of the "stock photography" industry online.[6] He notes, "There are three major players (platforms) in the stock photography industry: Getty Images (iStockPhoto), Shutterstock and Adobe Stock. There are many smaller competitors in the space, but the 'big 3' account for the vast majority of market share."[7] Heck is correct in his assertion but excludes an additional primary source of stock photography licenses, the individual photographers themselves.

When a photographer is commissioned by a client to take a photograph, we generally refer to that as "assignment" photography, or photography that is created at the request of a third-party for the purposes of that third-party. This is in contrast with "stock" photography which is a term used in the industry as pre-existing imagery that is then sold on the open market to users to incorporate in their projects as needed.

Heck correctly identifies the "big 3" online stock providers but fails to account for the significant number of photographers, like McGucken, who license their pre-existing work directly. Further, these two routes are not mutually exclusive. Many photographers can, and do, license their work directly, as well as through online companies such as Shutterstock. Importantly, however, many do not. Based on my conversations with McGucken, he does not, and has not sold his work on platforms like Shutterstock, iStock, or Adobe Stock.[8] This is intentional.

McGucken, like many photographers, views these "micro-stock" platforms (that is, a platform that sells royalty free images for minimal prices, but in large volume) as outlets which devalue and commoditize the images they represent. Heck acknowledges this himself by noting: "As

---

[6] *Id.* at 3.
[7] *Id.*
[8] Interview with Elliot McGucken, September 26, 2022.

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 5 of 20

discussed more fully below, this commoditization has precipitated a substantial decline in licensing value of images. While the lower pricing makes licensing more attractive than taking photographs off the internet for free, it has reduced the market equilibrium for images – particularly images of commonly photographed subjects, such as landscapes in commonly visited national parks in the western United States, which appear to be the focus of McGucken's imagery at issue in this lawsuit."[9] It is for precisely this reason that photographers like McGucken choose not to place their work on such sites. Photographers can exert control and influence over who they sell their works to and for what purpose.

(2)  *The Onboarding (Ingestion) Process.*

Heck next examines three aspects of Shutterstock's processes and procedures: the onboarding process, the content and metadata handling procedure, and the image review procedure. With respect to the contributor onboarding process, Heck notes that platforms like Shutterstock have a series of both manual and automated "checks" throughout the ingestion process.[10] These, initially, include the contributor creating an account, providing contact information and tax information for payment, and uploading the work to the platform.[11] It is here that the contributor's behavior ends, and Shutterstock's behavior begins. As Heck notes, "Once the user submits an image that passes the platform's compliance and standards tests, their account becomes active…"[12]

Once the contributor has an active account, they can upload photographs at will. Each photograph, however, must pass Shutterstock's standards and each is reviewed by a Shutterstock employee.[13] Heck next notes what happens to the images that are uploaded. First, he notes that a "original image file is archived."[14] This original image file is what he refers to as a "full-resolution" image. This is just the first of many copies that are made, however. Heck further notes that a working "'master copy' of a standard size is made."[15] Additionally, "many copies of the image will be automatically generated by the system from this master copy…"[16] This reproduction of the image

---

[9] Heck Expert Rpt. at 5-6.
[10] *Id.* at 6.
[11] *Id.*
[12] *Id.*
[13] *Id.*; Deposition of Heather Shimmin 67:22-24.
[14] Heck Expert Rpt. at 7.
[15] *Id.*
[16] *Id.*

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 6 of 20

would commonly be evaluated by photographers to be an unauthorized reproduction of their work and would strike them as infringement.

>    *(3)  Metadata and Watermarks.*

Heck further notes that "any embedded metadata" is "extracted" from the image and stored in a database record "that is forever associated with that unique image."[17] Metadata, as Heck explains, consists of information that is in certain fields that are associated with a particular image. Traditionally, photographers are taught to include their contact information and copyright notice in the metadata, hopefully allowing those who view their work to contact them for direct licensing opportunities. Shutterstock deprives these photographers from having that protection. Heck contends that this removal of identifying information is a "best practice" and protects both "uploaders and downstream consumers" of the images.[18] McGucken, like many photographers, is alarmed by this removal.[19] He took care to ensure that his images had appropriate metadata included to protect his livelihood.[20]

Further, Heck notes a process that is more than just stripping metadata that the photographer has included, but also recounts injecting metadata the platform wishes to incorporate when a sale is made: "Only once a license is sold is the copy delivered to the customer generated and injected with metadata that is specific to the contributor and transaction such as contributor name (on record), the license details, etc."[21]

Heck notes that McGucken asks that Shutterstock and all platforms examine the metadata of submitted images to help determine copyright status and ownership. To this, Heck states that:

>    "this is an impossible and ultimately fruitless task given that no platform can be familiar with the individual portfolios of hundreds of thousands of contributors, the relationships between them and third parties (such as agents who are authorized by the creators to upload and submit works to various platforms, like Wirestock), potential d/b/a's or other names that a contributor might want to use, and the fact that metadata is highly subject to

---

[17] *Id.*
[18] *Id.*
[19] Interview with Elliot McGucken, September 26, 2022.
[20] *Id.*
[21] Heck Expert Rpt. at 8.

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 7 of 20

manipulation. Combined with the risks noted above of keeping metadata attached to an image, what McGucken proposes is simply unfeasible."[22]

As one of the "big 3" online stock platforms, Shutterstock has both the ability and responsibility to ensure that the images it is reproducing, displaying, selling licenses to, and deriving profits from are, in fact, from the creators of those images, and not be complicit in infringement. While all of McGucken's proposals Heck mentions may not be simultaneously possible, examining metadata for evidence that the creator is not the contributor should be part of the training that Shutterstock image reviewers undergo. In fact, Shutterstock corporate representative Heather Shimmin disagrees with Heck when she stated, "[the image reviewer] does look at the title and keywords, because sometimes the title might say, 'Photo by Heather Shimmin,' when it was somebody else," and this mismatch in the title would be grounds for further investigation as to ownership.[23]

Importantly, Shutterstock is not utilizing the systems, processes, and platforms of others, rather, it is the architect of its own systems; it alone can control what is stripped or added, included or excluded. As Shimmin notes: "I mean the system, it's the backend. It's a very complicated -- and I'm not an engineer, but there are many many things that the photo has to go through in order for it to be published on the site to be licensed. When I say, 'Shutterstock's system,' it's a complicated backend that I don't know all the ins and outs of."[24]

Heck says, "[i]t is important to note that there is a drastic difference in value between the various sizes of image copies."[25] He further notes that "[i]n general, the larger the image, the more value it has because it can be utilized in more scenarios."[26] As a result, platforms such as Shutterstock place a watermark on the image. He notes:

> "In general, any image above 1000 px receives a watermark (a visual overlay), normally
> identifying the location where the image was available (for example, "Getty Images,"
> "Alamy," "Shutterstock," "iStock"), which renders the image as unusable for any kind of

---

[22] *Id.* at 10.
[23] Shimmin Dep. 240:16-19.
[24] Shimmin Dep. 59:17-25.
[25] Heck Expert Rpt. at 8.
[26] *Id.*

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 8 of 20

legitimate use. Salable size assets are simply not available anywhere until a valid license has been obtained, tied to a customer, and then recorded."[27]

This view of the effectiveness of watermarks for preventing theft and infringement is antiquated at best. A simple search for "watermark removal" at Google.com will result in 101,000,000 resulting webpages teaching you the best technique or providing you a tool to remove any watermark for you.[28] For example, you can visit www.watermarkremover.io which touts itself as "an AI-powered tool that automatically removes translucent watermarks from images in a matter of seconds."[29] For at least twenty years, professional photographers have not viewed watermarks to be a security feature, rather, they exist primarily as a marketing tool showing, at a glance, the "owner" of a work.

