UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELLIOT MCGUCKEN,

                Plaintiff,

    -against-

SHUTTERSTOCK, INC.,

                Defendant.

Case No. 1:22-cv-00905 (GHW)

## DECLARATION OF HEATHER SHIMMIN

HEATHER SHIMMIN declares as follows:

1.    I am employed by defendant Shutterstock, Inc. ("Shutterstock") as an Intellectual Property Agent.  I submit this declaration in support of Shutterstock's Motion for Summary Judgment.  The statements made below are true and accurate based on my own personal knowledge, including knowledge I gained as a result of my preparation to serve as Shutterstock's corporate witness at a deposition in this case.

**A.**    **Shutterstock's Website**

2.    Shutterstock operates a leading global online marketplace for photographic images and other content (such as video footage and music) at the website www.shutterstock.com.  There are currently more than 424 million images available for license on Shutterstock's website and approximately 200,000 images are added every day.  Shutterstock also hosts more than 26 million video clips, with an average of 75,000 clips added every week.

**B.**    **Shutterstock's Contributor Platform**

3.    Shutterstock operates a "contributor platform" through which third-party users (*i.e.*, "contributors") may upload and offer their content to the public for license.

4.      Anyone can sign up to become a Shutterstock contributor, free of charge, by registering an account through Shutterstock's website or mobile app.  To date, Shutterstock has over two million contributors.  The contributors are not Shutterstock employees.  Nor are they recruited, vetted, preapproved, or verified by Shutterstock.  The only reason a potential contributor would be rejected is if their information matches an account that had previously been terminated, which is relatively rare, and helps keep likely infringers off Shutterstock's website.

5.      As part of the sign-up process, all of Shutterstock's contributors must accept and agree to Shutterstock's "Contributor Terms of Service."  Pursuant to the Contributor Terms of Service, the contributors warrant and represent that "the Content [that they submit to Shutterstock] does not infringe the copyright or any other rights of any third party."  Attached hereto as **Exhibit A** is a true and correct copy of Shutterstock's current Contributor Terms of Service, effective as of February 5, 2020, which is publicly available on Shutterstock's website at https://submit.shutterstock.com/legal/terms.  Prior versions are attached hereto as **Exhibit B** (version 9; effective April 23, 2019 through February 4, 2020) and **Exhibit C** (version 8; effective July 30, 2015 through April 22, 2019).

6.      All of Shutterstock's contributors also must agree to Shutterstock's "Contributor Guidelines," which state that "[the contributors] must own or control the copyright to all content [they] submit to Shutterstock" and "cannot submit work obtained from other sources (*e.g.*, online image search results or websites), or incorporate such work into [their] content submissions, unless [they] have permission to do so."  Attached hereto as **Exhibit D** is a true and correct copy of the Contributor Guidelines, which is publicly available on Shutterstock's website at https://support.submit.shutterstock.com/s/article/Submission-and-Account-Guidelines.

7.     Upon completion of the sign-up, contributors can instantly start uploading content to be included in Shutterstock's online marketplace.  The contributors decide what content to upload and fully direct what is uploaded.  Shutterstock does not select, modify, supervise, curate, control, or play any major role in the images uploaded by contributors.

8.     Shutterstock relies on its contributors' representations about their content because it could not possibly investigate whether the 200,000 images that contributors submit every day infringe other parties' copyrights, without substantially altering its business model and incurring massive expense that would make it impossible for anyone to operate the platform.  And even then, it would be a futile endeavor, as Shutterstock cannot know what a contributor's relationship may be with a photographer or agency, nor can it verify information that may accompany a photograph.

9.     All of the content on the contributor platform is supplied by contributors, and is owned either by the contributor or by another third party who the contributor represents granted them the necessary permissions.  Shutterstock generally does not own the copyrights in the content that is offered for license through its contributor platform.  This is reflected in the Contributor Terms of Use, which expressly states, for example, that "[t]he copyrights in all Content remain with the copyright owner, and nothing in [Shutterstock's Terms of Service] shall be construed as a transfer of copyright to Shutterstock."  Shutterstock does offer its own, self-supplied content for license, but it does so through an entirely separate and distinct platform known as the "editorial platform," which has no relationship to this lawsuit.

