UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELLIOT MCGUCKEN,

                            Plaintiff,

      -against-

SHUTTERSTOCK, INC.,

                        Defendant.

Case No. 1:22:-cv-00905 (GHW)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT SHUTTERSTOCK, INC.'S MOTION FOR SUMMARY JUDGMENT**

MITCHELL SILBERBERG & KNUPP LLP
Eleanor M. Lackman (eml@msk.com)
Marissa B. Lewis (mbl@msk.com)
Elaine Nguyen (eln@msk.com)
437 Madison Ave., 25th Floor
New York, New York 10022-7001
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

*Attorneys for Defendant Shutterstock, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. iii

SUMMARY OF RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ................ 2

    A.    Shutterstock's Website, Contributor Platform, and Copyright Policies ......................... 2

    B.    Shutterstock's Automatic Processing of Contributors' Images ..................................... 3

    C.    Shutterstock's API and Third-Party Websites ............................................................... 4

    D.    Plaintiff's Takedown Notice .......................................................................................... 4

    E.    Plaintiff's Complaints and the Images .......................................................................... 5

    F.    The Operative Amended Complaint ............................................................................... 6

ARGUMENT ............................................................................................................................... 6

I.      LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT ............................ 6

II.     THE DMCA SHIELDS SHUTTERSTOCK FROM DIRECT AND SECONDARY
       LIABILITY FOR COPYRIGHT INFRINGEMENT ......................................................... 7

    A.    The DMCA Provides Safe Harbor To Qualifying Online Service Providers. ................ 7

    B.    Shutterstock Meets The Broad Definition Of A "Service Provider." .............................. 8

    C.    Shutterstock Satisfies The Threshold Conditions For Eligibility For Safe Harbor. ........ 9

         1.    Shutterstock Has Adopted and Implements a "Repeat Infringer" Policy ............. 9

         2.    Shutterstock Does Not Interfere With "Standard Technical Measures." ........... 10

    D.    Shutterstock Meets the Specific Conditions Safe Harbor Under DMCA § 512(c). ........ 11

         1.    Shutterstock Stores Materials On Its System At The Direction of Users ........... 11

         2.    Shutterstock Did Not Have Actual or "Red Flag" Knowledge of the Alleged
            Infringement and Expeditiously Removed the Images When or Before It Became
            Aware of the Specific Alleged Infringement. ................................................... 12

         3.    Shutterstock Had No Right Or Ability To Control The Alleged Infringement And
            Did Not Financially Benefit From It ................................................................ 17

            a.    Shutterstock Had No Control Over The Alleged Infringement.  17

            b.    Shutterstock Did Not Receive A Direct Financial Benefit.     18

         4.    Shutterstock Has Had A Designated DMCA Agent At All Relevant Times ...... 20

III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SHUTTERSTOCK ON
       PLAINTIFF'S COPYRIGHT MANAGEMENT INFORMATION CLAIM ................. 21

    A.    Plaintiff Did Not Provide False CMI in Violation of § 1202(a). ................................. 21

## TABLE OF CONTENTS
### (CONTINUED)

**Page**

B.    Plaintiff Cannot Establish a Violation of § 1202(b). .................................................... 22

IV.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SHUTTERSTOCK ON PLAINTIFF'S DIRECT COPYRIGHT INFRINGEMENT CLAIM FOR MULTIPLE OTHER INDEPENDENT REASONS ............................................................................. 24

A.    Shutterstock Did Not Engage in Any Volitional Conduct That Caused the Alleged Infringement. ........................................................................................................... 24

B.    Shutterstock's Alleged Use of the Images Constitutes Fair Use................................. 26

1.    Shutterstock's Alleged Use of the Images Is Highly Transformative. .............. 27

2.    The Nature of the Images Favors Fair Use.................................................... 28

3.    The Amount and Substantiality Used Favors Fair Use................................... 29

4.    The Effect of the Use on the Potential Market Favors Fair Use ...................... 29

C.    Plaintiff Lacks Standing to Claim Infringement of Certain Images That Are Not Validly Registered With the Copyright Office. ....................................................................... 30

D.    Plaintiff Is Not Entitled to Double Recovery.............................................................. 32

V.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SHUTTERSTOCK ON PLAINTIFF'S SECONDARY COPYRIGHT INFRINGEMENT CLAIM.................... 32

A.    The Evidence Does Not Support Plaintiff's Contributory Infringement Claim.............. 33

B.    The Evidence Does Not Support Plaintiff's Vicarious Infringement Claim. ................. 34

CONCLUSION................................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...................................................................................................6, 7

*Arica Inst., Inc. v. Palmer*,
  970 F.2d 1067 (2d Cir. 1992)............................................................................................28

*Arista Records, LLC v. Lime Group, LLC*,
  784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011)......................................................................34

*Authors Guild, Inc. v. HathiTrust*,
  902 F. Supp. 2d 445 (S.D.N.Y. 2012), *aff'd in part, vacated in part*, 755 F.3d
  87 (2d Cir. 2014)....................................................................................................27, 29, 30

*Bell v. Wilmott Storage Servs., LLC*,
  12 F.4th 1065 (9th Cir. 2021) ......................................................................................24, 25

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006)......................................................................27, 28, 29, 30

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006)...............................................................................................27

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*,
  69 F. Supp. 3d 342 (S.D.N.Y. 2014)...........................................................................33, 34

*Campbell v. Acuff–Rose Music, Inc.*,
  510 U.S. 569 (1994)...........................................................................................................27

*Capitol Records, Inc. v. MP3tunes, LLC*,
  821 F. Supp. 2d 627 (S.D.N.Y. 2011).........................................................................10, 19

*Capitol Records, LLC v. Vimeo, LLC*,
  826 F.3d 78 (2d Cir. 2016).....................................................................................8, 13, 15

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)...............................................................................................28

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008).........................................................................................24, 25

*Corbis Corp. v. Amazon.com, Inc.*,
  351 F. Supp. 2d 1090 (W.D. Wash. 2004)...........................................................................8

*Craig v. UMG Recordings, Inc.*,
  380 F. Supp. 3d 324 (S.D.N.Y. 2019)................................................................................22

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

*Desire, LLC v. Manna Textiles, Inc.*,
   986 F.3d 1253 (9th Cir. 2021) ............................................................... 32

*Disney Enters., Inc. v. Hotfile Corp.*,
   798 F. Supp. 2d 1303 (S.D. Fla. 2011) ............................................. 25, 26

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ............................................................... 35

*Gattoni v. Tibi, LLC*,
   254 F. Supp. 3d 659 (S.D.N.Y. 2017) .................................................... 22

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2d Cir. 1971) ................................................................. 34

*Greg Young Publ'g, Inc. v. Zazzle, Inc.*,
   No. 2:16-CV-04587-SVW-KS, 2017 WL 2729584 (C.D. Cal. May 1, 2017) ...................... 11

*Hosseinzadeh v. Klein*,
   276 F. Supp. 3d 34 (S.D.N.Y. 2017) ....................................................... 26

*Hydentra HLP Int. Ltd. v. Luchian*,
   No. 1:15-CV-22134-UU, 2016 WL 5951808 (S.D. Fla. June 2, 2016) .................... 35

*In re Aimster Copyright Litig.*,
   252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003) ............. 9

*Io Grp., Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008) ....................................... 13, 18, 20

*Keeling v. Hars*,
   809 F.3d 43 (2d Cir. 2015) ..................................................................... 27

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ......................................................... 28, 29, 30

*Krechmer v. Tantaros*,
   747 F. App'x 6 (2d Cir. 2018) ............................................................... 21

*Livnat v. Lavi*,
   No. 96 Civ. 4967 (RWS), 1998 WL 43221 (S.D.N.Y. Feb. 2, 1998) .................... 33

*Magnum Photos Int'l, Inc. v. Houk Gallery, Inc.*,
   No. CV 16-7030 (VSB), 2018 WL 4538902 (S.D.N.Y. Sept. 21, 2018) ............. 28, 30

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...................................................................................................6, 7

*Matthew Bender & Co. v. W. Pub. Co.*,
  158 F.3d 693 (2d Cir. 1998)........................................................................................33

*McGucken v. JJOK, LLC*,
  No. 2:22-cv-06095 (C.D. Cal. Aug. 26, 2022) ...........................................................32

*McGucken v. Lonely Planet USA, LLC*,
  No. 2:22-cv-05476 (C.D. Cal. Aug. 4, 2022) .............................................................32

*McGucken v. Shutterstock, Inc.*,
  No, 2:23-cv-00242, Dkt. No. 1 (C.D. Cal. Jan. 12, 2023) ...........................................2

*McLaren v. Chico's FAS, Inc.*,
  No. 10 Civ. 2481(JSR), 2010 WL 4615772 (S.D.N.Y. Nov. 9, 2010) ....................31

*Microsoft Corp. v. Softicle.com*,
  No. CV 16-2762, 2017 WL 5517379 (D.N.J. Sept. 29, 2017) ...............................26

*NXIVM Corp. v. Ross Inst.*,
  364 F.3d 471 (2d Cir. 2004)..................................................................................28, 30

*Obodai v. Demand Media, Inc.*,
  No. 11 Civ. 2503 (PKC), 2012 WL 2189740 (S.D.N.Y. June 13, 2012), *aff'd
  sub nom. Obodai v. Cracked Ent. Inc.*, 522 F. App'x 41 (2d Cir. 2013).....................9, 14, 20

*On Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001)........................................................................................28

*Palmer/Kane LLC v. Rosen Book Works LLC*,
  204 F. Supp. 3d 565 (S.D.N.Y. 2016).........................................................................31

*Parker v. Google, Inc.*,
  242 F. App'x 833 (3d Cir. 2007) ..............................................................................26

*Parker v. Paypal, Inc.*,
  No. CV 16-4786, 2017 WL 3508759 (E.D. Pa. Aug. 16, 2017)................................26

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) .............................................................................14, 19

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) .........................................................................24, 25, 26

**TABLE OF AUTHORITIES
(CONTINUED)**

**Page(s)**

*Pickholtz v. Rainbow Techs., Inc.*,
 260 F. Supp. 2d 980 (N.D. Cal. 2003) ......................................................................32