Most importantly, the number one professional photo editing software suite, Adobe Photoshop, released a new tool called "content-aware fill" first as part of its CS5 version in 2010, and later with a major update in 2020. This tool uses surrounding pixels in an image to replace those that you select. This is particularly effective on watermarks. For just one (of thousands) example, examine the tutorial "How to Get Rid of Watermarks in Photoshop" published in 2022.[30] This tutorial, like so many out there, are legitimate uses of a tool, and take great pains to impress upon the reader that while it is easy to remove a watermark, you likely would be violating the rights of the creator to do so.

The point remains that if Heck makes an unequivocal statement such as "[s]alable size assets are simply not available anywhere until a valid license has been obtained, tied to a customer, and then recorded,"[31] and as justification says that any image over 1000px receives a watermark, it is simply ignoring the weight of evidence, and modern methods of infringement, that a photographer faces in the current market. In my professional opinion, to the extent that Shutterstock places a watermark on images in its library, it is to further market their brand, not to provide image security.

---

[27] *Id.* at 9.
[28] *See, e.g.*, "Watermark Removal" Google Search, https://www.google.com/search?q=watermark+removal (last visited October 18, 2022).
[29] Home Page. WatermarkRemover.io, https://www.watermarkremover.io (last visited October 18, 2022).
[30] Boldt, Thomas, How to Get Rid of Watermarks In Photoshop, https://www.photoshopbuzz.com/how-to-get-rid-of-watermark/ (last visited October 18, 2022).
[31] Heck Expert Rpt. at 9.

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 9 of 20

### (4)  *Image Review and Reviewers.*

Heck next discusses the image review process. Throughout his report, Heck minimizes the impact that the reviewer has on the selection of images. He calls it "a very quick review process (a few seconds)"[32] where it is only checked for technical quality, content standards, and model or property releases. We know, however, that this is a simplification of a much more complex process. Shimmin describes the image review process where the reviewer can accept, reject, or escalate an image to a supervisor.[33] The reviewer evaluates the photograph for "quality of the image," such as focus problems or noise, compliance reasons, such as lacking releases, trademark reasons, editorial vs. commercial use reasons, intellectual property reasons, and more.[34] The reviewers are trained, and each of them are employees.[35] Shimmin states that "Shutterstock has about 200 remote reviewers across all the queues."[36] I examine the review process in more detail below in my supplement report after the inclusion of Shimmin's deposition testimony.

The bottom line is that Shutterstock exerts primary, and ultimate, control over the images that are reproduced on its servers, displayed on its website, and distributed to its partners. When asked "is it fair to say that no photograph will appear on Shutterstock unless the Shutterstock reviewer approves it," Shimmin states, "That's true. It has to be approved by a reviewer."[37] The reviewers are performing the task that a photographer's representative (agent) does, or the role that an editor holds. The reviewer examines the images, establishes the quality meets standards, examines the image in detail for compliance, and makes an ultimate decision on whether the image is included in the Shutterstock library. The process is not automated nor slight. Human employees decide who is in the collection, and who is out.

### (5)  *Affiliate Relationships and API's.*

In Section C of his report, Heck describes the "affiliate relationships" that platforms like Shutterstock enter into.[38] As part of an attempt to find more people to display and sell licenses to, platforms will partner with other independent companies who act as sales agents for images in the

---

[32] *Id.* at 10.
[33] Shimmin Dep. 70:7-9.
[34] *Id.* at 50:10-17.
[35] *See, generally, id.* at 67:6-25.
[36] *Id.* at 68:6-7.
[37] *Id.* at 62:6-9; 62:13-14.
[38] Heck Expert Rpt. at 11.

platform's library.[39] These partners are given "controlled access to a platform's image library and search technology via a secure API."[40] Despite this, Heck notes that "[s]ometimes affiliates may actually fulfill the transaction from their site, but the fulfillment of the high-resolution image **always** takes place via the platform's API."[41]

This last point matters as Heck notes that, "… once an image is deactivated by a platform, it is immediately unavailable to license on either the affiliate or platform sites."[42] That inability to license the work, however, is not equivalent to an inability to find or download the image. Heck again relies on the watermark as a preventative measure when he states that "… the high resolution (salable asset) never resides on the affiliate site and can be deactivate (preventing download) at any time by the platform."[43] Unfortunately, it is a reality that affiliates (and the public) can access images large enough to fulfill their purposes in one of the many sizes of copies that the platform automatically generates and distributes. While the rare user who is using stock imagery on a billboard may find it absolutely necessary to have the full-resolution "salable asset," the vast majority of uses for imagery online is perfectly fulfilled by smaller, lower resolution copies. And for these uses, the number and breadth of copies made by platforms provide all that is needed.

### (6) Platform's Responses to Infringing Content.

Heck notes that "[t]he big 3 all rely on the representations of their contributors as to copyright status,"[44] and that, "[p]latforms must rely largely on the contributor to police unauthorized use."[45] This is likely accurate in practice but does not need to be the case. As noted above, platforms can (and do) identify mismatches in titles to escalate possible infringement situations, and, knowing there are bad actors, a platform would better serve its customers, contributors, and those like McGucken by not "rely[ing] largely" on the very contributors who are complicit in the infringing actions.

Heck contends that it is the infringed photographer who should shoulder the burden of knowing, in some fashion, that their work is being infringed: "Platforms are greatly aided by DMCA

---

[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* at 12.
[43] *Id.* at 11-12.
[44] *Id.* at 12.
[45] *Id.* at 13.

notices, as the photographer is in best position to identify unauthorized use."[46] He further notes that when a DMCA notice is received, the platform will generally "only remove or disable images at the locations identified by the DMCA notice."[47] This means, as I understand it, that stating there is an unauthorized image at URL #1, but not knowing or having a way to know that that same image is online at URL #2, #3, and #4, the platform will remove it at URL #1 and leave it up at the others. To resolve this lapse in duty, Heck notes that these other copies (as he terms "edge copies" or "server copies") are "not a substitute for the original and is generally unusable…"[48] again relying on the idea that the only valuable version of an image is the full-resolution original.

As I interpret his report, Heck notes that platforms prioritize <u>not</u> terminating a contributor based solely on a properly formed DMCA notice: "Therefore, terminating a contributor because of just one notice would be unfair and overkill."[49] The photographers who comprise the membership of ASMP and all other professional creators would be shocked to hear this. ASMP promotes the use of DMCA notices as part of the way that a creator can enforce their rights.[50] If a photographer takes the time to: (1) find the infringing image in the sea of images on the internet; (2) takes the time to draft a statute complying notice; and, (3) submits it following the procedures outlined by the platform and the law, it should be the case that that laborious process would give a presumption of validity, and the accounts should be terminated subject to reinstatement. The photographer should not bear the burden of the infringement.

Heck yet follows up by stating that "[t]oday's sophisticated photographer will use services such as Pixsy, or Google Images or TinEye, to search for their images on the internet."[51] Many photographers do use these services, the more advanced of which cost money and time. Yet the vast majority of photographers, even professionals, are not aware of these options. Likewise, Heck states: "In addition, anyone who has read about copyright protection online generally knows to avoid making high-resolution images available online in downloadable format without some protections (such as a visible watermark), occasionally an image is licensed before the photographer finds it."[52]

---

[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.* at 15.
[50] Maddrey, Thomas. <u>The DMCA and Your Business</u>. ASMP ACADEMY, https://www.asmp.org/academy/spotlight-the-dmca-and-your-business/ (last visited October 18, 2022).
[51] Heck Expert Rpt. at 15.
[52] *Id.*

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 12 of 20

This final allusion to a visible watermark adds yet another layer to the responsibilities of the photographer who finds their work infringed.