10.     Shutterstock briefly reviews the images uploaded by contributors and rejects those that bear hallmarks of spamming (*i.e.*, submitting hundreds of virtually identical images), contain visible watermarks that might suggested they were pulled from a third-party site (such as Getty/iStock, Adobe, or a photographer or agency), or have obvious issues related to their technical

quality (*e.g.*, poor focus, composition) and/or the material depicted therein (*e.g.*, pornography, hateful imagery, trademarks, copyrighted materials, people's names and likenesses without a model release) prior to making them available for license on its customer-facing website.  The reviewers are not lawyers; they are hired for their ability to quickly judge whether an image is technically and visually acceptable.  The reviewers spend about ten to twenty seconds per image. While the reviewers may catch obvious intellectual property issues from time-to-time (*e.g.*, well-recognized brand names or copyrighted works "nested" within an image), this is not their main objective and they could not possibly verify the copyright status of every image.  Unless the image has some obvious issue, it is not rejected and passes to the next stage of the uploading process.  I know from my experience in the online photography industry that the scope of Shutterstock's review is consistent with industry practice.

11.     Shutterstock also utilizes specialized software to detect (and reject) potentially infringing material uploaded by contributors, including tools that identify duplicate images, images that are substantially similar to other images already in Shutterstock's collection, and images that the contributor may have downloaded from a third-party website that provides free images.

12.     The contributor-uploaded images that are not rejected automatically become available to the public for license through Shutterstock's online marketplace.

13.     Shutterstock keeps a portion of the licensing fee and pays the rest to the contributor. Since launching the contributor platform nearly twenty years ago, Shutterstock has paid over $1 billion in earnings to its contributors.

**C.     Automated Processes Triggered By the Contributors' Uploads**

14.     Apart from Shutterstock's ten- to twenty-second review of contributor-supplied images for objectionable content, the entire process triggered by the contributor's decision to

upload an image to Shutterstock—from ingesting the image into the contributor platform to making the image available on Shutterstock's customer-facing website to issuing any licenses for the image—is fully automated, with no involvement by any person at Shutterstock.

15.     During the ingestion process, Shutterstock's system automatically removes any and all metadata associated with the images uploaded by contributors in order to avoid computer viruses and prevent the dissemination of personally identifiable information.  This is consistent with industry practice.  Shutterstock's employees are not involved in this process.  To the extent an image contains metadata at the time of upload, it is removed by the time any Shutterstock employee or reviewer sees it.

16.     Shutterstock's system automatically creates multiple small-sized, low-resolution copies (*i.e.*, thumbnails) of every contributor-supplied image posted to its website for license so that the potential customer can get a sense of how the image might look.  This process is fully automated and is applied consistently across all contributor content.

17.     Like other online content licensing companies, Shutterstock's system automatically adds a "Shutterstock" watermark to all copies of the images displayed for license on its public-facing website (except very small thumbnails that have no practical use) in order to prevent third parties from using the images without a license.  Attached hereto as **Exhibit E** are examples of watermarks currently being used by other online content licensing companies (*e.g.*, Getty Images, Adobe Stock, Associated Press).  The "Shutterstock" watermark is intended and understood to identify Shutterstock as the source or distributor of the image, rather than as the author or copyright owner.

18.     Shutterstock's customers may license contributor-supplied images on-demand through an entirely automated process on Shutterstock's website on a "royalty-free" basis.

"Royalty-free" means that customers pay an up-front, one-time licensing fee, with no ongoing royalties due to Shutterstock in the future. The customer chooses what images to license and also may choose from Shutterstock's various licensing models (*e.g.*, standard per-image license, subscription license), which have different pricing.

19. Shutterstock only provides the unwatermarked, high-resolution copy of an image to a customer that has licensed it.

## D. Shutterstock's DMCA Policy

20. Shutterstock takes intellectual property rights very seriously. Copyright infringement not only hurts rights owners, including the rights of Shutterstock's contributors, but it harms the integrity of the digital content marketplace as well. Shutterstock has no motivation to allow infringement; to the contrary, its business depends on being a trusted source for authentic images. Moreover, Shutterstock does not want bad actors competing with legitimate photographic artists who use Shutterstock's platform to get access to millions of potential licensees—an opportunity that would not exist for the vast majority of contributors without the platform.