*Psihoyos v. John Wiley & Sons, Inc.*,
 No. 11 Civ. 1416 (JSR), 2011 WL 4916299 (S.D.N.Y. Oct. 14, 2011), *aff'd*,
 748 F.3d 120 (2d Cir. 2014)....................................................................................30

*Reed Elsevier, Inc. v. Muchnick*,
 559 U.S. 154 (2010)................................................................................................30

*Rosen v. eBay, Inc.*,
 No. CV 13-6801 (MWF) (EX), 2015 WL 1600081 (C.D. Cal. Jan. 16, 2015) ......................28

*Rosen v. Hosting Servs., Inc.*,
 771 F. Supp. 2d 1219 (C.D. Cal. 2010) ...............................................................11

*Steinmetz v. Shutterstock, Inc.*,
 No. 21 Civ. 7100 (AKH), 2022 WL 4342174 (S.D.N.Y. Sept. 19, 2022),
 *appeal dismissed*, No. 22-2699 (2d Cir. Dec. 8, 2022)........................2, 8, 9, 11, 17, 18, 20, 21

*Stevens v. Corelogic, Inc.*,
 899 F.3d 666 (9th Cir. 2018) ..............................................................................23, 24

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
 756 F.3d 73 (2d Cir. 2014)...................................................................................27, 29

*Thron v. HarperCollins Publishers, Inc.*,
 No. 01 Civ. 5437 (JSR), 2002 WL 1733640 (S.D.N.Y. July 26, 2002) ............................23, 31

*Totally Her Media, LLC v. BWP Media USA, Inc.*,
 No. CV 13-8379-AB, 2015 WL 12659912 (C.D. Cal. Mar. 24, 2015) ................................35

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
 718 F.3d 1006 (9th Cir. 2013) ........................................................................12, 13, 14

*Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*,
 142 S. Ct. 941 (2022).............................................................................................32

*Ventura Content, Ltd. v. Motherless, Inc.*,
 No. 11 Civ. 5912 (SVW) (FMO), 2013 WL 11237204 (C.D. Cal. July 3,
 2013), *aff'd*, 885 F.3d 597 (9th Cir. 2018).......................................................12, 15, 17

*Viacom Int'l Inc. v. YouTube, Inc.*,
 718 F. Supp. 2d 514 (S.D.N.Y. 2010), *aff'd in relevant part*, 676 F.3d 19 (2d
 Cir. 2012) .....................................................................9, 12, 14, 15, 16, 17, 18, 19

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*William Wade Waller Co. v. Nexstar Broad., Inc.*,
    No. 4-10-CV-00764 (GTE), 2011 WL 2648584 (E.D. Ark. July 6, 2011)..............................23

*Wolk v. Kodak Imaging Network, Inc.*,
    840 F. Supp. 2d 724 (S.D.N.Y. 2012), *aff'd sub nom. Wolk v.*
    *Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014)........................................ *passim*

*Yang v. Mic Network, Inc.*,
    405 F. Supp. 3d 537 (S.D.N.Y. 2019)........................................................................29

*Zuma Press, Inc. v. Getty Images (US), Inc.*,
    349 F. Supp. 3d 369 (S.D.N.Y. 2018), *aff'd*, 845 F. App'x 54 (2d Cir. 2021)......................22

### STATUTES

17 U.S.C.
    § 107............................................................................................................27, 29, 30
    § 411(a)................................................................................................................30
    § 504(c)(1)...........................................................................................................32
    § 512(i)(1)..............................................................................................................9
    § 512(i)(2)............................................................................................................10
    § 512(c)........................................................................................................ *passim*
    § 512(k)(1)(B).........................................................................................................8
    § 512(m)(1)...........................................................................................................12
    § 1202.........................................................................................6, 21, 22, 23, 24

### OTHER AUTHORITIES

37 CFR § 202.4(i)(2)..............................................................................................31

*Compendium III: Compendium of Copyright Office Practices*, § 1114.1 .....................31

Fed. R. Civ. P. 56(a) ..............................................................................................6

Local Rule 56.1.......................................................................................................2

Standard Technical Measures & Section 512: Notice of Inquiry, U.S. Copyright
    Office, 60 Fed. Reg. 25050 (Apr. 27, 2022) .........................................................10

## PRELIMINARY STATEMENT

Every day, millions of transactions take place between buyers and sellers through internet platforms. Amazon, eBay, Etsy, Facebook Marketplace, YouTube, and even Getty Images and Adobe Stock, all are able to operate because of the protection provided by the Digital Millennium Copyright Act (DMCA), which provides those platforms with protection in the event that a user lists an item on their platforms that a third-party claims is infringing. Without the DMCA, these online marketplaces would shut down for fear of endless litigation. As a result of the DMCA, these online marketplaces have flourished and become a vital part of the American economy.

Defendant Shutterstock, Inc. ("Shutterstock"), too, operates in part as a marketplace. Shutterstock permits third-party "contributors" to upload their images via an online portal and, after a quick review for objectionable content (*e.g.*, pornography, hate speech, spamming), the images become available to prospective customers to license on Shutterstock.com. A single fee is charged for any image the customer chooses to license. Like other similar platforms, Shutterstock takes a percentage of the sale and pays the contributor the rest. As a result of the DMCA's protections, Shutterstock has paid over $1 billion to visual artists who take advantage of Shutterstock's global reach and broad customer base to monetize their creative works.

This action arises from Shutterstock's display of several hundred images on its website that purportedly infringe the copyrights of plaintiff Elliot McGucken ("Plaintiff"), all of which were uploaded by a total of three third-party contributors. Plaintiff is a serial copyright infringement plaintiff and sophisticated party whose counsel is familiar with the notice-and-takedown provisions of the DMCA. Yet, prior to filing this lawsuit, Plaintiff sent only *one* takedown notice to Shutterstock identifying only *one* of the images at issue, despite knowing of others, and which noticed image Shutterstock promptly removed. As a trusted provider of over 424 million images,

1

Shutterstock does not tolerate infringement on its website. In fact, despite having received **no prior notice** from Plaintiff, by the time Plaintiff filed in court the complaints identifying the other 336 images that purportedly infringe his copyrights, Shutterstock already had removed them from its customer-facing website and terminated the accounts of the contributors who uploaded them.

What Plaintiff complains about is exactly what Congress anticipated in enacting the DMCA a quarter-century ago. His decision to sue on an image that Shutterstock had **already promptly removed**, and **without providing notice** as to hundreds of others, is an anathema to the DMCA's notice-and-takedown provisions. Had Plaintiff looked at the law—which was recently put right in front of his counsel in *Steinmetz v. Shutterstock, Inc.*, No. 21 Civ. 7100 (AKH), 2022 WL 4342174 (S.D.N.Y. Sept. 19, 2022), *appeal dismissed*, No. 22-2699 (2d Cir. Dec. 8, 2022)— he would have known that the DMCA wholly bars his copyright infringement claims, and that his claim regarding Shutterstock's automatic removal of metadata and watermarking also cannot stand.[1] Plaintiff's misguided lawsuit should be dismissed as a matter of law accordingly.

## **SUMMARY OF RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**[2]

### A.    Shutterstock's Website, Contributor Platform, and Copyright Policies

Shutterstock operates a leading global online marketplace for photographic images and other content (such as video footage and music) at the website www.shutterstock.com. SUF ¶ 1. There are currently more than 424 million images available for license on Shutterstock's website

---

[1] Underscoring Plaintiff's disregard for the DMCA and the law, on January 12, 2023, Plaintiff filed a new lawsuit against Shutterstock for near-identical claims related to contributor-submitted images (including at least one of the images and uploaders at issue in this case), *McGucken v. Shutterstock, Inc.*, No, 2:23-cv-00242, Dkt. No. 1 (C.D. Cal. Jan. 12, 2023), and provided **no notice of any kind** to Shutterstock at any time.  *See* Declaration of Heather Shimmin ("Shimmin Decl." ¶ 44, Ex. O.

[2] Shutterstock's accompanying Local Rule 56.1 Statement of Undisputed Material Facts ("SUF") contains a full recitation of the relevant factual background.

and 200,000 images are added every day. *Id.* ¶ 2. One way that Shutterstock obtains images for license is through its community of over two million third-party "contributors." *See id.* ¶ 3. Anyone can become a contributor by registering an account through Shutterstock's website or mobile app and uploading content to be included in Shutterstock's online marketplace. *Id.* ¶ 4.

Before uploading any content, all contributors must accept and agree to Shutterstock's "Contributor Terms of Service" (*id.* ¶ 5), pursuant to which contributors affirm that "the Content [that they submit to Shutterstock] does not infringe the copyright or any other rights of any third party" (*id.* ¶ 6). Shutterstock encourages copyright owners to report infringing activity (*id.* ¶ 25), and expressly reserves the right to "suspend access to [any] Content [uploaded by a contributor] and terminate [the contributor's] account" in the event that Shutterstock "receives a [copyright infringement] complaint about [the contributor's] Content." *Id.* ¶ 27.

B.    Shutterstock's Automatic Processing of Contributors' Images

Shutterstock briefly reviews contributor-uploaded images for obvious technical and quality issues, but otherwise, the entire process initiated by the contributor's decision to upload an image—from ingesting the image into the contributor platform to making the image available on Shutterstock's website to issuing any licenses—is automated, with no involvement by any person at Shutterstock. *Id.* ¶¶ 10, 14-16, 18, 20. During the ingestion process, Shutterstock's system automatically removes any metadata embedded into the contributors' image files to prevent computer viruses and the dissemination of personally identifiable information. *Id.* ¶ 15. Before the images are posted to Shutterstock's website, Shutterstock's system automatically creates multiple small-sized, low-resolution copies (*i.e.*, "thumbnails") of the images so that potential licensees can see how they might look, and applies a "Shutterstock" watermark to all copies (except very small thumbnails) to prevent unlicensed uses. *Id.* ¶¶ 16-18. Anyone may license the contributor-

submitted images on demand through an entirely automated process on Shutterstock's website. *Id.* ¶ 20.