      *(7) Pricing.*

Heck gives some background on pricing in the stock image marketplace, yet again does not refer even once to the photographer or creator as primary licensor. While stating that the works at issue here are "common subjects such as landscapes and seascapes," Heck compares the work of McGucken with images resulting from a search of the keywords showing hundreds of other images.[53] While in my professional opinion McGucken's work is at a level of quality beyond the examples noted by Heck, it is correct to say that these dozens of alterative "drives down the prices for all of them."[54] It is for this reason, in part, that McGucken reserves the right to license the work himself at his price scale.[55]

Heck next describes the difference between a "rights-managed" model of licensing and a "royalty-free" model such as the one that Shutterstock uses.[56] He calls the rights-managed model "largely-disused" which is only true in the sense that the "big 3" platforms default to a royalty-free model, but even this has exceptions. For example, while you can purchase an image from gettyimages.com for editorial use under a royalty-free model, if you wish to use the work in a commercial setting, Getty will send you to a calculator to create a custom price for the usage sought.[57]

---

[53] *Id.*
[54] *Id.*
[55] Interview with Elliot McGucken, September 26, 2022.
[56] Heck Expert Rpt. at 16.
[57] *See, e.g.,* https://www.gettyimages.com/purchase/price-calculator/488736348 (last visited October 18, 2022).

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 13 of 20



Example of Rights-Managed Licensing Calculator at GettyImages.com

If one of the "big 3" platforms features the rights-managed model as a primary method of sale, I would contend the model is not "largely disused." This is to say nothing of the fact that in most other areas of professional photography, both assignment and specific forms of stock, royalty-free licensing is the rare exception, not the norm. ASMP promotes a rights-managed model of licensing in all but the rarest occasions.[58] As Heck put it himself, "[i]n general, the larger the image, the more value it has because it can be utilized in more scenarios."[59] If a photographer like

---

[58] *See, generally,* American Society of Media Photographers, PROFESSIONAL BUSINESS PRACTICES IN PHOTOGRAPHY (8th Ed. 2008).
[59] Heck Expert Rpt. at 8.

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 14 of 20

McGucken is selling his image for use at a large resolution so that the client can use it in more scenarios, he should be paid more as the value to the client is commensurately greater.

If Heck updates or supplements his expert report, I respectfully reserve the right to respond to the new or added information.

B.  Supplemental Expert Report of Thomas Maddrey.

After my initial report was submitted in this matter, I had the opportunity to review the deposition testimony of Heather Shimmin, corporate representative for Defendant Shutterstock, Inc. Additionally, I was sent for review six additional sets of documents produced by Shutterstock. Below I will discuss my supplemental opinions based on this additional material.

(1)  *Shutterstock's Image Reviewers Play a Critical Role in Determining the Images in Shutterstock's Image Library.*

Shimmin's testimony defined the "walled garden" nature of the Shutterstock image library. When specifically asked if a photo that was rejected by the reviewer would be available on the site, she noted that such an image would not be available for licensing, nor appear on the site.[60] The 200 reviewers are employees of Shutterstock and are given guidelines which they are to holistically apply to the photos in front of them.[61] To aid contributors in creating photographs that adhere to Shutterstock's guidelines, and to assist reviewers, Shutterstock creates and provides documentation to help create images that will, "help contributors produce work that hopefully will make the contributor money, and clients will find it and license it."[62]

Specifically, Shimmin noted "bokeh" and "lens flare" as examples of techniques or features that could in some instances be acceptable, and in others would prove the basis for a rejection.[63] In the professional photographic community, photographer will specifically choose their "aperture" as this is the primary determinate of an image's depth-of-field (that is, the parts of the image around the in-focus areas of the image that are in or out of focus themselves.) By choosing a numerically lower value for an aperture, the depth-of-field is minimized, and the bokeh is often more prominent. This is a primary creative choice made by the photographer. It, too, is an evaluation made

---

[60] Shimmin Dep. 63:2-7.
[61] *Id.* at 68:6-8.
[62] *Id.* at 109:18-22.
[63] *Id.* at 98:6-8; 116:23.

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 15 of 20

independently by Shutterstock when deciding whether to include or exclude an image from its library.[64]

Reviewers also have a hierarchy and path for escalation if they cannot independently determine whether an image should be accepted.[65] At the end of the day, Shimmin notes, "As our reviewers are humans, they obviously can think for ourselves. We give them guidelines and we try to give them the best tools possible to review photos and to use their best judgment based on the guidelines we give them."[66] In taking this role, Shutterstock reviewers would likely be viewed by a professional photographer as akin to an editor, a gatekeeper choosing which of their images are accepted.

*(2)   Shutterstock Policies Do Not Routinely Inform Licensee's as to the Void Status of Their Licenses.*

Photographers are taught that they can only license what they own, and if any parts of an image are unable to be properly licensed (such as talent who was not properly released) that they should inform the parties as to the invalidity of their license and seek to find a resolution. Here, when asked if Shutterstock contacted prior licensees of images that thereafter had been suspended, Shimmin stated: "We rarely send out kill notices. We're usually able to resolve the issue with the rights holder directly."[67] After confirming that a kill notice was issued to the 930 licensees of McGucken photographs[68], Shimmin said that these notices were mailed in June of 2022, more than a year after the termination of the account involved in the infringement, an action she stated was "not unusual."[69]

*(3)   Shutterstock's Policies on Metadata Removal Negate the Work and Efforts of Photographers.*

Photographers spend countless hours and dollars to properly include metadata in their images. This is a first line of defense in the battle against infringement. At a minimum, photographers will include copyright status information and contact information. Because of the unseen nature of metadata, novice infringers will often leave metadata intact, showing unequivocally

---

[64] *Id.* at 118:18-25.
[65] *Id.* at 241:6-22.
[66] *Id.* at 123:18-24.
[67] *Id.* at 251:22-24.
[68] *Id.* at 253:19-20.
[69] Id. at 343:21-22.

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 16 of 20

they have stolen an image. Shutterstock's policy, however, is to remove metadata very early in the process. In fact, the metadata is removed *before* the image is seen by the reviewer.[70]

This step of removing metadata eliminates an opportunity for the reviewer to identify an image that needs to be flagged for infringement. This is not a general concern, however, as Shimmin recounts how the reviewer uses the information they do have, like a watermark, to determine if the contributor matches the creator:

> "They'll also look at -- is there a watermark on it, if so, does the watermark, does the name match the contributor's, because that's a different rejection -- if the contributor names match, then they'll be rejected for branding, which isn't allowed, but if it doesn't match then it would be escalated to a review coordinator to investigate for fraud."[71]

This protective step by the reviewer is rendered toothless by eliminating the best source of information about an image, the metadata created by the author. While it may not be determinative, it can be a flag for further investigation.

(4) *Shutterstock Is a Varied Commercial Enterprise Engaged in the Business of Licensing Photographs, Developing Partnerships, and Recruiting Contributors.*

Shutterstock derives revenue from licensing photographs to end users, but also makes money entering into agreements with affiliates and partners who use the API Shutterstock provides.[72] For example, in documents submitted for my review shortly before this report's deadline, Shutterstock has a business relationship with TinEye, the aforementioned reverse image search company. The details are clear: Shutterstock will provide TinEye access to its API, and TinEye will display links to Shutterstock content (and advertisements) related to the searched for term.[73] For each sale derived, Shutterstock will pay a portion of the revenue (either 15% or 30%) back to TinEye as a royalty.[74] By allowing TinEye to display the photographs and content found at Shutterstock, and incentivizing TinEye to promote Shutterstock as a source of images, Shutterstock is using its large content library to increase its footprint in the image licensing arena.

---

[70] Id. at 239:15.
[71] *Id.* at 95:9-18.
[72] *See, e.g.,* Bates No. STK006527 – STK006531.
[73] *Id.*
[74] *See, e.g.,* Bates No. STK006532 – STK006533.