21. Shutterstock's commitment to respecting intellectual property rights is reflected in its various policies, including, for example, Shutterstock's Contributor Terms of Service and Contributor Guidelines discussed above. Shutterstock also has a "DMCA Policy" that sets forth the procedure for submitting notices of copyright infringement (also known as "takedown notices") to Shutterstock pursuant to the Digital Millennium Copyright Act (DMCA). Attached hereto as **Exhibit F** is a true and correct copy of Shutterstock's DMCA Policy, which is publicly available on Shutterstock's website at https://www.shutterstock.com/terms/dmca-notice.

22. Shutterstock's DMCA Policy identifies and provides the contact information for Shutterstock's designated agent, which has been registered with the U.S. Copyright Office and

listed in the U.S. Copyright Office's public directory at all relevant times.  Attached hereto as **Exhibit G** are true and correct printouts of the Copyright Office's public directory.

23.     Shutterstock does not interfere with—and, in fact, supports—copyright owners' ability to issue takedown notices.  Shutterstock not only encourages copyright owners to write to Shutterstock if they believe their rights are being infringed, but also encourages non-copyright owners to report any suspected instances of infringement.

24.     Shutterstock promptly investigates and responds to takedown notices.  Shutterstock has a team that carefully evaluates every copyright claim that it receives to ensure that appropriate action is taken with respect to the content and/or applicable contributor account.  On average, in 2021 and 2022, Shutterstock responded to DMCA-compliant notices within 75 hours of receipt.

25.     Shutterstock does not tolerate abuse of its website or others' intellectual property rights.  It has adopted and follows a policy for removing potentially infringing content and terminating contributors who upload such content to Shutterstock's platform.  The policy is set forth in the Contributor Terms of Service, which provides that "Shutterstock may suspend access to [the contributor's] Content and terminate [the contributor's] account" in the event that Shutterstock "receives a [copyright infringement] complaint about [the contributor's] Content."

26.     Shutterstock regularly removes content and terminates contributors' accounts due to alleged infringing activity.  Shutterstock keeps detailed records of each takedown notice that it receives, including the identity of the contributor responsible for uploading the offending content, so that it may identify repeat infringers and take action where appropriate.  Shutterstock always terminates a contributor who infringes repeatedly, generally on the third notice or where multiple images are reported in a single notice.  Indeed, Shutterstock generally terminates the accounts of

those who violate its terms of service much faster than the "six strikes" proposed by the motion picture industry around the time Shutterstock's platform launched.

27.     Shutterstock receives relatively few takedown notices in connection with contributor-supplied images.  In 2021, the rate of DMCA takedown notices, valid or not, was approximately 0.005% as compared to the new content uploaded that year.  Applying that number to existing content reduces the rate substantially further, to less than 0.001% of the content hosted for contributors.  On many occasions, the takedown notices are sent in error and relate to claims such as two photographs sharing the same idea, claims against photographs that the claimant later realizes are not his or hers, and other questions that have nothing to do with copyright infringement but appear to be sent in order to get someone's attention.

28.     Shutterstock does not promote or market infringing activity or content on its website.  Shutterstock also would not and does not knowingly distribute infringing content, let alone charge more for such content than its other content.  Indeed, Shutterstock is not incentivized to do so given that the point of the platform is to obtain authorized content for license.  In fact, Shutterstock represents and warrants to its licensees that "Shutterstock's contributors have granted Shutterstock all necessary rights in and to the Content to grant the rights set forth [therein]," and that the licensee's proper use of the licensed content "will not infringe a third party's copyright," and also agrees to indemnify its licensees for "damages arising from a third-party claim directly attributable to [any] breach" of such representations and warranties.  Attached hereto as **Exhibit H** is a true and correct copy of the "Shutterstock License Agreement(s)," which is publicly available on Shutterstock's website at https://shutterstock.com/license.  Shutterstock would not stand behind its content and offer such indemnification if it did not believe in the integrity of its contributors' content.