  C. <u>Shutterstock's API and Third-Party Websites</u>

  Shutterstock offers an "API" (or "application programming interface") that automatically provides access to its entire library of content, including millions of contributor-submitted images. *Id.* ¶ 71. Shutterstock's API allows third-party websites such as TinEye and StockFresh to integrate the functionality of searching, accessing, licensing, and/or downloading the images in Shutterstock's library into their websites. *Id.* ¶¶ 71-72. The API provides real-time access to the same content available on Shutterstock's website. *Id.* ¶ 74. When an image is removed from Shutterstock's website, it automatically becomes completely unavailable for license through TinEye, StockFresh, and any third-party website that integrates Shutterstock's API (collectively, "API User Platforms"). *Id.* ¶ 75.

  D. <u>Plaintiff's Takedown Notice</u>

  On or about January 15, 2021, Plaintiff sent a takedown notice to Shutterstock ("Takedown Notice"), indicating that ***one*** of his allegedly copyrighted images ("Noticed Image") had been posted to Shutterstock's website (at two URLs) without Plaintiff's authorization and requesting removal. *Id.* ¶¶ 34-35.[3] The Noticed Image had been uploaded to Shutterstock's website by a third-party contributor by the name of Moajjem Hossain a/k/a Hane Street ("Hane Street") and, prior to Plaintiff's Takedown Notice, Shutterstock had no specific knowledge or reason to suspect the alleged infringement. *Id.* ¶¶ 37-38. On January 19, 2021, Shutterstock removed the Noticed Image

---

[3] Plaintiff initially contacted Shutterstock regarding the Noticed Image on December 30, 2020, but did not provide information required under the DMCA. *Id.* ¶ 32; *cf.* 17 U.S.C. § 512(c)(3). Shutterstock replied on January 4, 2021 to request a DMCA-compliant notice. SUF ¶ 33. Plaintiff sent the Takedown Notice eleven days later, and although Shutterstock promptly removed the Noticed Image in response (*id.* ¶ 36), it does not concede that such notice was DMCA-compliant.

from both of the identified URLs and withdrew it from licensing. *Id.* ¶ 36.

E.   Plaintiff's Complaints and the Images

On February 2, 2022, Plaintiff filed the original Complaint, claiming, *inter alia*, that Shutterstock infringed his purported copyright rights in the Noticed Image in Plaintiff's Takedown Notice and 324 other images. *See id.* ¶ 41. On April 29, 2022, Plaintiff filed the operative First Amended Complaint ("Amended Complaint"), identifying an additional twelve images, for a total of 337 images at issue (collectively, the "Images"). *Id.* ¶ 47.

All of the Images were uploaded to Shutterstock's website by third-party contributors, namely, Moajjem Hossain a/k/a Hane Street ("Hane Street"), Gouranga Charan Bishoi ("Bishoi"), and Muhammad Raza a/k/a Raza 76j ("Raza") (collectively, "Contributors"). *Id.* ¶¶ 42-43, 48. Except for the Noticed Image (which Shutterstock promptly removed upon receipt of Plaintiff's Takedown Notice), Plaintiff did not send any takedown notices to Shutterstock for the Images, or otherwise notify Shutterstock of the alleged infringement, prior to filing suit. *Id.* ¶¶ 44, 49. For reasons unrelated to Plaintiff, Shutterstock already had removed the Images from its customer-facing website and terminated the Contributors' accounts by the time Plaintiff filed the Complaint and/or Amended Complaint identifying same. *Id.* ¶¶ 45-46, 50. For easy reference, Figure 1 below groups the Images by Contributor and lists the corresponding dates of Plaintiff's notice and Shutterstock's removal.

Figure 1

| Contributor | Total Image(s) | Date Notified by Plaintiff | Date Removed |
|---|---|---|---|
| Hane Street | Noticed Image | Jan. 15, 2021 (Takedown Notice)[4] | Jan. 19, 2021 |
| | 324 | Feb. 2, 2022 (Complaint) | Feb. 11, 2021 |

---

[4] As noted *supra*, Plaintiff also sent an email regarding the Noticed Image on December 30, 2020.

5

| Bishoi | 1 | Feb. 2, 2022 (Complaint) | Jan. 23, 2019 |
| Raza | 12 | Apr. 29, 2022 (Amended Complaint) | Apr. 18, 2022 |

Over half of the Images were never licensed and, thus, Shutterstock never provided the full-sized, unwatermarked copies to anyone; only unusable demonstration versions could be seen. *Id.* ¶¶ 66-67. The others were licensed on-demand through Shutterstock's website on a "royalty-free" basis, under one of Shutterstock's standard licensing models, and amounted to a mere $2,131.60 in revenue. *Id.* ¶ 64. Shutterstock has since sent "kill notices" instructing the customers who obtained licenses (collectively, "Licensees") for the Images to cease all use. *Id.* ¶ 68.

  F. <u>The Operative Amended Complaint</u>

The Amended Complaint alleges claims for (1) direct copyright infringement; (2) contributory and/or vicarious copyright infringement; and (3) falsification and/or removal of copyright management information ("CMI") in violation of 17 U.S.C. § 1202. Shutterstock now moves for summary judgment on each of these claims because the undisputed record, taken as a whole, establishes that Plaintiff cannot prevail.

<u>**ARGUMENT**</u>

**I. LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT**

Summary judgment must be granted when the evidence, viewed in the light most favorable to the nonmoving party, shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a properly supported motion for summary judgment, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The evidence must be "of such a character that it would warrant the jury in finding a verdict in favor of" the nonmoving party. *Id.* at 251; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"). Summary judgment cannot be defeated by raising "metaphysical doubt as to the material facts," *id.* at 586, or adducing evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249.

## II.    THE DMCA SHIELDS SHUTTERSTOCK FROM DIRECT AND SECONDARY LIABILITY FOR COPYRIGHT INFRINGEMENT

Plaintiff seeks to hold Shutterstock directly and secondarily liable for purportedly infringing his alleged copyright rights in the Images. The undisputed evidence establishes that Shutterstock qualifies for safe harbor protection under the DMCA, thus completely shielding Shutterstock from liability on Plaintiff's claims for direct and secondary (and, certainly, willful) copyright infringement as a matter of law.

### A.    The DMCA Provides Safe Harbor To Qualifying Online Service Providers.

Congress enacted the DMCA to "clarif[y] the liability faced by [online] service providers who transmit potentially infringing material over their networks." S. Rep. No. 105-190, at 2 (1998). To do so, it created a series of statutory "safe harbors" that "protect qualifying service providers from liability for all monetary relief for direct, vicarious, and contributory infringement" based on certain common internet activities. H.R. Rep. No. 105-551, pt. 2, at 50 (1998). Among these safe harbors is § 512(c), which provides protection against claims based on "information residing on [the service provider's] systems or networks at [the] direction of users." 17 U.S.C. § 512(c). "[W]hat Congress intended in passing § 512(c) was to strike a compromise [between copyright owners and service providers] under which, in return for the obligation to take down infringing works promptly on receipt of notice of infringement from the owner, Internet service providers would be relieved of liability for user-posted infringements of which they were unaware, as well as of the obligation to scour matter posted on their services to ensure against copyright

infringement." *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 89-90 (2d Cir. 2016). The DMCA makes no distinction based on whether revenue is earned. Even Amazon, one of the most profitable companies in the world, has been held to qualify for § 512(c) safe harbor protection. *See Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1110 (W.D. Wash. 2004).

Like its competitors, Shutterstock's ability to offer contributor-supplied images to the public via its online marketplace depends, in significant part, on the protections afforded to it as a "service provider" under the DMCA. As set forth below, Shutterstock meets every single identified threshold and specific requirement for safe harbor protection under DMCA § 512(c), and thus cannot be liable for copyright infringement as a matter of law.

B.    Shutterstock Meets The Broad Definition Of A "Service Provider."

"[Shutterstock] is a 'service provider' within the meaning of the statute" and "no reasonable finder of fact could otherwise conclude." *Steinmetz*, 2022 WL 4342174, at *6.[5] For purposes of DMCA § 512(c), "service provider" means "a provider of online services or network access, or the operator of facilities therefor." 17 U.S.C. § 512(k)(1)(B). "This definition encompasses a broad variety of Internet activities," *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2012), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014), including the operation of a for-profit website like Shutterstock's that allows

---

[5] The *Steinmetz* decision is instructive. It involves the same three claims as Plaintiff alleges in this case and similar facts, including Shutterstock's use of a watermarked copy of a contributor-uploaded image on its website and availability of same to TinEye, HelloRF, and StockFresh via its API. The *Steinmetz* court granted Shutterstock's motion for summary judgment, and denied Plaintiff's motion, on all claims. *Id.*, at *8. In sum, the *Steinmetz* court held that Shutterstock is "entitled to summary judgment as a matter of law on [p]laintiff's copyright infringement claims" because it "meets both the threshold and specific requirements for Section 512(c)'s Safe Harbor." *Id.* It further held that Shutterstock is "entitled to summary judgment as a matter of law on Plaintiff's false CMI claim" because Shutterstock's "use of a watermark does not constitute false CMI" and Shutterstock did not have the requisite "double scienter." *Id.* As discussed below, the fact that some platform users chose to license the images is a distinction without a difference.

8

users to upload and share their content with the public. *See* SUF ¶¶ 1-4; *cf. Wolk*, 840 F. Supp. 2d at 744 (website that "hosts and allows online sharing of photos and videos at the direction of users" and "profits from the service [it] provides" is a "service provider"); *Obodai v. Demand Media, Inc.*, No. 11 Civ. 2503 (PKC), 2012 WL 2189740, at *4, *8 (S.D.N.Y. June 13, 2012) ("website that permits users to post and share materials" and "earn[s] . . . revenue every time the [materials are] viewed" is a "service provider"), *aff'd sub nom. Obodai v. Cracked Ent. Inc.*, 522 F. App'x 41 (2d Cir. 2013); *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010) (YouTube, a website that allows users to upload and share videos and earns "income from advertisements displayed" in connection therewith, is a "service provider"), *aff'd in relevant part*, 676 F.3d 19 (2d Cir. 2012). Shutterstock plainly qualifies. Indeed, one court stated that it has "trouble imagining the existence of an online service that *would not* fall under the definition[]" *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 658 (N.D. Ill. 2002) (emphasis in original), *aff'd*, 334 F.3d 643 (7th Cir. 2003).