Rebuttal / Supplemental Expert Report of Thomas Maddrey
Elliot McGucken v. Shutterstock, Inc. *et. al.*
Case No. 1:22-CV-00905-GHW
October 18, 2022
Page 17 of 20

Shutterstock also incentivizes its contributors to refer other contributors by paying a set amount of money per image licensed from any contributor that has been referred under your specific referral links.[75] As Shimmin noted: "there's widgets one can add to their blog to get a referral fee if a contributor signs up, so it's more, you know, I think a great deal comes from contributors just having a friend sign up or spreading the word."[76]

Critically, however, Shutterstock does not refer to the photographers who create the work in their agreements. In fact, in the agreement with TinEye, Shutterstock states:

> "The API, Shutterstock media content accessed through the API ("Content") and related metadata shall be deemed "Shutterstock IP" hereunder. Publisher shall have the right to access and store Shutterstock IP as permitted by the licenses granted herein, provided that Publisher may not use the Shutterstock IP in any manner that is competitive with Shutterstock's stock content and image search products and is expressly prohibited from using Shutterstock IP to optimize digital content search, recognition, or machine learning technology."[77]

Shutterstock takes all ownership of the "content", and grants permission to "access and store" that content as a benefit of being in a business relationship with Shutterstock. Ultimately the curated media library is Shutterstock's asset over which they claim complete ownership.

## III.    RIGHT TO SUPPLEMENT

If further testimony or document production occurs, or if any expert testimony is offered to support Defendant's defenses and counterclaims, I respectfully reserve the right to supplement this Report or provide rebuttal testimony at the request of Plaintiff.

Respectfully submitted,

Date:      October 18, 2022

Thomas Maddrey

---

[75] Shimmin Dep. 44:7-9.
[76] Shimmin Dep. 37:24-25 – 38:2-5.
[77] Bates No. STK006528.

# Appendix 1

# Materials Considered

# Materials Considered

| Type | Description | Reference (Bates No.'s / ECF Doc. No.'s) |
|---|---|---|
| Expert Report | Expert Report of Steve Heck. | N/A |
| Deposition Transcript | Deposition transcript of Heather Shimmin, 30(b)(6) corporate representative for Defendant Shutterstock, Inc. | N/A |
| Documents Produced | Affiliate Agreements, Terms of Service, Business Documents. | Bates No. STK006503 – Bates No. STK006535 |
| Book | American Society of Media Photographers, PROFESSIONAL BUSINESS PRACTICES IN PHOTOGRAPHY (8th Ed. 2008). | N/A |
| Website | Getty Images Rights-Managed License Calculator (https://www.gettyimages.com/purchase/price-calculator/488736348). | N/A |
| Website | American Society of Media Photographers (https://www.asmp.org). | N/A |
| Website | Watermark Remover (https://www.watermarkremover.io). | N/A |
| Website | Google (https://www.google.com). | N/A |
| Article | Boldt, Thomas, How to Get Rid of Watermarks In Photoshop, https://www.photoshopbuzz.com/how-to-get-rid-of-watermark/ (last visited October 18, 2022). | N/A |

**Appendix 2**

**Expert Report of Steve Heck**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELLIOT MCGUCKEN,<br><br>                    Plaintiff,<br><br>v.<br><br>SHUTTERSTOCK, INC., a Delaware<br>corporation, and DOES 1-10,<br><br>                    Defendants. | CASE NO. 1:22-CV-00905-GHW |

## EXPERT REPORT OF STEVE HECK

### I.        Qualifications

1.        My background in digital photography platforms is extensive. This includes spending 22 years working for Getty Images, the industry leader in creative stock and editorial digital media. During seven years of that period, I served as Chief Technical Officer, part of the Executive Committee, which included roles in forming company strategy involving content acquisition, distribution, and pricing. I was also responsible for managing the global technology organization of over 500 people. As part of that role, I was the architect for multiple iterations of the media licensing platform that Getty Images still runs on today.

2.        My work also included my role as technical lead for the assessment of Getty Images' acquisition of iStockphoto. This role gave me intimate knowledge of content creator (i.e., photographer) management systems and processes that govern photographer and platform interaction, including royalty management, content approval, and metadata assignment processes.

3.        Prior to switching to a management track, I designed and built photographer royalty calculation systems, designed Getty Images' first data warehouse and reporting system,

and served as technical lead on Getty Images' first global ERP and accounting system. I also hold a patent in search and metadata extraction technology.

4.      My relevant employment history is attached as **Exhibit A**.

## II.      Retention and Compensation

5.      I have been retained by Mitchell Silberberg & Knupp LLP, counsel for defendant Shutterstock, Inc. ("Shutterstock") to provide my expert analysis and opinions with respect to certain matters involved in a lawsuit filed by plaintiff Eliot McGucken ("McGucken"), *McGucken v. Shutterstock, Inc.*, No. 22-cv-905 (GHW) (S.D.N.Y.). Specifically, I have been asked to opine on the industry category of large-scale, online image licensing platforms, as well as aspects pertaining to it, such as general processes pertaining to the contributor onboarding process, content and metadata processing and management, interactions with third parties through affiliate relationships and application programming interfaces (APIs), handling of unauthorized uses that may come to the platform's attention, and general pricing of content in the stock photography industry.

6.      I am being compensated at the rate of $450 per hour to prepare this expert report. My compensation does not depend on the outcome of the case or the position I take.

## III.      Summary of Opinions and Bases Therefor

7.      My conclusions, in summary form, are: (1) Shutterstock's processes and procedures pertaining to the onboarding of contributors, handling and processing of files (including watermarking) and metadata, content review and policing, and processes pertaining to copyright claims – including in as it pertains to McGucken's claimed images that were uploaded to Shutterstock's contributor platform – are technologically justified and consistent with the practices of its major competitors; (2) McGucken's suggestions that the presence of metadata or the appearance of images themselves places Shutterstock on notice of infringement, are

2

unsupported assertions that are misaligned with the increasing volume of material that legitimate artists supply to platforms, technological and legal requirements (such as protection against disclosure of personal identifying information or the transmission of hidden malware), and the complicated nature of copyright ownership and licensing; (3) Shutterstock's API and affiliate relationships do not result in the transmission of full-sized, unwatermarked images to them, and platforms do not control what an API user or affiliate may do with thumbnails or other small demonstration copies; and (4) Shutterstock's licensing structure is simple and hands-off, and its pricing is competitive with its competitors' prices.

8.      In forming my opinions herein, I have reviewed the documents and materials attached as **Exhibit B**. In addition, I spoke with Jefferson Frazer in Shutterstock's technical team for roughly 45 minutes in late September 2022.

## IV.    Observations and Opinions

### A.      Background of the Online Stock Photography Industry

9.      Stock images are photos, illustrations and videos created with the intention that they can be used by designers or marketers in projects such as print and digital advertisements, marketing emails, web sites, brochures, and various other uses. Tens of millions of these images are created and uploaded to stock platforms every year. The vast majority will never be licensed, as it is incredibly difficult for an individual work to stand out in the vast sea of content. Nonetheless, millions of licenses are issued through these platforms in part because prices have become very affordable and the platforms have made it incredibly easy to search, find and download images for a equivalent of a couple of dollars. There are three major players (platforms) in the stock photography industry: Getty Images (iStockPhoto), Shutterstock and Adobe Stock. There are many smaller competitors in the space, but the "big 3" account for the vast majority of market share.

3

14839261.1

10.     Based on my knowledge of the industry, I believe that Shutterstock was created in 2003 as direct competitor to iStockPhoto, who pioneered the low price "user generated" (nonprofessional) content that was disrupting the incumbents in the stock industry (specifically, Getty Images and Corbis) by offering quality content and dramatically lower prices. Shutterstock was unique in that it was the first to offer a subscription model, which made the process of procuring images even easier and more affordable by creating an essentially one-click process. As a result of its subscription model and highly effective marketing, Shutterstock quickly began taking market share from iStock and became (and remains) a major player in the industry. Eventually the rest of the industry has adopted and favored the subscription model.