29.     In light of all of the above, it is little wonder that Shutterstock's contributor platform has operated for nearly twenty years without a single lawsuit being filed against it.  Only recently has a small group of frequent-filing attorneys sued over the platform, but considering Shutterstock has continued to follow standard DMCA protocols, I cannot understand why this has occurred, especially where I understand that the only case to be decided on this question found that Shutterstock follows DMCA protocols.

**E.      Plaintiff's Takedown Notice**

30.     I understand that, on December 30, 2020, counsel for the plaintiff in this lawsuit, Elliot McGucken ("Plaintiff"), emailed Shutterstock regarding the one image shown below (the "Noticed Image"), but failed to provide certain critical information under the DMCA (such as a statement under penalty of perjury that the sender was authorized to act on behalf the alleged copyright owner).  On January 4, 2021, Shutterstock responded to request that Plaintiff provide a DMCA-compliant notice.   A copy of this correspondence is attached as Exhibit D to the accompanying Declaration of Eleanor M. Lackman ("Lackman Declaration").

**Plaintiff's Noticed Image**



31.     On January 15, 2021, Plaintiff sent a takedown notice per Shutterstock's request ("Takedown Notice"), indicating that the Noticed Image had posted to Shutterstock's website without Plaintiff's authorization and requesting removal therefrom.  A copy of the Takedown

Notice is attached as Exhibit F to the accompanying Lackman Declaration.  Plaintiff identified two URLs in the Takedown Notice.  At the first URL, at a location that would appear following a search for a particular type of image and the customer selecting it from the results, Shutterstock's site showed a low-resolution, watermarked copy of the Noticed Image and small-sized thumbnails thereof on its customer-facing website in order to identify and offer the Noticed Image for license.  This is the page that a customer would visit and decide to obtain a license for the full-sized image (which would be provided only after completion of the licensing transaction process).  The second URL is the location of the ".jpg" file for one of the watermarked thumbnails associated with the Noticed Image, which does not turn up in search results and is generally used for the operational purpose of making the image appear to be located on the licensing page.

32.     Upon review of Plaintiff's Takedown Notice, Shutterstock acted expeditiously to remove the Noticed Image from the identified URLs and to de-index and withdraw it from licensing.  It did so on January 19, 2021, *i.e.*, two business days after receiving Plaintiff's Takedown Notice.  Attached hereto as **Exhibit I** is a copy of the asset details for the Noticed Image, which shows that it was removed per Plaintiff's Takedown Notice on January 19, 2021.  A copy of Shutterstock's correspondence with Plaintiff, including an email from Shutterstock confirming that the Noticed Image had been removed, is attached as Exhibit E to the accompanying Lackman Declaration.  As of January 19, 2021, the Noticed Image was not visible at the identified URLs, nor searchable on Shutterstock's website.  Even if it was somehow located by someone with a copy or a direct link to another URL where a record copy might reside, it could not be "added to cart" or otherwise licensed by a customer.

33.     The Noticed Image had been uploaded to Shutterstock's website by a third-party contributor located in Bangladesh by the name of Moajjem Hossain a/k/a Hane Street ("Hane

Street") on or about April 20, 2020.  Attached hereto as **Exhibit J** is a copy of the account details for Hane Street's contributor account.[1]  Plaintiff's Takedown Notice was the first complaint that Shutterstock had ever received in connection with the contributor.

34.     Shutterstock had no knowledge or awareness of the Noticed Image or the alleged infringement prior to receiving Plaintiff's Takedown Notice.  The first indication that the Noticed Image or the contributor had any issue at all came from the Takedown Notice.

35.     Plaintiff's Takedown Notice solely identified the Noticed Image; it did not identify, request removal of, or refer in any way, to any of the other images uploaded by Hane Street or any other contributor.  Shutterstock had no obligation to investigate whether any other copies of the Noticed Image may be stored on its website elsewhere because the Takedown Notice did not identify other locations for removal.  Plaintiff did not send any other takedown notices to Shutterstock or provide any other notices of other allegedly infringing images prior to filing this lawsuit.

**F.     Plaintiff's Complaints and the Images**

36.     I understand that, on February 2, 2022, Plaintiff filed the initial Complaint in this action, claiming, *inter alia*, that Shutterstock infringed his purported copyright rights in the Noticed Image and 324 other images (collectively, and together with the twelve additional images identified below, the "Images").