C.    Shutterstock Satisfies The Threshold Conditions For Eligibility For Safe Harbor.

Having established itself as a "service provider," Shutterstock remains generally eligible for DMCA safe harbor protection as long as it:

(A)    has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

(B)    accommodates and does not interfere with standard technical measures.

17 U.S.C. § 512(i)(1). As set forth below, Shutterstock satisfies both of these threshold conditions.

1.    Shutterstock Has Adopted and Implements a "Repeat Infringer" Policy.

A recent ruling has already found that Shutterstock "has [adopted and] implemented a policy for repeat infringers that complies with the DMCA." *Steinmetz*, 2022 WL 4342174, at *6.

Shutterstock's Contributor Terms of Service—which is posted on its website and to which all contributors must agree—indicates that Shutterstock may "suspend access to [any] Content [uploaded by a contributor] and terminate [the contributor's] account" in the event that it "receives a complaint about [the contributor's] Content." SUF ¶¶ 5, 27. Shutterstock reasonably enforces this policy by enabling copyright owners to submit takedown notices and responding to such notices. *Id.* ¶¶ 25-26. Indeed, Shutterstock regularly removes contributor-uploaded images in appropriate circumstances and terminates contributors' accounts due to alleged infringing activity, as it did in the case of the Images and Contributors at issue here. *Id.* ¶ 28. This is enough to satisfy this condition for DMCA eligibility. *See, e.g.*, *Wolk*, 840 F. Supp. 2d at 744 (condition met where defendant had "a policy under which copyright holders can submit a take-down notice," posted it "on [its] website," and "remove[d] the infringing material" when appropriate); *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011) (same, where defendant had "a system for responding to takedown notices," did "not interfere with the copyright owners' ability to issue notices," and "terminate[d] users who repeatedly or blatantly infringe copyrights").

### 2. Shutterstock Does Not Interfere With "Standard Technical Measures."

Shutterstock does not and cannot interfere with any "standard technical measures . . . used by copyright owners to identify or protect copyrighted works," 17 U.S.C. § 512(i)(2), as a matter of law because, currently, none exist. The requisite "multi-industry standards process" for developing "standard technical measures" has never occurred. *Id.* (defining "standard technical measures" as those "developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process"); Standard Technical Measures & Section 512: Notice of Inquiry, U.S. Copyright Office, 60 Fed. Reg. 25050 (Apr. 27, 2022) ("observ[ing] that, in the two decades since the passage of the DMCA, no [standard technical measures] have been identified"). Thus, the final condition for DMCA eligibility is satisfied.

D.    Shutterstock Meets the Specific Conditions Safe Harbor Under DMCA § 512(c).

Having met the conditions for eligibility, DMCA § 512(c) immunizes Shutterstock from copyright infringement liability "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," as long as it:

> (A)    (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
>
> (B)    does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
>
> (C)    upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1). In addition, Shutterstock must have a properly designated agent for receiving notices of claimed infringement. *Id.* § 512(c)(2). As set forth below, Shutterstock meets all of these specific conditions and is entitled to safe harbor under DMCA § 512(c).

1.    Shutterstock Stores Materials On Its System At The Direction of Users.

As an initial matter, there can be no genuine dispute that the Images were "stored" on Shutterstock's system "at the direction of" the Contributors, putting this case squarely within the province of DMCA § 512(c).[6] *See* SUF ¶¶ 8, 9, 12; *Steinmetz*, 2022 WL 4342174, at \*\*6-7 (finding

---

[6] Shutterstock's contributors are "users" for purposes of DMCA § 512(c). This term is construed broadly and includes content creators (like Shutterstock's contributors) that store and/or distribute their content through a service provider's platform. *See, e.g., Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219, 1221 (C.D. Cal. 2010) (photographer was "user" under DMCA); *Greg Young*

11

"images are uploaded and 'stored' within [Shutterstock's] portfolio at the direction of contributors" within the meaning of § 512(c)). The Contributors uploaded their chosen Images to Shutterstock's system entirely on their own volition (SUF ¶¶ 8, 14), triggering a series of automatic processes designed to facilitate storage and access to the Images through Shutterstock's website (*id.* ¶¶ 14-21). "The relevant case law makes clear that the § 512(c) safe harbor" is "not limited to merely storing material" and "extends to software functions performed for the purpose of facilitating access to user-stored material." *Viacom*, 676 F.3d at 39 (defendant entitled to § 512(c) safe harbor even though it not only "stores" but also "copie[s]" user-submitted videos to make them "viewable over the Internet" and "deliver[s] copies . . . to a user's browser cache in response to a user request"); *accord UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1017-19 (9th Cir. 2013) (§ 512(c) safe harbor "includes activities that go beyond storage" such as "mak[ing]" and "transmit[ting]" copies of and "modify[ing] user-submitted material to facilitate storage and access"). The fact that Shutterstock briefly reviews its contributors' images prior to posting is irrelevant. *See* 17 U.S.C. § 512(m)(1); *Ventura Content, Ltd. v. Motherless, Inc.,* No. 11 Civ. 5912 (SVW) (FMO), 2013 WL 11237204, at *2 (C.D. Cal. July 3, 2013) (defendant entitled to § 512(c) safe harbor even though it "employs its own review process designed to ensure that uploaded content does not violate its terms of use"), *aff'd*, 885 F.3d 597 (9th Cir. 2018).

      2.    <u>Shutterstock Did Not Have Actual or "Red Flag" Knowledge of the Alleged Infringement and Expeditiously Removed the Images When or Before It Became Aware of the Specific Alleged Infringement.</u>

      For safe harbor under DMCA § 512(c), it must be the case that Shutterstock (i) had no "actual knowledge" of the specific alleged infringement; (ii) had no "aware[ness] of facts or

---

*Publ'g, Inc. v. Zazzle, Inc.*, No. 2:16-CV-04587-SVW-KS, 2017 WL 2729584, at *1 (C.D. Cal. May 1, 2017) (individuals who "upload images" and are "pa[id] a royalty" for orders are "users").

circumstances from which infringing activity [was] apparent;" or (iii) "upon obtaining such knowledge or awareness, act[ed] expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(c)(1)(A); *see also id.* § 512(c)(1)(C). "[T]he burden falls on the copyright owner to demonstrate that the service provider acquired knowledge of the infringement, or of facts and circumstances from which infringing activity was obvious, and failed to promptly take down the infringing matter, thus forfeiting its right to the safe harbor." *Vimeo*, 826 F.3d at 95. Plaintiff cannot meet this burden. As set forth below, Shutterstock not only expeditiously removed the sole Noticed Image in response to Plaintiff's Takedown Notice, but the record shows that it removed all of the other Images before it even became aware of Plaintiff's claim that they infringe his rights.

    a.    Shutterstock Promptly Removed the Noticed Image Upon Receipt of Plaintiff's Takedown Notice and Was Not Required to Do More.

It is undisputed that the Noticed Image is the ***only one*** for which Plaintiff sent a takedown notice. *See* SUF ¶¶ 44, 49, 51. Shutterstock had no actual knowledge of the Noticed Image nor reason to suspect that it may be infringing until it received Plaintiff's Takedown Notice on January 15, 2021 (or, at the very earliest, until it received Plaintiff's initial email on December 30, 2020). *Id.* ¶ 38. There is no evidence in the record to the contrary. Because Shutterstock expeditiously removed the Noticed Image from both identified URLs within ***two business days*** after receiving Plaintiff's Takedown Notice (*id.* ¶ 36), Shutterstock qualifies for the § 512(c) safe harbor as to the Noticed Image. *See Vimeo*, 826 F.3d at 95 (service provider "still qualif[ies] for the safe harbor if, after gaining the requisite mental state, it acted expeditiously to disable access to the infringing content"); *UMG Recordings*, 718 F.3d at 1023 (service provider who "promptly removed" material "when it became aware of specific instances of infringement" qualifies for safe harbor); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1150 (N.D. Cal. 2008) (removal of identified

content "within a few days" after receiving a DMCA-compliant notice is "expeditious[]").[7]

Importantly, Plaintiff's Takedown Notice did not trigger an obligation for Shutterstock to do anything more. Shutterstock had no obligation to proactively search for and/or remove other copies of the Noticed Image that may have existed elsewhere on its system. Nor for the other Images in Hane Street's (or any other contributor's) portfolio that allegedly infringe Plaintiff's other alleged copyrights. *See Wolk*, 840 F. Supp. 2d at 747 (rejecting notion that "one notice of infringement would apply to all instances of that image appearing on the website"); *Viacom*, 718 F. Supp. 2d at 528 (rejecting complaint that defendant "remove[d] only the specific clips identified in the DMCA notices, and not other clips which infringe the same works"). Indeed, the "DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *Perfect 10*, 488 F.3d at 1113.

> b.    Shutterstock Removed the Other Images Even Before It Became Aware That They May Infringe Plaintiff's Copyrights.

Despite knowing about the alleged infringement and being familiar with the notice-and-takedown procedure, Plaintiff made no attempt to notify Shutterstock about the other Images prior to filing suit. *See* SUF ¶ 51. Plaintiff's "decision to forgo the DMCA notice protocol stripped [him] of the most powerful evidence of a service provider's knowledge—actual notice of infringement from the copyright holder." *UMG Recordings*, 718 F.3d at 1021-22. With the exception of the

---

[7] Shutterstock was not required to take action in response to Plaintiff's initial email, because it lacked information required under § 512(c)(3). *See* SUF ¶ 32; *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1112 (9th Cir. 2007) ("service provider [not required] to start potentially invasive proceedings" of removing content and/or terminating users where complainant did not "declare, under penalty of perjury, that he is authorized to represent the copyright holder, and that he has a good-faith belief that the use is infringing"). But even if measured from the date of such email, December 30, 2020, Shutterstock's response was sufficiently "expeditious" for safe harbor. *See, e.g.*, *Obodai*, 2012 WL 2189740, at *7 (removal within 22 days after notice is "expeditious").