11.     In the early 2000's, technology advanced to the point where high-quality digital cameras became affordable enough that they were no longer strictly the provenance of professionals with large capital budgets for high-priced equipment. This, combined with web-based licensing platforms, marked a sea change in the creative photography and stock photo industries. Rather than just limiting photography licensing to hand-selected professional photographers or agencies that would make photographs available to distributors like Getty Images or Shutterstock through direct deals, millions of photographers – amateurs and professionals alike – now had access to photography companies' wide customer network. Hundreds of thousands of new, amateur photographers had easy access to a way to make money from a photography hobby. The quality gap between amateur and professional quickly began to close to the point where "experts" had difficult time distinguishing the content. This trend was further dramatically accelerated as iPhone and Samsung Android-based phones began to include incredibly powerful cameras and post processing capabilities in near ubiquitous devices that could fit in anyone's pocket. In my opinion, as visual communication, as the rise of image- and

4

14839261.1

video-focused Instagram and TikTok and the decline of Facebook becomes even more pervasive, the content generation glut will continue to grow and continue to increase in quality. In addition, we are now seeing the advent of quality original content that is being generated by Artificial Intelligence. So much so, that major platforms are taking early stances on whether to include them in their collections.

12.     While platforms do seek to build their brands as a source for licensed imagery, platforms do not specifically "recruit" contributors to the platforms, nor do they work with them in any significant fashion. Rather, on all of the big 3 sites and on other sites that I have encountered over the years, anyone with a valid email address and payment information can apply to be a contributor. Even so, thanks to the community, platforms' protection measures, and disincentives to infringe, the rate of even just claims of violations is extremely low. I understand that Shutterstock has roughly two million contributors, yet a claims rate of less 0.005% against recently-uploaded content and 0.001% as applied to the overall platform portfolio.[1]

13.     While the steady and dramatic increase in the volume of quality imagery available has been good for the public and has created a robust option for use of images online and offline in a way that allows the creator to get paid, the glut of high-quality content has outpaced demand. There are literally millions of new images uploaded to the big 3 platforms every week. As discussed more fully below, this commoditization has precipitated a substantial decline in licensing value of images. While the lower pricing makes licensing more attractive than taking photographs off the internet for free, it has reduced the market equilibrium for images –

---

[1] Claimants sometimes are mistaken about their claims. In my experience, I have seen claims over two images that share only the same idea, claims over uses that the copyright claimant thought were not permitted but in fact were, and other errors where the claimant turns out to be wrong. As a platform cannot have direct knowledge of who any copyright owner is or under what names they may be operating, platforms simply take claims at face value and handle them as the law and/or their policies direct.

5

particularly images of commonly photographed subjects, such as landscapes in commonly visited national parks in the western United States, which appear to be the focus of McGucken's imagery at issue in this lawsuit. Attached as **Exhibit C** are examples of images, which are very similar to McGucken photos, and are currently available on Shutterstock, iStockPhoto, and Adobe.

      **B.**      **Contributor Onboarding Process, Content and Metadata Handling, and Image Review**

14.    <u>Contributor Onboarding Process</u>. The platforms all use very similar process to contract with new photographers and allow them to begin uploading images for sale on the respective platform. This is commonly referred to as ingestion process and takes place on a contributor portal. The basic process generally is as follows.

    a.    The photographer creates an account, including agreeing to terms of services and supplying information for receiving licensing payments;

    b.    The photographer is "verified" (typically, through supplying an email address and then confirming that the email address is valid), and tax status is submitted;

    c.    The photographer uploads a sample of his or her images and tags them with appropriate metadata, specifically, title of image and keywords that are used to help customers search for images;

    d.    The images are briefly reviewed (consistent with what is discussed below) for compliance with the company's standards;

    e.    Once the user submits an image that passes the platform's compliance and standards tests, their account becomes active, and they can upload images onto the platform.

15.    <u>Technological Process and Metadata</u>. Functionally, the way the image is

6

processed when uploaded by the contributor is a mainly automated process. It works as follows:

a.  Original image file is archived – only when someone licenses the image can they access the full-resolution image;

b.  A working "master copy" of a standard size is made. Many copies of the image will be automatically generated by the system from this master copy for purposes of helping the customer see what the image might look like in different sizes. All except low-resolution thumbnails are automatically watermarked either with the platform's name alone or the platform's name and contributor name, depending on size;

c.  Any embedded metadata such as EXIF or IPTC[2] is extracted from the image and stored in a database record that is forever associated with that unique image, prior to a cursory review by any human. Extraction or deletion of metadata is standard across many sites because literally any data, including malware and personally identifiable information, among others, can reside in these fields, whether the photographer or uploader knows it or not. Removal is a best practice to protect both uploaders and downstream consumers of the images.

d.  The various copies of varying sizes are then made from the master and stored securely, at this point images and metadata are not publicly accessible.

e.  Once images are approved for sale (a largely automated process, described below) they are placed in storage areas that can be securely accessed by the web sites, applications and APIs of the platform. There is an immense amount of effort and

---

[2] EXIF stands for exchangeable image file format and is a standard that specifies formats for images, sound, and other tags used by digital cameras and other systems that handle image and sound files recorded by digital cameras. IPTC is an acronym for International Press Telecommunications Council and is a standardized media format used by media and press agencies. As noted below, it includes details such as title, description, and location.

14839261.1

expense expended to keep the secure un-watermarked high-resolution (salable) versions of the images secure as these are essentially the inventory in which the platform can sell.

f. Once an image is marked as active, it can be seen in search results on asset detail pages, and can be licensed. Only once a license is sold is the copy delivered to the customer generated and injected with metadata that is specific to the contributor and transaction such as contributor name (on record), the license details, etc. Very little if any of the original metadata from uploaded image is used in the final distributed copy, as it is unregulated and could contain potentially harmful data or malicious computer code. The download of this copy is then stored and tracked by the platform for future reference.

16. It is important to note that there is a drastic difference in value between the various sizes of image copies. All major stock industry platforms use very similar version sizing. Image size is referred by its pixel dimensions (length width in number of pixels on screen).

17. The pixel dimensions of the various versions are generally as follows:

| Size | Common name | Pixels in longest side |
| --- | --- | --- |
| Small | Thumbnail | 250 px |
| Medium | Asset Detail, Medium | 1000 px |
| Large | Salable, High Res | >3000 px |

18. In general, the larger the image, the more value it has because it can be utilized in more scenarios. For instance, one cannot display a thumbnail on a billboard or use it as a hero image of a home page. It simply is too small to make an impact and any enlargement would result in significant degradation in clarity. However, they are just fine for when a potential

8

14839261.1

customer may be looking thorough hundreds of images to select one suitable for a project: they provide a point of reference to give some indication of what the licensed photo might look like. Large, high-resolution images can be used for nearly any kind of project and therefore have a much higher value. These are generally referred to as salable assets. As a result of this natural progression the industry takes a commensurate level of security and precaution with the different sizes. In general, any image above 1000 px receives a watermark (a visual overlay), normally identifying the location where the image was available (for example, "Getty Images," "Alamy," "Shutterstock," "iStock"), which renders the image as unusable for any kind of legitimate use. Salable size assets are simply not available anywhere until a valid license has been obtained, tied to a customer, and then recorded.[3]

19.     The whole industry relies extensively on traffic generated by people using the very popular Google image search to find images for projects. Therefore, thumbnail images are allowed to be indexed by the search engine to help locate images on platforms' sites, and are displayed on Google's site in search results. If a thumbnail is clicked in Google, the user is taken to the appropriate page on the stock platform where a high-resolution version can be legally licensed. Therefore, at no time is a useful version of the image in danger of being stolen. This is standard practice and greatly benefits the photographer and platform by exposing the work to a much broader audience (potential customers) outside the platforms' existing customer base.