37.     All of the Images that Plaintiff identified in the Complaint were supplied by third-party contributors.  Specifically, the same contributor responsible for the Noticed Image, namely,

---

[1] The documents attached as Exhibits J, K, L, M, and P have been redacted to protect the privacy interests of the Contributors and other non-party individuals.  Shutterstock has contemporaneously filed a letter motion for approval to redact and/or seal these documents, and filed unredacted copies under seal with the proposed redactions highlighted.

Hane Street, uploaded all but one of these Images (collectively, the "Hane Street Images"), between April 22, 2020 and November 18, 2020.  The one other Image in the Complaint was uploaded to Shutterstock's website by a contributor located in India by the name of Gouranga Charan Bishoi ("Bishoi" and the "Bishoi Image"), on or about March 19, 2018.  The account details for Bishoi's contributor account are attached hereto as **Exhibit K**.

38.     Plaintiff did not send any takedown notices or otherwise notify Shutterstock about the Hane Street Images (except for the one Noticed Image) and/or the Bishoi Image prior to filing the Complaint.  However, by the time Plaintiff filed the Complaint, Shutterstock had already terminated both contributors' accounts and removed all of the images from their portfolios— including the Hane Street Images and Bishoi Image identified in the Complaint—from its customer-facing website for reasons having nothing to do with Plaintiff.  Specifically, on January 23, 2019, Shutterstock terminated Bishoi's contributor account and removed all of the images (including the Bishoi Image at issue) after its matching software detected potential infringement in connection with unrelated images uploaded by Bishoi.  On February 11, 2021, Shutterstock terminated Hane Street's contributor account and removed all of the images (including the remaining Hane Street Images at issue) from its customer-facing website, after receiving a complaint from another party, with whom I understand Plaintiff spoke, that certain images uploaded by Hane Street infringed their copyrights.  That was Hane Street's second "strike," with the first being Plaintiff's January 15, 2021 Takedown Notice.

39.     I understand that, on April 29, 2022, Plaintiff filed the First Amended Complaint ("Amended Complaint"), identifying an additional twelve (for a total of 337) Images.

40.     The additional Images identified in the Amended Complaint were uploaded to Shutterstock's platform by a third-party contributor located in Pakistan by the name of Muhammad

Raza a/k/a Raza 76j ("Raza" and the "Raza Images"), between May 3, 2021 and April 8, 2022. Attached hereto as **Exhibit L** is a copy of the account details for Raza's contributor account.

41.     Plaintiff did not send a takedown notice or otherwise notify Shutterstock about the Raza Images prior to filing the Amended Complaint.  However, on April 13, 2022, Shutterstock received the email attached hereto as **Exhibit M** from a "Good Samaritan" indicating that she "spotted a user on Shutterstock who is selling images that do not belong to them."  That user was Raza.  On April 18, 2022, Shutterstock terminated Raza's contributor account and removed all of the images in its portfolio (including the Raza Images at issue) from its customer-facing website.

42.     For easy reference, Figure 1 below groups the Images by contributor—*i.e.*, Hane Street, Bishoi, or Raza (collectively, "Contributors")—and lists the corresponding dates of Plaintiff's notice and Shutterstock's removal.   A more detailed chart containing similar information is attached hereto as **Exhibit N**.

Figure 1

| Contributor | Total Image(s) | Date Notified by Plaintiff | Date Removed |
|---|---|---|---|
| Hane Street | Noticed Image | Jan. 15, 2021 (Takedown Notice)[2] | Jan. 19, 2021 |
| | 324 | Feb. 2, 2022 (Complaint) | Feb. 11, 2021 |
| Bishoi | 1 | Feb. 2, 2022 (Complaint) | Jan. 23, 2019 |
| Raza | 12 | Apr. 29, 2022 (Amended Complaint) | Apr. 18, 2022 |

43.     Plaintiff's failure to send takedown notices or otherwise notify Shutterstock of the alleged infringement prior to filing suit threatens Shutterstock's entire business model, which depends, in significant part, on the protections afforded to it under the DMCA.  Shutterstock could

---

[2] As noted *supra*, Plaintiff also sent an email regarding the Noticed Image on December 30, 2020.

not possibly (and, as I understand the DMCA's terms, is not legally obligated to) scour the millions of images uploaded to its website to ensure against copyright infringement.  It relies on copyright owners, like Plaintiff, to specifically identify and report instances of alleged infringement. Plaintiff inexplicably chose not to do so for 336 (out of 337) Images at issue in this case.  Had Plaintiff sent takedown notices for these Images, Shutterstock would have removed them promptly (to the extent such Images remained on its website), just like it did for the one Noticed Image identified in Plaintiff's Takedown Notice.