Noticed Image (which, as discussed *supra*, Shutterstock expeditiously removed), Shutterstock had no actual knowledge that the Images allegedly infringed copyrights owned by Plaintiff until it received the Complaint and/or Amended Complaint identifying same. *See* SUF ¶¶ 44, 46-49, 51; *Viacom*, 676 F.3d at 31 ("the actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement"). Plaintiff has not produced and cannot produce any evidence suggesting otherwise.

Nor is there any evidence that Shutterstock was subjectively aware of facts indicating that the Images may infringe Plaintiff's copyrights. For the requisite "red flag knowledge," the record must establish that "the provider was ***subjectively aware*** of facts that would have made [it] **'*objectively*' *obvious*** to a reasonable person that the ***specific copyrights owned by the plaintiff*** were being infringed." *Ventura*, 2013 WL 11237204, at *6 (the question is "whether the service provider 'deliberately proceeded in the face of blatant factors of which it was aware'" or "turned a blind eye to red flags of obvious infringement") (emphasis added) (citations omitted). Here, Shutterstock had no reason to suspect that the Images infringed Plaintiff's specific copyrights at any relevant time. *See* SUF ¶¶ 44, 49, 51. Even if the contractors who briefly reviewed the Images somehow gleaned that they may contain Plaintiff's claimed works (of which there is no evidence), this still "would be insufficient for many reasons to make infringement *obvious* to an ordinary reasonable person." *Vimeo*, 826 F.3d at 94, 97 (emphasis in original) (no red flag knowledge even if "an employee of the service provider has viewed [allegedly infringing content]" containing "all or nearly all of a ['recognizable'] copyrighted [work]," because employee cannot be expected to know if the user "had authorization to use the copyrighted [work]" or whether the use is fair).[8]

---

[8] Moreover, as Shutterstock's expert noted, Plaintiff's works are substantially indistinguishable from others' works (SUF ¶¶ 84-85), and even Plaintiff was unsure about whether a photograph was his. *See* Lackman Decl., Ex. H, pp. 131:14-132:13, 133:16-18.

By the time Shutterstock obtained the requisite knowledge or awareness of the specific alleged infringement (*i.e.*, upon the service of the Complaint, except for the Raza Images, which were first identified in the Amended Complaint), Shutterstock had **already** terminated the Contributors and removed all of the images in their portfolios—including the Images—from its customer-facing website due to potential infringing activity unrelated to Plaintiff. *See* SUF ¶¶ 45-46, 50.[9] This is far more than the law requires, and shows strong good faith on Shutterstock's part.

Plaintiff also has suggested in this lawsuit that the thumbnails associated with the Images are infringing. Plaintiff never identified these thumbnails in a DMCA-compliant takedown notice or otherwise (except for one thumbnail associated with the Noticed Image, which Shutterstock expeditiously removed in response to Plaintiff's Takedown Notice). *Id.* ¶¶ 59-63. Despite having no obligation to do so, in February and May 2022, Shutterstock conducted its own investigations and removed the thumbnails associated with the Bishoi Image and Raza Images found lingering as residual artifacts in its cache servers, which could not be found by the general public and, even if found, could not be licensed. *Id.* ¶¶ 60, 62-63.[10] Shutterstock "cannot be held liable for its failure to [earlier] remove [thumbnails] for which [] Plaintiff failed to provide proper notice." *Wolk*, 840 F. Supp. 2d at 747-48 (defendant entitled to safe harbor where "whenever [plaintiff] had validly notified [defendant] of infringing activity, [defendant] acted promptly to take down the infringing material in an expeditious manner" and in "those instances where [plaintiff's] notices were non-DMCA compliant, [defendant] still acted to remove the material to the best of its ability"); *see also, e.g.*, *Viacom*, 718 F. Supp. 2d at 528 (rejecting complaint that defendant "remove[d] only the

---

[9] Notably, Shutterstock terminated Raza's account upon receipt of an email from a third-party Good Samaritan, even though it was the first complaint it had ever received about Raza. *Id.* ¶ 50.

[10] Shutterstock removed all of the other thumbnails associated with the Hane Street Images prior to the filing of the Complaint, for reasons unrelated to Plaintiff and/or the Images. *See* SUF ¶ 61.

specific clips identified in DMCA notices, and not other clips which infringe the same works").

        3.    <u>Shutterstock Had No Right Or Ability To Control The Alleged Infringement And Did Not Financially Benefit From It.</u>

A service provider loses the protection of § 512(c)'s safe harbor where it (1) has the "right and ability to control" the infringing activity and (2) receives "a financial benefit directly attributable" to such activity. 17 U.S.C. § 512(c)(1)(B). Both elements must be met for the safe harbor to be denied on this basis. Neither one is met here.

        a.    <u>Shutterstock Had No Control Over The Alleged Infringement.</u>

The undisputed facts show that Shutterstock had no "right and ability to control" the Contributors' infringing activity. *See* SUF ¶¶ 5-9, 14; *cf. Steinmetz*, 2022 WL 4342174, at *7 (finding "[Shutterstock] had no right to control the initial infringing conduct by the [c]ontributor" because it "did not invite or request the [c]ontributor to upload" and "none of the 'control' possessed by [Shutterstock] rises to the level necessary to disqualify it from safe harbor"). The Contributors had total control over what images to upload. SUF ¶ 8. Shutterstock did not invite, request, or in any way influence the Contributors' decisions to upload the Images. *Id.* While Shutterstock had the ability to remove (and, when notified, did remove) the Images from its website, the Second Circuit has made clear that this is not enough to establish a "right and ability to control" within the meaning of DMCA § 512(c)(1)(B). *See Viacom*, 676 F.3d at 38 (the "right and ability to control" involves "a service provider exerting substantial influence on the activities of users") (citation omitted); *accord Wolk*, 840 F. Supp. 2d at 748 (the "right and ability to control" "cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored on its system") (citation omitted); *Ventura*, 885 F.3d at 613 (no "right and ability to control" even though defendant "could take down all of [the website's] content, infringing or not, and bar any uploads, infringing or not"). Instead, "something more" is required,

*Viacom*, 676 F.3d at 38, such as "prescreening content, rendering extensive advice to users regarding content and editing user content," *Wolk*, 840 F. Supp. 2d at 748. Shutterstock did not engage in any such activities (SUF ¶¶ 8, 10), and, considering the vast number of images uploaded to Shutterstock's website on a daily basis (*id.* ¶ 2), "it is unlikely that [the] kind of prescreening [required to establish a 'right and ability to control'] is even feasible." *Id.*; *see also Io Grp.*, 586 F. Supp. 2d at 1153 (no "right and ability to control" where defendant had "received hundreds of thousands of video files from users").

Shutterstock similarly had no right or ability to control the alleged infringing activity by the API User Platforms. *See* SUF ¶¶ 71-75. While Shutterstock controls its API, it has no control over the activities of the third-party websites that access it. *Id.* ¶ 73; *cf. Steinmetz*, 2022 WL 4342174, at *7 (finding "[Shutterstock's] affiliate relationships [with third-party websites HelloRF and Stock Fresh] give it no control over [their] operations"). Likewise, Shutterstock has no control over the third-party customers who licensed the Images from its website. SUF ¶ 69.

### b.    Shutterstock Did Not Receive A Direct Financial Benefit.

Shutterstock also did not receive a "financial benefit directly attributable to the infringing activity," either directly or through any contractual relationship. The Contributors uploaded the Images to Shutterstock's website free of charge and more than half were never licensed. *See* SUF ¶¶ 66-67. While Shutterstock earned a small amount of revenue from licensing certain other Images (*id.* ¶ 64),[11] the law is clear that a "direct financial benefit" will ***not*** be found merely because the service provider has profited from the display and/or sale of infringing content on an ***otherwise legitimate system***. Instead, such a "direct financial benefit" requires evidence that the

---

[11] The licenses involved 165 of the Images and generated a total of $2,131.60 in revenue, a portion of which was paid out to the Contributors. *Id.* ¶ 64. Some of the licenses were issued under a free trial subscription. *Id.* ¶ 65. The remaining 172 Images were never licensed. *Id.* ¶ 66.

service provider specifically promoted and/or marked up the price of the infringing content. *See Viacom*, 718 F. Supp. 2d at 521 ("In general, a service provider conducting a legitimate business would not be considered to receive a financial benefit directly attributable to the infringing activity where the infringer makes the same kind of payment as non-infringing users of the provider's service.") (quoting H.R. Rep. No. 105-551, Part 2, at 54); *see also, e.g.*, *Capitol Records*, 821 F. Supp. 2d at 645 (no "direct financial benefit" where service provider "did not promote infringement" and "songs were stored free of charge and infringing and noninfringing users [ ] paid precisely the same or nothing at all"); *Perfect 10*, 488 F.3d at 1118 (no "direct financial benefit" because no evidence service provider "attracted or retained subscriptions because of the infringement or lost subscriptions because of [its] eventual obstruction of the infringement").

The record in this case is devoid of any such evidence. To the contrary, the record is clear that Shutterstock is conducting a legitimate business and does not tolerate infringing activity on its website, let alone promote it. *See* SUF ¶¶ 22-31. The record in this case shows that Shutterstock took action at the first hint of a violation (*id.* ¶¶ 41-51), even though neither the DMCA nor common law secondary liability law requires a party to go so far, and offered the Images for license at the same prices and pursuant to the same terms as it offers all other contributor-submitted images (Shimmin Decl. ¶ 57). In fact, Shutterstock not only does not receive a financial benefit from infringement, but each infringement represents a direct financial liability to Shutterstock, which commits to defending, indemnifying, and holding harmless users who license and download images that are claimed to infringe on third-party rights. *See id.* ¶ 28, Ex. H, § 4.