20.     I understand that a lot of claims have been made about metadata. First of all, the term "metadata" is a broad category that could refer to the camera name, information that the camera automatically generates or that is added to the camera, and information added to the

---

[3] As an amusing way to demonstrate how well watermarks are understood, a Twitter post received over 43,000 likes for the early-pandemic comment (with accompanying image of the writer in a branded face mask): "To make sure nobody shares a photo of you, put a GettyImages® watermark on your face mask." *See* https://twitter.com/djbaskin/status/1271965100727865344 (June 20, 2020).

9

image at any point in time, such as title and keywords.

21.     There is simply no such thing as immutable embedded metadata in an image file. Although there are several recognized data standards, including IPTC and EXIF, they only specify what fields and datatypes should be included in the image. IPTC defines specific fields such as creator, credit line, create date, etc., and specific format for these fields so that they can be programmatically read. However, there is no validation (other than data type) of what data can be entered in those fields. The data can be easily changed or deleted by any number of free software programs. Further there is no industry standard registry (worldwide or otherwise) for copyright owners, therefore there is no unique identifier (such as a code) that could tie an image to a particular person. This fact renders it impossible programmatically verify an image's ownership, as literally millions are uploaded to platforms each week, not to mention that contributors often wish to use different names for different categories or uses, as I understand McGucken did in using "45SURF" or "45EPIC" on some images and his given name on others. Therefore, while I understand that McGucken insists that a platform should look at metadata embedded in an uploaded image and assess copyright ownership, this is an impossible and ultimately fruitless task given that no platform can be familiar with the individual portfolios of hundreds of thousands of contributors, the relationships between them and third parties (such as agents who are authorized by the creators to upload and submit works to various platforms, like Wirestock), potential d/b/a's or other names that a contributor might want to use, and the fact that metadata is highly subject to manipulation. Combined with the risks noted above of keeping metadata attached to an image, what McGucken proposes is simply unfeasible.

22.     <u>Image Review</u>. After an image is uploaded on a typical platform, it goes through a very quick review process (a few seconds) where it is checked for technical quality (meets

14839261.1

minimum size, in focus, composed well), meets standards regarding nudity, hate speech, etc., and is accompanied by the any appropriate model releases (for any visible human faces) and/or property releases (for identifiable landmarks such as the Space Needle in Seattle).

### C.      Affiliate Relationships and APIs

23.      It is common practice in the industry for stock platforms to form affiliate relationships with sites that have high traffic and large audience of potential stock buyers. These affiliate relationships can be provide millions of additional image views and click-throughs and have no financial cost to the contributor, only the platform. Contributors are aware of and generally in favor of these relationships, as they greatly increase potential exposure to their work and increase the likelihood of licensing. Affiliates are given controlled access to a platform's image library and search technology via a secure API.

24.      There are various methods in which affiliate sites use the platform content and API, but the most common model is as follows. When an affiliate user enters a search such as "business meeting," the affiliate site will run a search against its own library and simultaneously the same search against the platforms' images as well. Sometimes this search of platforms' images takes place locally on a copy of the thumbnail images and metadata tags, or the search takes place via the API using platforms search technology. The results from both libraries are displayed to the user. If the user happens to click on a platform's image, the user is then taken to that image's detail page on the platform's site, where the user may complete the transaction and download the high-resolution image. If a successful transaction takes place, the affiliate is compensated by the platform according to the agreed upon contract.

25.      Sometimes affiliates may actually fulfill the transaction from their site, but the fulfillment of the high-resolution image **always** takes place via the platform's API. Hence the high resolution (salable asset) **never** resides on the affiliate site and can be deactivated

11

(preventing download) at any time by the platform. It is important to note that once an image is deactivated by the platform, it is immediately unavailable to license on either the affiliate or platform sites. Hence, although a thumbnail may still be visible on an affiliate site, the high-resolution image is NOT available.

26. APIs are essentially an internet-facing conduit into a company's systems. The APIs expose functionality such as search and download. The company chooses which functionality programmatically is exposed and to whom; this interface has many layers of security and control layered on top. APIs allows sites and applications to easily share data and assts over the internet in *real time*. They are now a ubiquitous form of data exchange with third parties. For example, APIs are used every time a site verifies an address with postal service or with a bank when authorizing a credit card.

**D.      Addressing Allegedly Infringing Content**

27. The big 3 all rely on the representations of their contributors as to copyright status. As trusted providers of licensed imagery, they cannot tolerate a scenario where infringing content is licensed by a contributor through the platform to a customer who reasonably believes that the content he or she is licensing is authorized.

28. While I am not a lawyer, I am familiar with how the Digital Millennium Copyright Act (DMCA) operates in the context of online photography platforms, as the DMCA is so intertwined with how platforms operate. No platform can be familiar with two million contributors' images, their privacy and promotion preferences, or the licensing arrangements they may have with third parties. In addition, where dozens of retouched nature images may be submitted within a week, it may be difficult for even the copyright owner herself to distinguish her images from others'.

29. Platforms must rely largely on the contributor to police unauthorized use; they

12

rely on the contributor community as well, who may know certain portfolios of others better than the platform might know the portfolio of any number of contributors. Further, a very small percentage of contributors exclusively upload their content to a single platform; most spread their content to three major platforms or more – not including other sites such as social media platforms. For non-exclusive imagery (which is the vast majority), it is literally impossible for an individual platform to determine an unauthorized use because the platform is not privy to other platforms' license details. Platforms are greatly aided by DMCA notices, as the photographer is in best position to identify unauthorized use.

30.     Occasionally, as I understand happened here, a "good Samaritan" will inform us about images that he believes are infringing. If the information provided seems reliable, the platform may suspend the contributor and the content therein.

31.     Platforms generally only remove or disable images at the locations identified by the DMCA notice. Normally the notices will identify the image in the marketplace itself, rather than server copies that no customer would ever find without having the original image and conducting a reverse-image search (and even then they might not find it). However, if a link to an edge or server copy is identified and found, the platform ordinarily will remove or disable it even though the edge or server copy is not a substitute for the original and is generally unusable for the reasons I mention above.

32.     As part of the process which makes an image sellable on a platform, thumbnail versions of an image are pushed to edge caching services like Akamai and Amazon Cloudfront. Almost every company that offers products on the internet uses some type of service like this in order to serve millions of requests for delivery images per day. It is the only way to guarantee reasonable delivery speeds to customers all over the world. Data can transfer no faster than the

13

speed of light, so the further you are from the source, the longer it takes to get and render the image on your screen. For instance, data can take nearly five times longer to get from New York to Sydney as it does New York to Dallas.

33.     A single search results page on a stock platform will return hundreds of thumbnails. In order to display those images within a few seconds of hitting the "search button" no matter where the customer is in the world, platforms must utilize edge caching which essential distributes copies of thumbnails to different edge caching servers all around the world assuring that people in local regions get the images quickly because they are retrieving them from a server that is near them. If every internet user could only access one copy of a popular image from one location, a major part of the system would cease to function. In general, platforms such as Shutterstock have software that will find and flush cache copies automatically or on request. However, considering that these platforms host petabytes of data, it is often impossible to track down the location every cache copy just from the identification of a single URL. This is why it is important that with every notice, the copyright owner identifies the URL where he claims he sees a violation, as the claimant might see something that Shutterstock's system does not (or, alternatively, the claimant might not object to the platform keeping copies for recordkeeping purposes, including applying matching software).