44.     This appears to be a pattern for Plaintiff: monitor, fail to send notice, and then sue, which does not help to promptly remedy any injury and conflicts with what I understand is the point of the DMCA.  On January 12, 2023, Plaintiff filed **another lawsuit** against Shutterstock for near-identical claims related to contributor-submitted images, including at least one of the images and contributors at issue in this case, *McGucken v. Shutterstock, Inc.*, No, 2:23-cv-00242, Dkt. No. 1 (C.D. Cal. Jan. 12, 2023), and provided **no notice of any kind** to Shutterstock at any time.  A true and correct copy of the complaint filed in that case is attached hereto as **Exhibit O**.

**G.     The Contributors**

45.     Each of the Contributors accepted and agreed to Shutterstock's Contributor Terms of Service prior to uploading the Images to Shutterstock's platform.

46.     Plaintiff has not sued any of the Contributors for copyright infringement, nor do we have any information indicating that he has reached out to any of them to demand they stop and to seek recourse.

**H.      Copyright Management Information**

47.     As previously mentioned, Shutterstock's system automatically removes any and all metadata associated with contributor-uploaded images upon ingestion.  This includes any "copyright management information" (or "CMI") that may be in the metadata.

48.     Some of the Images contained no CMI at the time they were uploaded by the Contributors.  However, others did contain CMI in their metadata.  Like all other images uploaded to Shutterstock's contributor platform, during the ingestion process, that metadata (including any CMI) was removed in order to avoid computer viruses and prevent the dissemination of personally identifiable information.

49.     Following removal of any metadata, the Contributors added their own preferred display name and metadata consisting of the Contributors' preferred image title and keywords for searchability in the licensing system.  Shutterstock does not advise or encourage its contributors to provide any particular display names or metadata, nor to conceal a work's copyright status.  To the contrary, Shutterstock educates its contributors on copyright issues and the importance of obtaining any necessary licenses prior to submitting content to Shutterstock.  As noted above, it is vitally important to Shutterstock and the contributor community of over two million creators that the content uploaded to Shutterstock's site is authorized.  It is disincentivized to allow any violation and will take proactive steps beyond what the DMCA requires as a result.  Thankfully, as noted above and due to Shutterstock's efforts as well as the support of the creator community, the rate of fraud through violation of the Terms of Service is very low, and Shutterstock's objective is to reduce it even further.

I. __Lingering Thumbnails of the Images__

50.     As previously mentioned, Shutterstock's system automatically creates multiple thumbnails of every contributor-supplied image posted to its website for license.  When an image is removed from Shutterstock's public-facing website, the associated thumbnails remain in Shutterstock's back-end servers, unless the copyright owner specifically identifies them in a DMCA takedown notice (in which case Shutterstock removes the identified thumbnails, too). Shutterstock keeps these types of thumbnails for informational, recordkeeping, and matching purposes to help detect and prevent future potential infringing or fraudulent activity.  For example, when a contributor uploads an image, Shutterstock's software automatically compares it to the thumbnails associated with images that had been previously submitted to Shutterstock's website. If there is a match with an image that had been previously removed from Shutterstock's website due to a notice of infringement, the contributor-uploaded image will be rejected (and Shutterstock may take other steps, such as terminating the contributor, like it did for Bishoi).  Additionally, contributors who want to stop licensing their content often ask for their content to be removed from the licensing platform but that their thumbnails be retained for reference to assist with questions about payment and other issues having nothing to do with infringement.  Accordingly, thumbnails are often vital to help track information pertaining to the contributor as well as customers who licensed contributors' images.