Shutterstock did not receive a "direct financial benefit" attributable to the Images through any of the API User Platforms, either. Any profits attributable to the API User Platforms are derived from the legitimate service that Shutterstock provides, including access to its portfolio of

hundreds of millions of images, and not to any particular content. *See* SUF ¶¶ 71, 74; *see, e.g.*, *Wolk*, 840 F. Supp. 2d at 748 (defendant is entitled to § 512(c) safe harbor because its "profits are derived from the service [it] provide[s], not a particular infringement," and rejecting argument that defendant "receive[d] a financial benefit from infringements from a profit-sharing relationship with [another party]"). Accordingly, Shutterstock is entitled to § 512(c) safe harbor.[12]

 4. Shutterstock Has Had A Designated DMCA Agent At All Relevant Times.

 Finally, irrefutable document evidence establishes that Shutterstock has had a designated agent for receiving and responding to DMCA takedown notices at all relevant times. *See* SUF ¶ 24; *cf. Steinmetz*, 2022 WL 4342174, at *8 (finding "[Shutterstock] has complied with the requirement that it have a designated DMCA agent"). Shutterstock provides contact information for its designated agent on its website as part of its DMCA Policy (SUF ¶ 23), and the same information is listed in the Copyright Office's public directory (*id.* ¶ 24). This is sufficient to satisfy DMCA § 512(c)(2) as a matter of law. *See, e.g., Obodai*, 2012 WL 2189740, at *9 (finding requirement met where, "[a]s part of [the website's] 'Terms and Conditions,' the defendant list[ed] the physical and e-mail addresses of its copyright agent").

 \* \* \*

Because there is no genuine issue of material fact that Shutterstock is entitled to § 512(c) safe harbor protection in this case, Shutterstock has a complete defense to Plaintiff's direct and

---

[12] Even assuming *arguendo* that Shutterstock received the requisite "direct financial benefit" (which it did not), Shutterstock still is entitled to the § 512(c) safe harbor because, as discussed *supra*, it lacked the "right and ability to control" the alleged infringement. *See, e.g., Io Grp.*, 586 F. Supp. 2d at 1150 ("even assuming (without deciding) that [defendant] received a direct financial benefit from the alleged infringing activity, . . . defendant [is not disqualified from the safe harbor because defendant] does not have the right and ability to control such activity").

secondary copyright infringement claims, warranting summary judgment in Shutterstock's favor.[13]

**III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SHUTTERSTOCK ON PLAINTIFF'S COPYRIGHT MANAGEMENT INFORMATION CLAIM**

Plaintiff claims that Shutterstock has "removed" and/or "added false copyright management information" to the Images, in violation of 17 U.S.C. § 1202(a) and/or (b). *See* FAC ¶¶ 36-42. "Copyright management information" or "CMI" specifically includes, *inter alia*, the name of the copyright owner and the name of the author. *See* 17 U.S.C. § 1202(c)(2), (c)(3). Plaintiff cannot establish a violation under either provision.

A.    Plaintiff Did Not Provide False CMI in Violation of § 1202(a).

Section 1202(a) provides that "[n]o person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement . . . provide . . . or distribute . . . [CMI] that is false." 17 U.S.C. § 1202(a)(1)-(2). This provision is subject to a so-called "double scienter" requirement. *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018). In particular, for violation of § 1202(a), a plaintiff must establish that the defendant (1) "knowingly provided false [CMI];" and (2) "did so with the intent to induce, enable, facilitate, or conceal an infringement." *Id.*

Plaintiff's § 1202(a) claim is premised on the "Shutterstock" watermark and fails as a matter of law because neither required element is met. *Cf. Steinmetz*, 2022 WL 4342174, at *1, *8 (granting summary judgment to Shutterstock on similar § 1202(a) and finding the "'Shutterstock' watermark . . . is not false" and "the purpose of the watermark is to prevent infringement"). First, Shutterstock does not dispute that it added a "Shutterstock" watermark to the Images (as it does for all images posted to its customer-facing website), but nothing about the watermark is "false." *See* SUF ¶ 18. The watermark accurately identifies Shutterstock as the source or distributor of the

---

[13] The multiple other reasons why Plaintiff's direct and secondary copyright infringement claims should be dismissed on summary judgment are discussed *infra*.

images. *Id.* ¶ 19. Further, like other online content licensing companies, Shutterstock's system automatically adds the "Shutterstock" watermark in order to **prevent** infringement, not to "induce, enable, facilitate, or conceal" it. *Id.* ¶ 18. Thus, even if Plaintiff could somehow prove that Shutterstock knowingly provided or distributed false CMI (which he cannot do), Plaintiff's § 1202(a) claim fails as a matter of law. *See, e.g., Zuma Press, Inc. v. Getty Images (US), Inc.*, 349 F. Supp. 3d 369, 375-76 (S.D.N.Y. 2018) (granting summary judgment to defendant on § 1202(a) claim where defendant "appended watermarks and other copyright information" to the image because there was "no evidence that [it] intended to induce or facilitate infringement"), *aff'd*, 845 F. App'x 54 (2d Cir. 2021).

B.    Plaintiff Cannot Establish a Violation of § 1202(b).

Section 1202(b) addresses "[r]emoval or alteration" of CMI. 17 U.S.C. § 1202(b). To establish a violation under § 1202(b)(1), a plaintiff must establish "(1) the existence of CMI on the [plaintiff's work]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally." *Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659, 664 (S.D.N.Y. 2017) (citation omitted). The same double-scienter applies to this provision, requiring the defendant to also possess the mental state of knowing, or having a reasonable basis to know, that its actions "will induce, enable, facilitate, or conceal" infringement. 17 U.S.C. § 1202(b).

Plaintiff concedes that some of the Images were uploaded to Shutterstock's system without any CMI (SUF ¶ 54), and thus, his claim immediately fails as it relates to those images. *See, e.g., Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 338 (S.D.N.Y. 2019) (granting summary judgment to defendant on § 1202(b) claim where there was no "evidence suggesting whether there was CMI on the Photographs when Defendants obtained them").

Although the remaining Images undisputedly had CMI in their metadata at the time of upload, Plaintiff's § 1202(b) claim still fails as a matter of law because no reasonable finder of fact

could conclude that Shutterstock altered and/or removed that CMI "intentionally" in order "to induce, enable, facilitate, or conceal an infringement." The record shows that Shutterstock's system automatically removes any and all metadata (including CMI) associated with contributor-submitted images during the ingestion process for reasons having nothing to do with infringement, including to avoid computer viruses and prevent the dissemination of personally identifiable information. *See* SUF ¶ 15.[14] The facts and simple logic show that Shutterstock has no interest in facilitating infringement. Because there is no evidence that Shutterstock acted with the requisite intent, Shutterstock is entitled to summary judgment on Plaintiff's § 1202(b) claim. *See, e.g.*, *Thron v. HarperCollins Publishers, Inc.*, No. 01 Civ. 5437 (JSR), 2002 WL 1733640, at *1 (S.D.N.Y. July 26, 2002) (granting summary judgment to defendant on § 1202(b) claim where plaintiff "offered no competent, admissible evidence to support any findings that defendants removed or altered [the CMI] 'intentionally,' as required by the statute"); *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018) (affirming grant of summary judgment to defendant on § 1202(b) claim where defendant's software removed CMI from photographs, but the "[plaintiff] [p]hotographers have not offered any evidence to satisfy that mental state requirement"); *William Wade Waller Co. v. Nexstar Broad., Inc.*, No. 4-10-CV-00764 (GTE), 2011 WL 2648584, at *5 (E.D. Ark. July 6, 2011) (granting summary judgment to defendant on § 1202(b) because, even assuming defendant "intentionally cropped the copyright notice out of the picture," Plaintiff "made no effort to show that [it] did so intentionally to induce, enable, facilitate or conceal

---

[14] Notably, Plaintiff makes his images available on Flickr and various social media websites, despite knowing that these sites remove any associated metadata. *See* Lackman Decl., Ex. H, pp. 98:23-24, 139:17-22, 161:3-23. Plaintiff also chooses not to restrict downloads of his roughly 400,000 images on Flickr, which he makes available in high resolution for anyone to download without any visible watermarks in a variety of sizes. Lackman Decl., Ex. H, pp. 139:17-140:12, 143:10-19, 144:6-12, 151:10-12, 151:23-152:5, 157:7-15, 180:6-21; *see also id.* ¶ 15, Ex. M.

infringement").[15]

## IV.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SHUTTERSTOCK ON PLAINTIFF'S DIRECT COPYRIGHT INFRINGEMENT CLAIM FOR MULTIPLE OTHER INDEPENDENT REASONS

As discussed *supra*, the DMCA immunizes Shutterstock from liability for direct copyright infringement. But even assuming *arguendo* that the DMCA somehow does not apply, Plaintiff's direct copyright infringement claim still fails as a matter of law for multiple independent reasons. First, Shutterstock did not undertake any volitional act that caused the alleged infringement, which is an important element of direct liability. Second, Shutterstock's alleged use of the Images and associated thumbnails is a classic, non-infringing fair use. Finally, at the very least, Plaintiff lacks standing to claim infringement of the 47 Images which are subject to invalid group registrations.

### A.    Shutterstock Did Not Engage in Any Volitional Conduct That Caused the Alleged Infringement.

Plaintiff's copyright infringement claim must fail for the simple reason that Shutterstock did not engage in any "volitional conduct" that "caused" the alleged infringement, which "is an important element of direct liability." *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008); *see also Wolk*, 840 F. Supp. 2d at 742 ("Direct liability requires 'volitional conduct' that 'causes' the infringement."). A defendant "that provides only a platform for third-party users to upload, download, and share content" has not engaged in sufficient "volitional conduct" to be directly liable; "it is the users who cause [such] infringement." *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021); *see also Perfect 10, Inc. v. Giganews,*

---

[15] To the extent Plaintiff is claiming violation of § 1202(b)(3), his claim also must fail because, *inter alia*, there is no evidence indicating that Shutterstock's distribution of the Images without Plaintiff's CMI ever "'induce[d], enable[d], facilitate[d], or conceal[ed]' any particular act of infringement by anyone, let alone a pattern of such infringement likely to recur in the future." *Stevens*, 899 F.3d at 675 (granting summary judgment to defendant on § 1202(b)(3) claim).

*Inc.*, 847 F.3d 657, 668 (9th Cir. 2017) ("passively storing material at the direction of users in order to make that material available to other users upon request" is not "volitional"). A defendant's "display of copyrighted images on [its] website does not demonstrate volition," either, even where the service provider reviewed the images prior to posting. *Wolk*, 840 F. Supp. 2d at 742-43(citing *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (insufficient volition where defendant's employees reviewed user-submitted images before posting to website).