34.     Although residual copies of thumbnails may reside in various caches for days on the internet, when an image is deactivated on Shutterstock's platform it is immediately removed from the search index and – as noted above – high-resolution versions are unable to be licensed or downloaded either on the site or via the API.

35.     In addition, if one image is claimed in an account with dozens of images, the platform cannot know that other images are unauthorized. Indeed, I am aware that platforms

14

14839261.1

receive a number of claims where the photographer was confused as to ownership or the notice is subject to a counter-notice. Therefore, terminating a contributor because of just one notice would be unfair and overkill.

36.     Today's sophisticated photographer will use services such as Pixsy, or Google Images or TinEye, to search for their images on the internet. In my experience, these services can be quite reliable if the photographer supplies the images although, like other "matching" software, miss-hits and false positives are not infrequent, so the photographer must be involved in reviewing the results to confirm. In addition, anyone who has read about copyright protection online generally knows to avoid making high-resolution images available online in downloadable format without some protections (such as a visible watermark), occasionally an image is licensed before the photographer finds it. In my experience, the photographer or her agent will contact the platform to discuss what to do. Photographers generally have tended to understand that despite measures taken, the photographer and the platform are aligned, and that the customer is not at fault either. With this view in mind, in my experience, parties generally have been able to work out Sending "kill notices" (in other words, a notice to the licensee that the image is subject to a claim, and that the licensee should cease use) is very rare and normally occurs only when it is clear that the photographer objects to the continuing use by the licensee.

**E.      Pricing**

37.     As discussed above, the ease with which high quality, professional-looking content can be created by an average person with a decent-quality cell phone has resulted in the availability of countless images – particularly of common subjects such as landscapes and seascapes. For example, as shown in **Exhibit C**, McGucken's photographs compete with dozens of alternatives, which drives the prices down for all of them. With filters available commonly to the general public through sites like Instagram or other free online offerings, anyone can readily

15

saturate certain colors or edit an image if they would like to do so.

38.     Almost all stock images are licensed under a royalty free model or "RF". RF provides the customer with rights for a flat fee, to use an image in almost any use case, and in a format digitally or in print. The name is somewhat confusing in that there is in fact a "royalty" paid to the photographer from the sale; however the customer is not responsible for any further payment (royalty), no matter how the customer utilizes the image, so long as the use falls within the scope of the license selected. (If the customer wants to make a broader use, a new license will need to be obtained.)

39.     This is in great contrast to the now largely-disused Rights Managed model, in which the license price was based on a particular use, industry, distribution quantity, and a certain timeframe. The broader the rights, the more expensive the license. Once the timeframe of license expired, the customer was required to contact the platform and re-license it if they wanted to continue to use it in any form. The RF model is far more friendly to the customer and allows the customer to easily transact with platform and then have no further relationship. In essence, RF is far more like a simple sale of material item like a pair of shoes. A transaction takes place and both parties go their own way.

40.     There are two common industry methods for pricing imagery: "a la carte" and subscription model. A la carte, as its name implies, is a fixed price given to a customer wants to license a single image at a time. Licenses can be purchased with local currency or "credits" which are essentially a currency specific to a particular platform.

41.     Alternatively, the subscription model requires customer to sign up for an agreed term, usually monthly or yearly, which grants them rights to license a certain number of images per month. For instance, a "Best Value" subscription on shutterstock.com is good for 10 image

16

downloads/licenses per month and costs $29/month. Customers with greater image consumption

needs may choose larger subscription plans granting 50, 350 or 700 image licenses per month for

increasing monthly fee. In most cases, the larger subscription you buy, the less the customer pays

for an individual image. A 10-image subscription for $29 = $2.90 per image whereas a 50-image

subscription for $99 = $1.98 per image. An a la carte price for an image ~$7 - $15 is

significantly more than even the most expensive subscription when calculated on a PPI basis.

42.     The move to the subscription model has dramatically decreased the "price per

image" (PPI). In addition, the industry itself is very competitive and has almost identical pricing.

As prices have steadily decreased, contributors and platforms are impacted: per image, the

platform receives less money that it needs to operate its system, and contributor income is

squeezed as a result. Below is a comparison of the major platforms' basic subscription offerings

as of September 2022.

| Platform | Images per Month | Cost | Price Per Image |
|---|---|---|---|
| **Shutterstock** | 10 | $29 | $2.90 |
|  | 50 | $99 | $1.98 |
| **iStockPhoto** | 10 | $29 | $2.90 |
|  | 50 | $90 | $1.80 |
| **Adobe** | 10 | $29 | $2.90 |

43.     Nonetheless, if a contributor is dissatisfied with the pricing, he can withdraw his

portfolio from the marketplace entirely or move to a competitor. The platform will ordinarily

retain copies of the images for reference because the licenses are non-revocable once issued, and

a customer may have a question.

44.     My analysis is ongoing, my opinions may change, and this report may be updated

17

14839261.1

18

if new facts become known. In addition, I may be asked to review, evaluate, and comment on additional options or conclusions that may be offered by McGucken at a future date.

Dated: October 4, 2022

Steve Heck

14839261.1

# EXHIBIT A

# Steve Heck

**TECHNOLOGY. INNOVATION. GROWTH.**

Seattle, WA | 206-349-1870 | shecktor@gmail.com | linkedin.com/in/steve-heck-cto

Experienced senior-level executive specializing in technology and innovation. 20+ years leading cutting edge technology and services in a +500 person-multinational organization. Skilled in driving strategic direction, spotting future technology trends, and anticipating how they will affect business needs. Demonstrated expertise in open source technology, multisite e-commerce platforms, mobile apps, VR technology, and lean-agile development processes. Exceptional people leader with a strong track record of development and retention of top talent, a champion for a culture of collaboration, high performance, and execution.

## EXPERTISE

- Leveraging technology in pursuit of business performance
- Strategic Partnerships
- Talent Acquisition & Mentorship

- Vision Setting & Evangelist
- Digital Transformation
- Emerging Technology & Innovation

## EXPERIENCE

**Hecktech Consulting LLC - Founder**
**2019– Present**
*Independent consulting agency specializing in technical strategy, enterprise architecture and interim C level management.*

06/2019 – Present
True Blue Inc
*A publicly traded staffing company with 1500 employees and revenues exceeding $1 Billion.*

Advisor / Enterprise Architect
I was engaged to advise and help create the technical strategy to enable the companies multi-year multi-million dollar digital transformation initiative.
- Performed assessment of core legacy business systems and integration strategy.
- Worked with executives to understand and document both business and technical objectives for the initiative.
- Created an enterprise architecture and phased roll-out plan for the digital transformation initiative. Subsequently presented to and approved by  CTO, CFO, President.

**Getty Images, Seattle, WA**
**1996 – 2017**
*Digital Media Company with over 200 million assets available online. Approximately >$500 annual sales and employees in 28 offices worldwide.*

**Chief Innovation Officer – Senior Vice President**
2016 – 2017

Asked by CEO to create Getty's first innovation team to identify digital product trends, design and implement new products to expand Getty Images portfolio of products. Responsible for defining vision, strategy and securing budget from the Board of Directors to support this nimble/agile team of up to 10. Team accomplishments included bringing 2 new products to market in under 12 months.

- Built first WYSIWYG editor for web-based VR editor allowing B2B customers to take Getty Images content and build their own story, publish and host it in a 3D environment; sold to customers and used internally at Getty to support consumer business.
- Spearheaded joint research partnership with Microsoft using AI algorithms to programmatically change photos.
- Created over 2 dozen "sticker" packs (Gimme Stickers) for iPhone iOS 10 within 10 days of team launch; sticker packet featured never seen Getty images and was showcased by Apple.
- Solely responsible for creation and talent acquisition team; built a balanced gender, multicultural, a multi-racial team of high performing/potential team within 45 days of inception.
- Built a 3D virtual reality version of gettyimages.com and presented it to the board to showcase product potential.