51.     Plaintiff did not send any takedown notices to Shutterstock, or otherwise notify Shutterstock of the alleged infringement, regarding any of the thumbnails associated with the Images.  The only exception is the one thumbnail associated with the Noticed Image, which Shutterstock removed on January 19, 2021 in response to Plaintiff's Takedown Notice specifically

identifying that thumbnail.  Accordingly, when the Images were removed for the various reasons discussed above, the associated thumbnails remained in Shutterstock's back-end servers.

52.     The lingering thumbnails were not visible on Shutterstock's website or indexed for searches; they could only be found by someone who had preserved a copy of the Images and used specialized software to conduct a reverse-image search, or by someone who had a copy of the Shutterstock image ID number and identified the directory and file-naming convention used on Shutterstock's servers to reverse-engineer the link to the unindexed thumbnail file.  This is not how the public searches for images to license.

53.     Prior to the filing of the Complaint, Shutterstock had already removed all thumbnails associated with Hane Street (including the Hane Street Images in the Complaint) from its back-end severs for reasons having nothing to do with Plaintiff or the Hane Street Images at issue.  Specifically, on May 17 and 18, 2021, Shutterstock removed the thumbnails associated with Hane Street, after another party, Itasca Images, LLC had identified (evidently through the use of software) thumbnails that it claimed infringed its copyrights and requested in a series of letters that the thumbnails specifically identified in those letters be removed.

54.     Upon the filing of the Complaint, Shutterstock became aware that Plaintiff claimed to own the Bishoi Image and that the Bishoi Image was allegedly infringing Plaintiff's copyright.  On February 16, 2022, Shutterstock voluntarily conducted an investigation and removed all thumbnails associated with the Bishoi Image from its back-end servers.

55.     After Plaintiff filed the Amended Complaint, Shutterstock became aware that Plaintiff claimed to own the Raza Images, so Shutterstock thereafter voluntarily searched for and removed the thumbnails associated with the Raza Images from its back-end servers on May 11, 2022.

**J.**      **Licensing of the Images**

56.      Shutterstock issued a total of 938 licenses for 165 of the Images and generated a total of $2,131.60 therefrom, a portion of which was paid to the Contributors.  Of the 938 licenses, approximately 65 were licensed under a free trial subscription in which Shutterstock did not receive any payment attributable to the licensee's use.

57.      Shutterstock offered the Images for license at the same prices and pursuant to the same terms as it offers all of the other contributor-submitted images available on its website.

58.      172 of the Images were never licensed and Shutterstock did not earn any revenue therefrom.  Because they were never licensed, the high-resolution, unwatermarked copies of the 172 Images were never accessible or provided to anyone.

59.      On June 3, 2022, after I understood that Plaintiff wanted the licensees to stop making use and was refusing to let these innocent parties off the hook in exchange for an amicable resolution—in fact, I understand he sued the licensees after receiving their information in discovery—Shutterstock sent kill notices to each of the licensees, informing the licensee that a legal claim has been made in connection with their licensed image and requesting that they remove the image and cease usage.  Attached hereto as **Exhibit P** are examples of those kill notices. Shutterstock does not have an ability to control its licensees or ensure that they have actually ceased use.  For example, while Shutterstock's license agreements require that a licensee use an image only in the size and manner paid for, Shutterstock cannot determine whether the licensee will comply, nor does it otherwise know what use the licensee makes of the image.  Further, as there is no ongoing royalty paid for the image, the transaction is closed at the time of license.

**K.**     **Shutterstock's API and The Third-Party Websites That Integrate It**

60.     Shutterstock offers an API that provides access to its entire library of content (*i.e.*, the same library of content that is offered on Shutterstock's website), including the millions of contributor-supplied images available on Shutterstock's website.  For background purposes, an "API," which stands for "application programming interface," is a software intermediary that allows two or more computer programs to communicate with each other with no human intervention.  Shutterstock's API allows third parties to integrate the functionality of searching, accessing, licensing, and/or downloading the images in Shutterstock's library into their own websites.

61.     TinEye, StockFresh, and HelloRF are among the thousands of third-party websites that integrate Shutterstock's API into their own websites, albeit in somewhat different ways and pursuant to different terms.  Shutterstock has more than 7,500 API integrations with various other platforms, including Facebook, Apple, IBM, Microsoft, and Google.  For ease of reference, I will use the term "API User Platform" to refer generally to any third-party website that integrates Shutterstock's API.

62.     I understand that Plaintiff has made much of Shutterstock's so-called "partners[hips]" with the third-party websites TinEye, StockFresh, and HelloRF.  These websites are not Shutterstock's "partners" in any official, legal sense, and Shutterstock does not have a "partnership agreement" with any of them.  To the extent that any of these websites use the word "partner" in relation to Shutterstock, it purely is marketing-speak.  Shutterstock has no ownership in or control over StockFresh and/or TinEye.  In the interest of full disclosure, Shutterstock has a small investment interest in HelloRF's parent company, ZCool.  However, Shutterstock has no direct ownership interest in HelloRF, nor any control over HelloRF and its business operations.

63.     Shutterstock's API automatically provides API User Platforms with access to—not copies of—the images in Shutterstock's library.  For example, if a user performs a keyword search for "beach" on an API User Platform, Shutterstock's API automatically allows the API User Platform to access all of the images in Shutterstock's library associated with the keyword "beach" and display them in the search results.  The "display" links back to the copies of the beach-related images that exist in Shutterstock's library (*i.e.*, the same copies that would be displayed if the user had searched for "beach" directly on Shutterstock's website).  If no one ever searched the API User Platform for these images, they would never be displayed there.

64.     There are different types of API User Platforms.  Some API User Platforms (*e.g.*, TinEye and StockFresh) merely drive referral traffic to Shutterstock's website.  Continuing with the example above, if the user decided it wanted to license one of Shutterstock's beach-related images that it found on this type of API User Platform, it would be redirected to Shutterstock's website to complete the transaction, and the API User Platform would receive a commission if the user purchases a subscription plan.[3]  Other API User Platforms integrate search and licensing of Shutterstock images into the API User Platforms own applications, such as the online display advertising creative tools used on Facebook Ads or Microsoft Ads.  Other API User Platforms (*e.g.*, HelloRF) are resellers, which means the transaction is completed on their own website and there are more complicated royalty splits.  Either way, the process is totally automatic.

65.     The API automatically provides real-time access into Shutterstock's content library, thereby allowing the API User Platform to access whatever content has been added to

---

[3] TinEye can only be searched using an image file, not a keyword, but the result is the same.  If a user searches TinEye for an image that is available on Shutterstock's website, it will be re-directed to Shutterstock's website, and TinEye will receive a commission if a customer purchases a subscription plan.

Shutterstock's library of content (and thus its public-facing website), and also revoking access to any content that has been removed. When an image is removed, it automatically becomes completely unavailable for license on Shutterstock's website and also through any of the API User Platforms. While a very few API User Platforms may cache thumbnail, watermarked copies of an image for purposes of them appearing in search results in a more functionally efficient way, the full-sized image is never available. When the API User Platform refreshes the API, the removed image cannot even show up in search results. Accordingly, Shutterstock does not specifically notify its thousands of API User Platforms every time one of its more than 424 million images is removed from the library.

66.    Shutterstock did not provide or distribute any copies of the Images to TinEye, StockFresh, HelloRF, or any other API User Platform. Nor did Shutterstock direct them to display the Images on their websites (to the extent they were ever displayed). As explained above, that is not how Shutterstock's API works. Shutterstock merely made the Images (and millions of other images) accessible to these third-party websites through its API.

67.    The Images were automatically unavailable to license through Shutterstock's API—and thus unavailable to license through HelloRF, StockFresh, TinEye, and every other API User Platform—as of the dates of removal from Shutterstock's website set forth above. By way of example, as of January 19, 2021, the Noticed Image was not licensable to these third-party websites through Shutterstock's API, and as of February 11, 2021, none of the Hane Street Images were licensable. Thus, even if thumbnail, watermarked copies of the images showed up in a search of these third-party websites, they could not be licensed.

68.     Plaintiff did not send takedown notices or otherwise notify TinEye, HelloRF, or StockFresh regarding the allegedly infringing Images.   Nor has he sued these websites for copyright infringement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: New York, New York
         January 20, 2023



Heather Shimmin