Shutterstock's role in the alleged infringement is too passive and attenuated to impose direct liability for copyright infringement. Shutterstock merely provided a platform through which the Contributors uploaded the Images, and then passively stored and automatically created and displayed copies of the Images on its website to make those images available to other users upon request. *See* SUF ¶¶ 8-16. Any reproduction, display, or distribution of the Images by or on Shutterstock's website was attributable to a fully automated process initiated by the Contributors and/or other users, with little to no intervention by any Shutterstock employee to determine whether an image should be rejected for policy violations. *Id.* ¶¶ 9-12, 14. This is decidedly insufficient to hold Shutterstock directly liable. *See CSC Holdings*, 536 F.3d at 132 ("a system that automatically produces copies [of defendant-supplied content] on [customer's] command" is not "volitional"); *Wolk,* 840 F. Supp. 2d at 742 (automated reproduction, display, transmission of images, or copying of images onto products is not "volitional"); *see also Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1309 (S.D. Fla. 2011) ("courts have repeatedly held that the automatic conduct of software, unaided by human intervention, is not 'volitional'"); *Giganews*, 847 F.3d at 668 (finding insufficient "volitional conduct" for direct liability where defendant "passively stor[ed] material at the direction of users in order to make that material available to other users upon request") (citation omitted); *Bell*, 12 F.4th at 1081 (same, where defendant

"provid[ed] only a platform for third-party users to upload, download, and share content");; *Parker v. Google, Inc.*, 242 F. App'x 833, 836 (3d Cir. 2007) (same, where defendant cached websites that stored infringing materials); *Parker v. Paypal, Inc.*, No. CV 16-4786, 2017 WL 3508759, at *4 (E.D. Pa. Aug. 16, 2017) (same, where defendants stored infringing work on their cloud server).

The fact that the Images were among the many millions of images available via Shutterstock's API, such that they may be accessed and displayed (as links) on the API User Platforms' websites, also is not enough for direct liability. *See* SUF ¶¶ 71-75. Again, this process is fully automated. *Id.* ¶¶ 71, 75; *see, e.g.*, *Disney*, 798 F. Supp. 2d at 1306 (finding insufficient volitional conduct for direct liability where defendants "allow third-party sites to post a link that, when clicked, automatically begins to download the file [from the defendant's website]" and profited therefrom); *Giganews*, 847 F.3d at 669 (same, where defendant sold "access to [its] servers, including [the] infringing [ ] images [at issue], for a monthly fee"); *Microsoft Corp. v. Softicle.com*, No. CV 16-2762, 2017 WL 5517379, at *2 (D.N.J. Sept. 29, 2017) (similar; linking "does not, as a matter of law, constitute direct copyright infringement.") (collecting cases)

B.    Shutterstock's Alleged Use of the Images Constitutes Fair Use.

Additionally fatal to Plaintiff's direct copyright infringement claim, Shutterstock's alleged use of the Images—including the alleged reproduction, display, and distribution of the Images to third-party websites via its API and use of the associated thumbnails—constitutes a classic fair use. *See Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 41 (S.D.N.Y. 2017) ("Fair use is an affirmative defense to copyright infringement."). In determining whether a use is fair, courts must consider four non-exhaustive factors:

(1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)    the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)     the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. No single factor is dispositive and "defendants … need not establish that each of the factors set forth in [ ] weighs in their favor" to prevail. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014) (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004)). Fair use may be decided on summary judgment where, as here, the material facts underlying the defense are not in dispute. *See Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) ("Although '[f]air use is a mixed question of law and fact,' [the Second Circuit] has on a number of occasions resolved fair use determinations at the summary judgment stage where . . . there are no genuine issues of material fact.").

As set forth below, each of the fair use factors weighs in Shutterstock's favor, warranting dismissal of Plaintiff's copyright infringement claim as a matter of law.

1.     <u>Shutterstock's Alleged Use of the Images Is Highly Transformative.</u>

Although no factor is independently determinative, the heart of the fair use inquiry is the first factor—particularly, whether the use is "transformative." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577 (1994); *accord Keeling v. Hars*, 809 F.3d 43, 53 (2d Cir. 2015). While some transformative uses may change the original work, that is not necessary, as a "transformative use can also be one that serves an entirely different purpose." *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445, 460 (S.D.N.Y. 2012) (use of books was "transformative" because it "serve[d] an entirely different purpose") (citation omitted), *aff'd in part, vacated in part*, 755 F.3d 87 (2d Cir. 2014); *see also, e.g., Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (use of images for a purpose that "is plainly different from the original purpose for which they were created" is "transformative").

Shutterstock's purpose in reproducing, displaying, and distributing to API User Platforms copies of the Images in thumbnail, watermarked, and/or low-resolution form was highly transformative, including to show the Images to potential licensees and for other informational and recordkeeping purposes. *See* SUF ¶¶ 17, 57. This factor strongly favors fair use. *See, e.g.*, *Magnum Photos Int'l, Inc. v. Houk Gallery, Inc.*, No. CV 16-7030 (VSB), 2018 WL 4538902, at *3 (S.D.N.Y. Sept. 21, 2018) (use of thumbnails to "identify the photographs" and "provide information to the art-seeking public" is "transformative"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) (use of thumbnails on internet search engine is transformative); *Rosen v. eBay, Inc.*, No. CV 13-6801 (MWF) (EX), 2015 WL 1600081, at *15-20 (C.D. Cal. Jan. 16, 2015) (use of photos of magazines to show magazines for sale is fair use).[16]

### 2.    The Nature of the Images Favors Fair Use.

The second factor, which is "rarely found to be determinative," considers the "nature of the copyrighted work." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001). In general, a use is more likely to be fair when the copyrighted work is "factual or informational" in nature (rather than "expressive or creative") and was previously published. *Cariou v. Prince*, 714 F.3d 694, 709-10 (2d Cir. 2013). Here, the Images are more factual than they are creative insofar as they depict naturally-occurring scenes with filters applied to oversaturate the colors. *See* SUF ¶ 84. But even if they were creative, the second factor still favors fair use because the Images were published before the alleged infringement (*id.* ¶ 86) and, as discussed *supra*, Shutterstock used them for a transformative purpose. *See Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (whether the work was published is "critical" to the second factor); *Bill Graham*, 448 F.3d

---

[16] This factor also considers the "commercial nature of the use," but this consideration is "properly discounted" where, as here, the use is "substantially transformative." *NXIVM*, 364 F.3d at 477-78.

at 612 (second factor is of "limited usefulness" where "creative work" is "used for a transformative purpose"); *see also, e.g.*, *Kelly*, 336 F.3d at 820 (second factor favored fair use where works "appeared on the internet" before alleged infringing use in search engine); *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 546 (S.D.N.Y. 2019) (finding fair use of creative photo; the "classification [of a work as creative] cuts against a finding of fair use," but this "has rarely played a significant role").

3.    The Amount and Substantiality Used Favors Fair Use.

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The amount used must be considered "in relation to the purpose of the copying." *Swatch Grp.*, 756 F.3d at 89. Even the use of an entire may be considered "fair" if it was reasonably necessary to accomplish the transformative purpose. *See, e.g.*, *Bill Graham*, 448 F.3d at 613 ("copying [entire work] does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image"). Here, Shutterstock displayed the Images in their entireties, but did so in a reduced and watermarked form and in order to accomplish its transformative purpose of correctly identifying the Images for potential licensees. *See* SUF ¶¶ 16-18. Further, Shutterstock's system automatically created and kept thumbnail versions of the Images for informational and recordkeeping purposes, including to detect and prevent future infringement. *Id.* ¶ 57. This factor favors fair use (or at least does not weigh against it). *See, e.g.*, *Bill Graham*, 448 F.3d at 613 ("display[] [of] reduced versions of the [entire] original images" was fair); *HathiTrust*, 755 F.3d at 98-99 (third factor favored fair use because use of entire works was "reasonably necessary" to accomplish transformative purpose).

4.    The Effect of the Use on the Potential Market Favors Fair Use

The fourth factor considers the "effect of the use upon the potential market for or value of

the copyrighted work." 17 U.S.C. § 107(4). "The focus here is on whether defendants are offering a market substitute for the original," *i.e.*, "whether the secondary use usurps the market of the original work." *NXIVM*, 364 F.3d at 481-82. "To defeat a claim of fair use, the copyright holder must point to market harm that results because the secondary use serves as a substitute for the original work." *HathiTrust*, 755 F.3d at 96. This factor ordinarily favors fair use where, as here, the secondary use is transformative. *See Bill Graham*, 448 F.3d at 614 ("transformatively different" use does not affect market for original); *Kelly*, 336 F.3d at 821 ("transformative work is less likely to have an adverse impact on the market of the original").

The thumbnail, watermarked, and/or low-resolution versions of the Images posted on Shutterstock's website are no substitute, and did not "usurp" the traditional market, for the Images. The associated thumbnails kept in Shutterstock's back-end servers could not possibly have "usurped" Plaintiff's market, either. *See* SUF ¶ 56-63. In fact, Plaintiff admittedly has never licensed any of the Images for this type of use. *Id.* ¶ 88. Accordingly, this final factor weighs in favor of fair use. *See Magnum*, 2018 WL 4538902, at **4, 5 (finding fourth factor favored fair use; "the thumbnail versions of the [i]mages posted on the [defendant] [g]allery's website were no substitute for the original works" and plaintiff failed to "identify a separate market for the thumbnail versions of the [i]mages"); *Kelly*, 336 F.3d at 821 (concluding that thumbnails are not a substitute for full-size images).

C.    Plaintiff Lacks Standing to Claim Infringement of Certain Images That Are Not Validly Registered With the Copyright Office.

Copyright registration is a prerequisite to bringing an infringement action in federal court. 17 U.S.C. § 411(a); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010). A plaintiff must not only show that each work at issue is registered with the Copyright Office, but also that the registration is valid. *See Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416 (JSR), 2011 WL

4916299, at *2 (S.D.N.Y. Oct. 14, 2011), *aff'd*, 748 F.3d 120 (2d Cir. 2014). While a certificate of registration is presumed to be valid, that presumption may be rebutted where, *inter alia*, the copyright claimant failed to comply with the Copyright Office's regulations for registration and the Copyright Office is likely to have rejected the application had the actual facts been known. *See, e.g.*, *McLaren v. Chico's FAS, Inc.*, No. 10 Civ. 2481(JSR), 2010 WL 4615772, at *3 (S.D.N.Y. Nov. 9, 2010) (invalidating registration due to failure to comply with Copyright Office regulations for registration of a collective work); *see also* 5 Patry on Copyright § 17:124 ("An error [in a registration] is considered material by most courts if the Copyright Office is likely to have rejected the application had the actual facts been known.") (collecting cases).

Plaintiff's infringement claims (both direct and secondary) must be dismissed as to the 47 Images purportedly registered with the Copyright Office under Registration Nos. VA0002089199, VA0002089207, and VA0002089215 (collectively, "Group Registrations") because such registrations are invalid. These Group Registrations each contain ***thousands*** of published photos. *See* SUF ¶¶ 78-80. The Copyright Office's regulations for this type of registration allow "***no more than 750*** photographs." 37 CFR § 202.4(i)(2) (emphasis added). This is a "key requirement;" if an applicant submits more than 750 photos, the Copyright Office may "simply refuse registration" or limit registration to "the first 750 photos identified in the title list." *Compendium III: Compendium of Copyright Office Practices*, § 1114.1. The Images are not among the first 750 listed. *See* SUF ¶ 83. Thus, the Group Registrations are invalid, and Shutterstock is entitled to summary judgment on Plaintiff's infringement claims as they relate to the 47 Images. *See, e.g.*, *Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp. 3d 565, 571-74 (S.D.N.Y. 2016) (invalidating group registration of published photographs and granting summary judgment because registered photos were not all published in the same year); *Thron,* 2002 WL 1733640, at *1 (same,

copyright claimant failed to comply with registration regulations).[17]

      D.     <u>Plaintiff Is Not Entitled to Double Recovery.</u>

Plaintiff's copyright infringement claims (both direct and secondary) must be dismissed as to the three Images for which Plaintiff has initiated separate lawsuits against the Licensees, because any liability among them (which Shutterstock does not concede) is joint and several. *See* SUF ¶ 70; *McGucken v. JJOK, LLC*, No. 2:22-cv-06095 (C.D. Cal. Aug. 26, 2022); *McGucken v. Lonely Planet USA, LLC*, No. 2:22-cv-05476 (C.D. Cal. Aug. 4, 2022). Plaintiff cannot recover separately as against each. *See*, *e.g.*, *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1265 (9th Cir. 2021) ("every district court to consider [17 U.S.C. § 504(c)(1)] and this question [except the one on appeal] has concluded that for any two or more jointly and severally liable infringers, a plaintiff is entitled to one statutory damage award per work") (collecting cases) (cleaned up).

## V.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SHUTTERSTOCK ON PLAINTIFF'S SECONDARY COPYRIGHT INFRINGEMENT CLAIM

As discussed *supra*, the DMCA bars Plaintiff's secondary copyright infringement claim, and the claims also failed as discussed above. *See* H.R. Rep. No. 105-551, pt. 2, at 50 (limiting relief); *see also*, *e.g.*, *Wolk*, 840 F. Supp. at 749 (dismissing secondary infringement claims against defendant protected by DMCA safe harbor); *supra* Section IV. Nor is Shutterstock contributorily and/or vicariously for the alleged infringement by any of the third-party Contributors, API User Platforms, and Licensees.[18]

---

[17] The Supreme Court's decision in *Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, 142 S. Ct. 941 (2022) is distinguishable. There, the error was a subtle one (*i.e.*, the timing of publication) and the plaintiff was unaware that it failed to satisfy the "single unit of publication" requirement. *Id.* at 942. Here, the question is one of mere counting, and Plaintiff admits that he is sophisticated in copyright filings and did not feel the need to contact counsel for assistance. *See* SUF ¶ 81; Lackman Decl., Ex. H, pp. 310:1-11, 311:7-19.

[18] Shutterstock cannot be both directly and secondarily liable based on the same conduct. *See Pickholtz v. Rainbow Techs., Inc.*, 260 F. Supp. 2d 980, 989-90 (N.D. Cal. 2003).

A.     <u>The Evidence Does Not Support Plaintiff's Contributory Infringement Claim.</u>

"Assuming there is a class of primary infringers, then a party 'who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.'" *Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (citation omitted). To be liable for contributory infringement, the defendant "must have acted in concert with the direct infringer" and its "participation in the infringement must be substantial." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 357 (S.D.N.Y. 2014).

Plaintiff cannot prove the basic elements of this claim. As discussed *supra*, the record is clear that Shutterstock had no knowledge of, nor any reason to suspect, the alleged infringing activity by the Contributors when it made the Images available on its platform—or, except as to the one Noticed Image, at any time prior to notification by the claimed copyright owner. SUF ¶¶ 33-36, 38, 40. Moreover, Shutterstock did not act in concert with the Contributors or substantially contribute to their alleged infringement. It had nothing to do with the Contributor's decisions to upload the Images and promptly removed them upon receiving notice of possible infringing activity (even when the notice did not come from Plaintiff or involve his images). *Id.* ¶¶ 36-38, 45-46, 50. At most, the evidence shows that Shutterstock provided the platform through which the Contributors infringed, and passively stored and displayed the Images a time when it was unaware of their allegedly infringing nature (*id.* ¶¶ 37-38, 42-51), which is simply insufficient for contributory liability. *See Wolk*, 840 F. Supp. 2d at 750 (merely "provid[ing] the means to accomplish an infringing activity" is not sufficient); *accord Livnat v. Lavi*, No. 96 Civ. 4967 (RWS), 1998 WL 43221, at *3 (S.D.N.Y. Feb. 2, 1998) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n.17 (1984)).

Plaintiff's contributory copyright infringement claim also must fail vis-à-vis the API User Platforms and Licensees because there is no evidence that Shutterstock "acted in concert" with any of them or "participat[ed] in [their alleged] infringement," let alone in any "substantial" way. *Hollywood Fan Sites*, 69 F. Supp. 3d at 357. As for the API User Platforms, the record at most shows that the Images were available to them automatically through Shutterstock's API along with millions of other images. *See* SUF ¶¶ 71, 74. The process by which the Licensees obtained the Images also was fully automated, with little to no involvement by Shutterstock. *Id.* ¶ 12, 14, 69.

B.    The Evidence Does Not Support Plaintiff's Vicarious Infringement Claim.

For vicarious liability, a plaintiff must show that the defendant has both: (1) "the right and ability to supervise the infringing activity;" and (2) "a direct financial interest in such activities." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Further, there must be a "causal relationship between the infringing activity and any financial benefit [the] defendant reaps." *Arista Records, LLC v. Lime Group, LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) (citation omitted).

Plaintiff cannot make this showing. As discussed *supra*, Shutterstock had no right or ability to supervise the alleged infringing activity by the Contributors (SUF ¶¶ 5-9, 12), and derived no direct financial benefit therefrom (*id.* ¶¶ 13, 31). *See, e.g.*, *Wolk*, 840 F. Supp. 2d at 751 (dismissing vicarious infringement claim based on same facts as DMCA § 512(c)(1)(B)). Accordingly, Shutterstock cannot be a vicarious infringer vis-à-vis the Contributors. For the same reasons, Shutterstock cannot be vicariously liable for the alleged infringement by the API User Platforms and/or the Licensees who chose to license certain of the Images. *See* SUF ¶¶ 64-66, 69, 73-75.

Simply put, Shutterstock operates a legitimate licensing market, with ***hundreds of millions*** of images made available on its website and through its API User Platforms. *Id.* ¶¶ 2, 71. The

availability of the few hundred allegedly infringing Images cannot plausibly have created a sufficient "draw" to its website warrant the imposition of vicarious liability. *See Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (affirming summary judgment for service provider on vicarious liability; "the central question of the 'direct financial benefit' inquiry [for vicarious liability] is whether the infringing activity constitutes a draw for subscribers, not just an added benefit"). Indeed, there is no evidence whatsoever that the Images drew traffic to Shutterstock's website and/or to any API User Platform. Even Plaintiff did not bother to take steps expeditiously to address the issue, evidently unconcerned that his claimed Images were available. *Id.* ¶¶ 44, 49, 51.[19] For this additional reason, Plaintiff's attempt to hold Shutterstock vicariously liable for copyright infringement must fail. *See, e.g.*, *Totally Her Media, LLC v. BWP Media USA, Inc.*, No. CV 13-8379-AB (PLAx), 2015 WL 12659912, at **9-10 (C.D. Cal. Mar. 24, 2015) (infringing content not a "draw" where there was no evidence plaintiff "attracted or retained [users] because of the infringement or lost subscriptions because of [Plaintiffs] eventual obstruction of the infringement") (emphasis omitted); *Hydentra HLP Int. Ltd. v. Luchian*, No. 1:15-CV-22134-UU, 2016 WL 5951808, at *14 (S.D. Fla. June 2, 2016) (no direct financial benefit where "no evidence that Plaintiff's copyrighted videos drew additional traffic to Defendants' [w]ebsites").

## **CONCLUSION**

For the reasons set forth above, Shutterstock is entitled to summary judgment in its favor on all of Plaintiff's claims.

---

[19] As the dockets show, Plaintiff's inaction is motivated by the fact that he makes much more money in settlements than he does in licensing, and therefore it benefits him to allow his images to be infringed by third parties. *See* Lackman Decl. ¶ 16, Ex. N; *see also id.*, Ex. H, pp. 33:23-34:14, 40:17-41:17, 41:23-42:7, 91:17-92:4, 92:13-93:7, 93:12-15, 94:23-95:2.

Respectfully submitted,

Dated: New York, New York
January 20, 2023

MITCHELL SILBERBERG & KNUPP LLP


By:   /s/ Eleanor M. Lackman
Eleanor M. Lackman (eml@msk.com)
Marissa B. Lewis (mbl@msk.com)
Elaine Nguyen (eln@msk.com)
437 Madison Avenue, 25th Floor
New York, New York 10022
Tel.: (212) 509-3900
Fax: (212) 509-7239

*Attorneys for Defendant Shutterstock, Inc.*