**Chief Technology Officer**
2008 - 2016
The senior leader of technology overseeing all functions worldwide including engineering, design, data centers, network, communications, application support, enterprise systems, and enterprise architecture. Managed team of 500+ people in 20 offices worldwide. Reported to CEO, and a key member of the Executive Committee setting the strategic direction for the company.

- Built and mentored a world-class tech leadership team by growing high potential talent from within and via outside recruitment when necessary.
- Doubled throughput of product and development teams by partnering with CPO to completely revamp product development lifecycle and reorganize teams accordingly.
- Managed to or below >$50M budget while continuing to meet the needs of growing business and organization with significant needs in replacing aging infrastructure and enterprise systems.
- Implemented new and upgraded enterprise CRM, DAM, digital marketing, and payment processing platform.
- Proposed cost-saving cloud migration initiative, secured Board and CEO buy-in and resources; on track to save 7-8% annually.
- Integrated stabilized and eventually replaced acquisition website that produced $100's of millions in revenue.
- Sponsored and secured funding for site performance initiatives that dramatically improved customer experience and increased revenue.
- Implemented lean/agile as a consistent enterprise-wide product development methodology across development, IT and product; dramatically improved measurement and throughput capabilities. Adopted throughout the organization with 500 FTE employees and several hundred contract employees.
- A critical member of company-sale "roadshows" with the CEO, CFO, and COO presenting and showcasing Getty to potential buyers including PE and private firms. Participated in 2008 and 2012 sales to Hellman & Friedman and Carlyle Group respectively.

**VP of Enterprise Architecture & Web Development**
2005 – 2008
**Director Enterprise Architecture**
2001 – 2005

**Database Architect**

1996 – 2001

Hired as an entry-level employee and within a brief period of time developed broad expertise taking on more technology responsibility and accountability. In 2005 promoted to VP of Enterprise Architecture and Web Development to oversee the enterprise architecture and web development teams. The platform I architected and oversaw the building of was instrumental in growing revenues from $250 Million to $700+Million in yearly revenue.

- Architected and oversaw the development of 2 generations of custom global e-commerce platform allowing for dozens of acquisitions, supports 10+ sites while sharing common infrastructure and enterprise services.
- Led project for first award-winning native mobile apps; developed deep relationships with Apple App Store, product development and developer evangelist groups leading to many App Store features for flagship apps.
- Led technology due diligence on more than 5 highly profitable acquisitions and incorporated new technology into Getty's enterprise.
- Inventor on multiple patents; sole inventor on single Patent for Automated selection of visual content based on semantic processing of a block of text.
- Led project to create the first public/customer-facing API's opening up $20M revenue stream.
- Acted as technology lead on implementing Getty's first ERP and first data warehouse.

## Sur La Table, Seattle, WA
## 1992 – 1996

*Luxury retailer specializing in gourmet kitchenware, houseware and specialty foods with annual sales of $187M with 100 stores and online sales.*

**Database engineer**

- Designed and built an inventory management system still in use today
- Led system selection process and managed Point Of Sale implementation during expansion to multiple stores

**Buyer**

- Responsible for maintaining and growing kitchenware product lines for store and catalog business
- Analyzed seasonal buying patterns, supply lead times and vendor pricing to optimize in-store inventory levels increasing profits in my categories by ~5%

**Assistant Store Manager**

- Managed Sales team, set work schedules and ensured the smooth operation of a retail store in Seattle's most popular tourist destination Pike Place Market

**Warehouse worker and Store Sales Person**

- Provided customer service specializing in cookware and cookbooks.

ADDITIONAL PROFESSIONAL ACTIVITY

**United Way - End Homelessness Initiative** (Technical Advisor, Donor), 2018-present
Volunteer time and expertise to help program leaders leverage technology to help solve homelessness in King County

**ADA Academy Cohort Sponsor,** 2014 – Present
ADA academy seeks to train and employ women in technology field through partnership with local industry.

**Pike Place Market Preservation & Development Authority,** 2008 – 2010
Served as the Mayoral appointee to the governing board of the countries oldest operating farmers market.

## PERSONAL INTERESTS

**Small Scale Farming**, 2017-present
Manage a .5 acre "market garden" and 40 tree fruit orchard in Eastern Washington with the goal to provide fresh vegetables, storage crops and fruit for my family, friends and the local community.

**Restaurant investment**
Investor in The London Plane a Cafe, Flower Shop and Bakery in Seattle's historic Pioneer Square neighborhood.

# EXHIBIT B

In forming my opinions herein, I have reviewed the following documents and materials:

- McGucken's First Amended Complaint and Exhibits;

- Spreadsheet Bates-numbered STK001139;

- Documents Bates-numbered MCG000135-174, MCG002026-2040, MCG002338-2362, MCG002363-2481, MCG002484-2487, STK000001-9, STK000015-18, STK000045-55, STK000724-744, STK000748-753, STK001490-1509, STK003004-3243, STK003246-4430, STK004435-5247, STK005335, and STK006270-6325;

- Letter from Eleanor Lackman to Doniger/Burroughs regarding misrepresentations in First Amended Complaint dated May 17, 2022;

- Shutterstock's Responses to McGucken's Second Set of Interrogatories;

- McGucken's Responses to Shutterstock's First Set of Requests for Admission;

- McGucken's Responses to Shutterstock's Second Set of Interrogatories;

- McGucken's Second Supplemental Responses to Shutterstock's First and Second Set of Interrogatories;

- Declaration of Artur Zambrowski in Support of Shutterstock's Motion for Summary Judgment (without exhibits) in *George Steinmetz v. Shutterstock, Inc.*, Case No. 1:21-cv-7100 (AKH) (S.D.N.Y.);

- Plaintiff's Rule 56.1 Statement of Undisputed Material Facts in Support of His Motion for Summary Judgment and Shutterstock's Counterstatement to Plaintiff's Rule 56.1 Statement of Facts and Additional Material Facts in *George Steinmetz v. Shutterstock, Inc.*, Case No. 1:21-cv-7100 (AKH) (S.D.N.Y.);

- Order and Opinion Granting Defendant's Motion and Denying Plaintiff's Motion for Summary Judgment in *George Steinmetz v. Shutterstock, Inc.*, Case No. 1:21-cv-7100 (AKH) (S.D.N.Y.), dated September 19, 2022; and

- The following public-facing websites: http://elliotmcgucken.com/, http://elliotmcgucken.com/, http://Shutterstock.com, http://GettyImages.com, http://stock.Adobe.com, http://iStockphoto.com, https://www.shutterstock.com/blog/ai-generated-media-with-shutterstock, and https://hyperallergic.com/763563/citing-copyright-concerns-getty-images-bans-ai-generated-content/.

# EXHIBIT C

**McGucken Original Example 1:**



First page of search results for "Antelope Canyon" on Adobe Stock – 35,236 images returned:



Detail of image middle top row - Photo by Nun in the Sky:



First page of search results for Antelope Canyon on iStockPhoto – 17,486 images returned:



Detail of middle image – Credit LaserLens:



First page of search results for Antelope Canyon on Shutterstock – 38,566 images returned:



Detail of bottom right image by Edwin Verin:



**McGucken Original Image Example 2:**



McGucken Photograph:
2020-01-26-Valley-View-El-Capitan-Snowy-
Rocks-Merced-River-Fuji-GFX100-
49445801002-m.jpg
Copyright Registration: VA0002225784

First page of search results for "El Capitan snow river" on Adobe Stock – 665 images returned:



Detail of image second row left by S. Rongkrod:



First page of search results for "El Capitan snow river" on Shutterstock – 1,086 images returned:



Detail of image second row left by Min C. Chu:



First page of search results for "El Capitan snow river" on iStockphoto – 356 images returned:



Detail of image, 1st row right:

