**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELLIOT MCGUCKEN,

Plaintiff,

v.

SHUTTERSTOCK, INC., et al.,

Defendants.

Civil Action No.: 1:22-cv-00905-JHR

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION**

i

## **TABLE OF CONTENTS**

I.   INTRODUCTION................................................................................................ 1

II.  STATEMENT OF FACTS .................................................................................. 1

A.  Dr. McGucken's creation and ownership of the Subject Photography .................. 1

B.  Shutterstock's business model ............................................................................... 1

C.  Shutterstock's infringement................................................................................... 3

D.  Shutterstock's licensees' infringement.................................................................. 5

E.  Shutterstock's willfulness ...................................................................................... 6

III. LEGAL STANDARD .......................................................................................... 8

IV. ARGUMENT ....................................................................................................... 8

A.  The DMCA "safe harbor" does not protect Shutterstock....................................... 8

    1. Shutterstock is not a "service provider" ............................................................. 9

    2. Shutterstock does not qualify for the "safe harbor" under Section 512(i) ............ 13

    a. Shutterstock did not adopt and implement a "repeat infringer" policy ................ 13

    b. Shutterstock frustrated standard technical measures ................................... 13

    3. Shutterstock's safe harbor defense fails under Section 512(c)................................ 14

    a. The Infringing Copies were not stored "at the direction of the user" and do not entirely "reside on a system" controlled by Shutterstock ............................................. 15

    b. Shutterstock knew or was aware of the infringement and did not expeditiously disable access to the infringing content ................................................................. 18

    c. Shutterstock financially benefited from, and had the right and ability to control the infringement ....................................................................................................... 20

    d. Shutterstock failed to properly follow DMCA agent requirements ....................... 22

B.  Shutterstock directly infringed McGucken's rights in the Subject Photography ..... 23

    1. McGucken owns valid copyrights in the Subject Photography ............................... 23

    2. Shutterstock violated McGucken's copyrights........................................................ 24

C.  Shutterstock is vicariously liable for third-party infringement ................................ 27

D.  Shutterstock is contributorily liable for third-party infringement ............................ 29

E.  Shutterstock violated 17 U.S.C. § 1202(a)............................................................. 31

F.  Shutterstock violated 17 U.S.C. § 1202(b) ............................................................ 33

G.  Shutterstock's exploitation of the Subject Photography was not "fair use" ............. 33

V.  CONCLUSION .................................................................................................... 35

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aaberg v. Francesca's Collections, Inc.*,
2018 WL 1583037 (S.D.N.Y. Mar. 27, 2018)....................................................32, 34

*ABKCO Music, Inc. v. Sagan*,
50 F.4th 309 (2d Cir. 2022) ................................................................................27

*Abramson v. Pataki*,
278 F.3d 93 (2d Cir. 2002) ...................................................................................9

*Agence France Presse v. Morel*,
934 F. Supp. 2d 547 (S.D.N.Y. 2013) ...............................................10, 11, 12, 23

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .............................................................................................8

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
992 F.3d 99 (2d Cir. 2021) .................................................................................36

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) ........................................................................25, 30

*Arista Recs., Inc. v. Mp3Board, Inc.*,
2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002)......................................................26

*Arista Recs. LLC v. Usenet.com, Inc.*,
633 F. Supp. 2d 124 (S.D.N.Y. 2009) ...........................................................23, 28

*BanxCorp v. Costco Wholesale Corp.*,
723 F. Supp. 2d 596 (S.D.N.Y. 2010) ................................................................34

*Baraban v. Time Warner, Inc.*,
2000 WL 358375 (S.D.N.Y. Apr. 6, 2000) ..........................................................35

*Bell v. Wilmott Storage Servs., LLC*,
12 F.4th 1065 (9th Cir. 2021) .............................................................................18

*Bodyguard Prods., Inc. v. RCN Telecom Servs.*,
2022 WL 6750322 (D.N.J. Oct. 11, 2022) ...........................................................21

*Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*,
2021 WL 5359671 (D. Md. Nov. 17, 2021) ..........................................................29

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*,
69 F. Supp. 3d 342 (S.D.N.Y. 2014) ..................................................15, 25, 28, 30

*BWP Media USA Inc. v. Polyvore, Inc.*,
922 F.3d 42 (2d Cir. 2019) ...........................................................................Passim

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
196 F. Supp. 3d 395...........................................................................................35

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ...........................................................................................36

*Capitol Recs., LLC v. Escape Media Grp., Inc.*,
2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015).......................................................14

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008) .................................................................... 25
*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .............................................................................. 8
*Columbia Pictures Inds., Inc. v. Fung*,
    , 710 F.3d1045 (9th Cir. 2 ....................................................................... 22
*Corbis Corp. v. Amazon.com, Inc.*,
    351 F.Supp 2d 1090 (W.D. Wash. 2004) ................................................ 11
*Disney Enters., Inc. v. Hotfile Corp.*,
    798 F. Supp. 2d 1303 (S.D. Fla. 2011) ................................................... 28
*Disney Enters., Inc. v. Hotfile Corp.*,
    2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ..................... 20, 23, 28, 29
*Dole v. United Steelworkers of Am.*,
    494 U.S. 26, 110 S.Ct. 929 (1990) ........................................................ 10
*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ............................................................... 21
*Feingold v. RageOn, Inc.*,
    472 F. Supp. 3d 94 (S.D.N.Y. 2020) ...................................................... 20
*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340, 111 S.Ct. 1282 (1991) ..................................................... 24
*Fox News Network, LLC v. Tveyes, Inc.*,
    883 F.3d 169 (2d Cir. 2018) .............................................................. 34, 36
*Gardner v. CafePress Inc.*,
    2014 WL 794216 (S.D. Cal. Feb. 26, 2014) .............................. 10, 15, 28
*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir.1971) ........................................................ 23, 29, 30
*Goldstein v. Metropolitan Regional Information Systems, Inc.*,
    2016 WL 4257457 (D. Md. Aug. 11, 2016) ............................................ 29
*Greg Young Publ'g, Inc. v. Zazzle, Inc.*,
    2017 WL 2729584 (C.D. Cal. May 1, 2017) .......................................... 11
*Hamil Am. Inc. v. GFI*,
    193 F.3d 92 (2d Cir. 1999) .................................................................... 24
*In re Cellco*,
    663 F.Supp.2d ....................................................................................... 28
*In re DDAVP Direct Purchaser Antitrust Litigation*,
    585 F.3d 677 (2d Cir. 2009) .................................................................. 33
*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir.1998) ................................................................... 35
*Kinsley v. Udemy, Inc.*,
    2021 WL 1222489 (N.D. Cal. Mar. 31, 2021) .................................. 20, 22
*Mango v. BuzzFeed, Inc.*,
    356 F. Supp. 3d 368 (S.D.N.Y. 2019) ................................................ 32, 33
*Mango v. BuzzFeed, Inc.*,
    970 F.3d 167 (2d Cir. 2020) .................................................................. 33
*Mavrix Photographs, LLC v. Livejournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) ......................................................... Passim

iv

*McGucken v. Newsweek LLC,*
   2022 WL 836786 (S.D.N.Y. Mar. 21, 2022).................................................. 26

*McGucken v. Pub Ocean Ltd.,*
   42 F.4th 1149 (9th Cir. 2022) ........................................................................ 35

*Michael Grecco Prods., Inc. v. Alamy, Inc.,*
   372 F. Supp. 3d 131 (E.D.N.Y. 2019) ................................................... 11, 32

*Michael Grecco Prods., Inc. v. Valuewalk, LLC,*
   345 F. Supp. 3d 482 (S.D.N.Y. 2018) ...................................................... 9, 14

*Microscopic, LLC v. United States,*
   144 Fed. Cl. 489 (2019)................................................................................. 26

*Penske Media Corp. v. Shutterstock, Inc.,*
   548 F. Supp. 3d 370 (S.D.N.Y. 2021) ........................................ 10, 28, 33, 34

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   2009 WL 1334364 (C.D. Cal. May 12, 2009) .............................................. 23

*Pickholtz v. Rainbow Techs., Inc.,*
   260 F. Supp. 2d 980 (N.D. Cal. 2003) ......................................................... 31

*Sands v. What's Trending, Inc.,*
   2021 WL 694382 (S.D.N.Y. Feb. 23, 2021) ................................................ 36

*Seide v. Level-(1) Glob. Sols., LLC,*
   2016 WL 4206076,n.5 (N.D. Ill. Aug. 10, 2016) ......................................... 20

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC,*
   718 F.3d 1006 (9th Cir. 2013) ................................................................. 16, 21

*Shihab v. Complex Media, Inc.,*
   2022 WL 3544149 (S.D.N.Y. Aug. 17, 2022)............................................. 33

*Steinmetz v. Shutterstock, Inc.,*
   2022 WL 4342174 (S.D.N.Y. Sept. 19, 2022) ....................................... 13, 19

*Trombetta v. Novocin,*
   2020 WL 1304120 (S.D.N.Y. Mar. 19, 2020).............................................. 32

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC,*
   667 F.3d 1022 (9th Cir.2011) ................................................................. 10, 19

*UMG Recordings, Inc. v. Veoh Networks Inc.,*
   665 F. Supp. 2d 1099 (C.D. Cal. 2009) ....................................................... 19

*Ventura Content, Ltd. v. Motherless, Inc.,*
   885 F.3d 597 (9th Cir. 2018) ................................................................... 18, 22

*Ventura Content, Ltd. v. Motherless, Inc.,*
   2013 WL 11237204 (C.D. Cal. July 3, 2013)............................................... 20

*Venus Fashions, Inc. v. ContextLogic, Inc.,*
   2017 WL 2901695 (M.D. Fla. Jan. 17, 2017) .............................................. 22

*Viacom Int'l Inc. v. YouTube, Inc.,*
   940 F.Supp.2d 110 (S.D.N.Y. 2013) ............................................................ 12

*Viacom Int'l, Inc. v. YouTube, Inc.,*
   676 F.3d 19 (2d Cir. 2012) ............................................................... 10, 12, 13

*Warner Bros. Entm't Inc. v. RDR Books,*
   575 F.Supp.2d 513 (S.D.N.Y. 2008) ............................................................ 27

*Warren v. John Wiley & Sons, Inc.,*
   952 F.Supp.2d 610 (S.D.N.Y.2013) ............................................................. 25

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
ADJUDICATION

*Wolk v Kodak Imaging Network. Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012) .................................................... 11, 12
*Zuma Press, Inc. v. Getty Images (US), Inc.*
  349 F.Supp.3d 369 (S.D.N.Y. 2018) ........................................................ 33

## Statutes

17 U.S.C. § 101 ............................................................................................ 26
17 U.S.C. § 106 ................................................................................... 9, 25, 26
17 U.S.C. § 106(2) ....................................................................................... 27
17 U.S.C. § 106(3) ....................................................................................... 26
17 U.S.C. § 106(5) ....................................................................................... 26
17 U.S.C. § 107 ............................................................................................ 34
17 U.S.C. § 512 ........................................................................................ 9, 10
17 U.S.C. § 512(c) ................................................................................. Passim
17 U.S.C. § 512(c)(1) ............................................................................. 15, 21
17 U.S.C. § 512(c)(1)(A)-(C), (2) ........................................................... 15, 19
17 U.S.C. § 512(c)(1)(B) ............................................................................. 21
17 U.S.C. § 512(c)(1)(C) ............................................................................. 19
17 U.S.C. § 512(d)(3) .................................................................................. 23
17 U.S.C. § 512(i) ............................................................................ 13, 14, 15
17 U.S.C. § 512(i)(1)(A) .............................................................................. 14
17 U.S.C. § 512(k)(1) ............................................................................. 10, 11
17 U.S.C. § 1202(c)(2)–(3), (7) ................................................................... 32

## Rules

Fed. R. Civ. P. 56(c) ...................................................................................... 8

## Regulations

37 CFR § 202.4(i)(2)..................................................................................... 24

## Other Authorities

S. Rep. 105-190............................................................................................ 16

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
ADJUDICATION

## DEFENDANT'S MOTION SHOULD BE DENIED

## I.    INTRODUCTION

Defendant, Shutterstock, Inc. ("Shutterstock"), wrongfully exploited **337** original photographs created and owned by Plaintiff, Dr. Elliot McGucken, by advertising and selling licenses for his photography, individually and as part of subscription packages, to at least **938** different licensees without his consent. The arguments in Shutterstock's motion are readily rebutted by the evidence on record. Shutterstock's summary judgment motion should be denied and McGucken's motion should be granted, as set forth in McGucken's motion and as follows.

## II.    STATEMENT OF FACTS

### A.    Dr. McGucken's creation and ownership of the Subject Photography

McGucken is an accomplished photographer who has earned numerous awards for his photography, including 73 *Epson International Pano Awards.* Plaintiff's Statement of Undisputed Fact ("SUF", Dkt. #105) ¶ 1, **Ex. 1**. He created the 337 original photographs at issue in this case ("Subject Photography"). SUF ¶ 2, **Exs. 2;** McGucken Decl. ¶ 3, **Ex. 47**. The Subject Photography contained metadata identifying McGucken as the copyright owner and author and was routinely published with attribution and other copyright management information identifying McGucken as the author. SUF ¶ 3, **Exs. 3-4; 39** at 150:24-151:9. McGucken owns all copyrights for the Subject Photography, which he registered with the Copyright Office. SUF ¶ 4; **Ex. 5;** McGucken Decl. ¶ 5, **Ex. 49**. He markets and offers his photography for license to publications, product companies, and others. **Ex. 6**.

### B.    Shutterstock's business model

Shutterstock is a licensing company that markets and sells, via its online store, photography licenses and subscriptions. SUF ¶ 6, **Ex. 7**. These licenses and subscription

packages permit its paying customers to use and exploit Shutterstock's curated collection of photography. SUF ¶ 7; **Ex. 38** at 178:24-180:10. Shutterstock offers full-size images in high resolution as part of subscription packages, individually, or at times as "trial" downloads to promote its site. SUF ¶ 8, **Ex. 38** at 34:18-35:2; 74:18-75:11; 178:24-180:10. Shutterstock's clients and licensees pay a monthly rate (currently ranging from $29.00 to $479.00) to use *all* of Shutterstock's photography, or an annual per-photograph rate (currently ranging from $29.00 to $229.00) to access, download, copy, and exploit Shutterstock's portfolio. SUF ¶ 9, **Ex. 8**.

This portfolio is heavily curated, and the "breadth and quality of [Shutterstock's] content offerings are critical to [its] success."[1] SUF ¶ 10; **Exs. 9** at pg. 19; **38** at 178:24-180:10; 182:23-183:6; **42**. Shutterstock advertises that "unlike the significant majority of free images available online, [Shutterstock's] rigorous vetting process enables [it] to provide confidence and indemnification to [its] users that the images in [its] library have been appropriately licensed for commercial or editorial use." SUF ¶ 11; **Ex. 10** at pg. 83. Shutterstock "source[s] high-quality content from contributors, and license[s] [sic] that content to customers worldwide." SUF ¶ 12; **Exs. 11, 38** at 173:5-11. Virtually all of its photographs are sourced from a pre-approved network of verified contributors, who are often recruited by Shutterstock. SUF ¶ 13; **Ex. 38** at 35:21-36:4; 37:10-40:19. Shutterstock exclusively reviews and approves its contributors' credentials before allowing them to contribute photography to be considered for inclusion in Shutterstock's portfolio. SUF ¶ 14, **Exs. 12** and **10** at pg. 83. Shutterstock does not make any photographs publicly viewable or licensable unless and until it first reviews and approves the photographs. SUF ¶ 15; **Ex. 38** at 55:23-57:14; 61:22-63:17; 65:17-66:9; 72:17-73:5.

This review process is thorough – Shutterstock uses its discretion to scrutinize the work's

---

[1] See Request for Judicial Notice (Dkt. #89), Ex. 33.

subject matter, commercial appeal, and technical quality before deciding whether to approve the work and add it to its licensing portfolio. SUF ¶ 16; **Exs. 12; 38** at 69:4-70:15;  98:10-17; 99:3-10; 99:17-100:12. Shutterstock employs a "specialized team of reviewers" to ensure that a contributor meets its "robust quality standards" and a photograph meets its "standards of quality and licensability" before it is made available on Shutterstock's site and offered for license. SUF ¶ 17, **Ex. 9** at pg. 19.[2] Shutterstock regularly rejects photographs for stylistic and aesthetic reasons, such as lighting, blurriness, composition, or framing. SUF ¶ 18, **Exs. 13**, **14** at pg. 16, and **38** at 50:5-51:2; 51:16-25. This extensive review may also involve additional assessment by Shutterstock's review coordinators, who oversee reviewers and provide second opinions. SUF ¶ 19, **Ex. 38** at 69:4-70:15. Shutterstock also reviews the metadata associated with its contributors' submissions. SUF ¶ 20; **Exs. 12; 38** at 95:19-96:12; **46**. After Shutterstock approves a photograph, it creates a dedicated "Asset Detail Page" that it makes public at a unique URL to provide details about the work and how it can be licensed. SUF ¶ 21; **Exs. 15; 38** at 175:4-180:2.

Shutterstock represents to its licensees that it owns the right to display and license the photography on its site. SUF ¶ 22, **Ex. 16** (Parts I and II). It contracts directly with its clients and sets specific license terms such as duration, geographic region, and whether the image can be used on merchandise. SUF ¶ 23; **Exs**. **17** (representative exemplars of those terms); **38** at 29:14-20. Shutterstock is the principal in licenses with its clients and is the only party with control over images before they are delivered to clients. SUF ¶ 24; **Exs. 38** at 60:18-22; **33**, pg. 46; RJN. Shutterstock's "review process is designed to ensure that every image is appropriately licensed for its intended use[,]" which can be "commercial" or "editorial." SUF ¶ 25; **Ex. 10** at pg. 89.

**C.    Shutterstock's infringement**

---

[2] See also RJN, **Ex. 33,** pg. 7.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

Shutterstock displayed on its publicly accessible site unauthorized copies of McGucken's Subject Photography (collectively, "Infringing Copies") and offered for sale and sold licenses for those works, all without McGucken's consent. SUF ¶ 26; **Exs. 3, 20**. Shutterstock worked with at least three of its carefully vetted and verified contributors to obtain the Infringing Copies. SUF ¶ 27; **Exs. 21, 43, 44, 45**. Shutterstock onboarded the Infringing Copies from these contributors[3] and received metadata for the Subject Photography reflecting McGucken's authorship and copyright ownership of the works. SUF ¶ 29; **Exs. 19, 38** at 226:9-18; **19** . Shutterstock then reviewed the works for metadata, quality, subject matter, aesthetics, and the numerous other factors described above. SUF ¶ 30; **Ex. 38** at 130:12-21.

After completing its review of the content and commercial appeal of the Infringing Copies, Shutterstock expressly approved the Infringing Copies for inclusion in its licensing portfolio. Id. It then made its own copies of the Infringing Copies, removed the metadata, added its logo to the copies to claim them as *its own* intellectual property, published these copies on its public website at its Asset Detail Pages and other URLs, and began offering them to its customers in high-resolution as part of its licensing and subscription programs. SUF ¶ 31; **Exs. 3; 38** at 73:7-75:11; 22:3-21;  126:15-21*; 20* (representative exemplar); **48**. In doing so, Shutterstock displayed the Infringing Copies – which are virtually identical to the Subject Photography aside from minor cropping, rotation or lighting adjustments – in multiple sizes on various URLs on its public website. SUF ¶ 32; **Exs. 3; 48; 20** (representative exemplar). Shutterstock then licensed the Infringing Copies to at least 938 licensees without McGucken's

---

[3] One of these contributors, Moajjem Hossain, whose Shutterstock account name is "Hane Street" (referred to as "Hane Street" herein), and who provided the majority of the Infringing Copies, also worked with Shutterstock to wrongfully exploit the photography at issue in *Itasca Images, LLC et al v. Shutterstock, Inc*., et al, 0-21-cv-00287 (D.MN). SUF ¶ 28; Exs.18; 44 (identifying Hossain as contributor).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

consent, earning at least $2,131.00 in revenues from individual licenses and additional revenues from subscriptions. SUF ¶ 33; **Exs. 21; 38** at 130:23-131:2.

### D.    Shutterstock's licensees' infringement

Shutterstock's licensees then exploited the Infringing Copies on books, websites, and other merchandise, reaping additional profits from the exploitation of McGucken's photography. SUF ¶ 34; **Exs. 21, 22**. Shutterstock did not notify these licensees of McGucken's claims of infringement until on or around June 2022, at least *four months* after this action was filed. SUF ¶ 35; **Ex. 23**. Notably, Shutterstock failed to mention McGucken's ownership in the belated notices to its licensees. Id. And when two licensees, in March of 2022, contacted Shutterstock about the issue, Shutterstock made mention of the infringement and reiterated the terms of the licenses. SUF ¶ 36; **Ex. 17**. Many of Shutterstock's licensees are still exploiting the Infringing Copies **as of the date of this submission**. McGucken Decl. ¶ 14, **Ex. 51**.

Shutterstock also entered into agreements with, and distributed the Infringing Copies to, third-party partner website companies including TinEye, HelloRF (which Shutterstock owns in part),[4] and StockFresh. SUF ¶ 37; **Exs. 24, 25, 26, 27**. Shutterstock works with these partner sites by providing Shutterstock's curated photography portfolio and directing them to display the photography, advertise Shutterstock licenses, and direct viewers to Shutterstock's site and online store. SUF ¶ 38; Id.; **Exs. 38** at 136:6-23; 140:8-141:7. Shutterstock provided these partner sites with Shutterstock computer code (referred to as Application Programming Interface, or "API") and a link to copies of the Shutterstock computer files for the Infringing Copies, and directed each partner site to further display the Infringing Copies on each of their sites and encourage viewers to visit Shutterstock's site to purchase licenses for the Infringing Copies. SUF ¶ 39; Id.;

---

[4] See **Ex. 34**, announcing Shutterstock's purchase of HelloRF parent company, ZCool.

see also **Ex. 28**. Shutterstock admits that the broad distribution of its photography across the internet via these partner sites is an important aspect of its business plan. SUF ¶ 40; **Exs. 38** at 181:15-182:6**; 9** at pg. 19.

Shutterstock's API terms require its partners to "incorporate the Shutterstock watermark" when displaying Shutterstock-provided photography and include a conspicuous indication that each photograph is "Powered by Shutterstock." SUF ¶ 41, **Ex. 28**. StockFresh, TinEye, and HelloRF are Shutterstock partners and at all relevant times participated in this program. SUF ¶ 42; **Exs. 24, 25, 26.** In compliance with their partnership agreements with Shutterstock, these entities displayed the Infringing Copies alongside Shutterstock branding and advertisements. SUF ¶ 43; Id., **Ex. 27**. Shutterstock used the Infringing Copies to advertise its 15% discount sale on the TinEye and StockFresh websites under this partnership. SUF ¶ 44; **Exs. 24, 25, 38** at 136:6-22. Because TinEye and StockFresh used Shutterstock's code and API, they were only able to display Shutterstock photographs while the photographs were "live" and available via Shutterstock's site. SUF ¶ 45; **Ex. 38** at 137:10-24; McGucken Decl. ¶ 13, **Ex. 50**.

E.    **Shutterstock's willfulness**

Shutterstock had access to McGucken's copyright management information ("CMI"), which identifies McGucken as the copyright owner of the Subject Photography, when it reviewed and approved the use of the photography on its website and thus knew or should have known he owned the photography. SUF ¶ 46; **Ex. 19** (condensed exemplar). McGucken also notified Shutterstock of its infringement of his rights in certain Subject Photography in December 2020. SUF ¶ 47; **Ex. 29.** Shutterstock also knew that its "Hane Street" contributor, with whom Shutterstock worked to offer most of the Infringing Copies, was an infringer as early as March 2020, when it was alleged to be responsible for the photography at issue in *Itasca*

*Images, LLC et al v. Shutterstock, Inc., et al*, 0-21-cv-00287 (D.MN). SUF ¶ 48; **Ex. 18**. Further

still, two of Shutterstock's licensees raised the issue of the validity of their licenses in March

2022 and Shutterstock  was given notice by another third party about certain Infringing Copies

on April 13, 2022. SUF ¶ 49; **Exs. 17, 40.** Yet, Shutterstock failed to fully remove certain

Infringing Copies from its site until May 2022. SUF ¶ 50; **Ex. 44.** And Shutterstock failed to

notify its licensees regarding the infringements until at least June 3, 2022, despite its multiple

notices of infringement. SUF ¶ 51; **Ex. 23, 41**. Shutterstock also continued to exploit the

Infringing Copies on StockFresh until at least July 2022, on HelloRF until at least September

2022, and to advertise Shutterstock's 15% discount sale on TinEye **until the date of this filing**.

SUF ¶ 52; **Exs. 24, 25, 26;** McGucken Decl. ¶ 13, **Ex. 50**. Indeed, certain licensees continue to

exploit the Infringing Copies as of this submission. McGucken Decl. ¶ 14, **Ex. 51**.

      Shutterstock has faced copyright infringement claims in *at least nine* cases since 2019.[5]

SUF ¶ 53. In one case, Shutterstock is alleged to have attempted to "exploit the COVID-19

pandemic to walk away from its contractual obligations" and infringed the plaintiff's rights in at

least 2,300 photographs in doing so. SUF ¶ 54; see *Penske Media Corp.*, 1-20-cv-04583, Dkt.

#29. Shutterstock has also received no fewer than 260 complaints to the Better Business Bureau.

SUF ¶ 55; **Ex. 35**. In the photography community, Shutterstock's business model is known to be

problematic. SUF ¶ 56; **Exs. 36, 37**. Shutterstock agrees, admitting that it has "been subject to a

variety of third-party infringement claims in the past and will likely be subject to similar claims

---

[5] See *Tamara Williams v. Shutterstock, Inc., et al*; 1-21-cv-05784 (E.D.N.Y); *Steinmetz v. Shutterstock, Inc., et al*, 1:21-cv-07100 (S.D.N.Y.); *Cavanaugh v. Shutterstock, Inc., et al*, 1-21-cv-03796 (S.D.N.Y.); *Itasca Images, LLC et al v. Shutterstock, Inc., et al*, 0-21-cv-00287 (D.MN); *Lickerish, Ltd. v. Shutterstock Inc.*, 1-20-cv-05384 (S.D.N.Y.); *Penske Media Corporation v. Shutterstock, Inc.*, 1-20-cv-04583 (S.D.N.Y.); *Grossman Enterprises LLC v. Hubbard Broadcasting, Inc., et al*., 1-20-cv-03023 (S.D.N.Y.); *Michael Grecco Productions, Inc. v. Rex Features, Ltd., et al.*, 2-20-cv-00787 (C.D.CA); *Michael Grecco Productions, Inc. v. Shutterstock, Inc*., et al., 2-19-cv-01153 (CD.CA).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

in the future[,]" and that "policing [its] intellectual property rights is difficult, costly and **may not always be effective**." SUF ¶ 57, **Ex. 10** at pgs. 24, 28 (emphasis added).

## III.    LEGAL STANDARD

Summary judgment is appropriate only where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the moving party to establish the lack of any factual issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether there is a genuine issue of material fact, "the court must 'examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002). Here, Shutterstock has not established any defense to infringement.

## IV.    ARGUMENT

McGucken owns the Subject Photography and Shutterstock displayed and published those works on its commercial website, in violation of McGucken's exclusive rights under 17 U.S.C. § 106. Shutterstock is thus liable for copyright infringement and its affirmative defenses fail.

### A.    The DMCA "safe harbor" does not protect Shutterstock

Shutterstock's infringement is not excused by the safe harbor provision of the Digital Millennium Copyright Act ("DMCA"), which shield "service providers" from liability for copyright infringement under certain circumstances. See 17 U.S.C. § 512. It is an "affirmative defense," so Shutterstock "has the initial burden of establishing that it meets the statutory requirements." *BWP Media USA Inc. v. Polyvore, Inc*., 922 F.3d 42, 54-55 (2d Cir. 2019)

(citation omitted). This burden is heavy and requires the infringer to prove "beyond controversy every essential element, and failure to so will render the [defendant] ineligible for the § 512(c) safe harbor's protection." *Mavrix Photographs, LLC v. Livejournal, Inc*., 873 F.3d 1045, 1052 (9th Cir. 2017)(citations and quotations omitted). Shutterstock "(1) must meet the statute's definition of service provider; (2) must have adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers; and (3) must accommodate standard technical measures used by copyright owners to identify or protect copyrighted works." *Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 509 (S.D.N.Y. 2018)(citations omitted). It cannot do so.

### 1.    Shutterstock is not a "service provider"

Shutterstock cannot prove that it meets the definition of a "service provider."[6] Under 17 U.S.C. § 512, a "service provider" is, *inter alia*, a "provider of online services or network access[.]" 17 U.S.C. § 512(k)(1). Shutterstock is not a service provider because it is does not provide online services or network access. Instead, it solicits and curates photography that it then markets, licenses, and includes in paid subscriptions. **Exs. 38** at 178:24-180:10; 182:23-183:6; **42**. At base, "Shutterstock, Inc. is a company that licenses 'stock' and 'editorial' photographs, videos, and other illustrations to media publications, commercial actors, and others." *Penske Media Corp. v. Shutterstock, Inc*., 548 F. Supp. 3d 370, 373 (S.D.N.Y. 2021)(citation omitted).

Licensing companies like Shutterstock are outside of the "service provider" definition, as any company "that is directly licensing copyrighted material online is **not** a 'service provider.'" *Agence France Presse v. Morel,* 934 F. Supp. 2d 547, 566 (S.D.N.Y. 2013)(emphasis added), citing *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35, 110 S.Ct. 929 (1990). Shutterstock

---

[6] *Steinmetz v. Shutterstock, Inc.* is not helpful, as discussed *infra*.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

directly licenses copyrighted material to the public. Given that it "directly sells, rather than facilitates the sale of, products" it is not a "service provider." *Gardner v. CafePress Inc.*, 2014 WL 794216, at *5 (S.D. Cal. Feb. 26, 2014)(citation omitted).

Shutterstock provides no public services – it exists to sell licenses, and profit. A party is typically found to be a "service provider" when it does "something useful" for "other entities or individuals, such as providing a file hosting or file sharing platforms, rather than itself selling or licensing copyrighted material.'" *Agence France Presse,* 934 F. Supp. 2d at 567, citing *Viacom Int'l,* 676 F.3d at 28; *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 667 F.3d 1022, 1026, 1035 (9th Cir.2011). Shutterstock was built not for sharing but for monetizing its curated photography portfolio. It directly sells its own licenses and subscriptions via its online store and directly delivers the licensed photographs to clients – the opposite of a passive sharing site. **Ex. 38** at 29:14-3012, 92:3-93:12; RJN, **Ex. 33,** pg. 46. And it directly sold at least 938 licensees for the works at issue. **Exs. 21; 38** at 130:23-131:2. This is terminal to the defense because the safe harbor does not protect companies that sell or license their own products. *Greg Young Publ'g, Inc. v. Zazzle, Inc.*, 2017 WL 2729584, at *6 (C.D. Cal. May 1, 2017), citing *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp 2d 1090, 1100 (W.D. Wash. 2004). Indeed, because Shutterstock, "rather than a user of the" website, displayed the Infringing Copies and "offered copies for prospective license," Shutterstock cannot be a "service provider" under 17 U.S.C. § 512(k)(1). *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 140 (E.D.N.Y. 2019), citing *Agence France Presse*, 934 F.Supp.2d at 566; **Exs. 21; 38** at 130:23-131:2; 29:14-20; 31:15-23; 32:24-33:21; 92:3-23; 173:5-11.

Shutterstock's cited authority is distinguishable. It relies on *Wolk v Kodak Imaging Network. Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012)  *aff'd sub nom. Wolk v. Photobucket.com,*

*Inc.*, 569 F. App'x 51 (2d Cir. 2014) to argue that it qualifies as a service provider because it allows the online sharing of photographs. But the Photobucket service at issue in *Wolk* allowed the public to upload, display, and share photographs on the Photobucket site instantly and for free without any form of review or curation by Photobucket. Shutterstock, in contrast, charges fees, does not allow uploaded photographs to be instantly viewable, does not allow **any** sharing of photography its site, and will not display any photograph without first reviewing and approving the work. **Ex. 38**, 55:23-57:14. *Wolk* is inapposite.

Defendants also cite *Viacom Int'l Inc. v. YouTube, Inc.* but there the district court on remand held that only those processes that made videos "more readily accessible" via technical means, such as "transcoding the files," and which were undertaken "**without manual intervention**," could meet the § 512(c) safe harbor. *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F.Supp.2d 110, 123 (S.D.N.Y. 2013) (emphasis added). Here, Shutterstock manually intervened to review and display the photographs and its intervention was not simply to modify the works' coding to make them more publicly accessible. No, it reviewed, curated, and copied those works.

YouTube, like Photobucket, and unlike Shutterstock, allows users to instantly display their uploaded works on the platform without human review or curation. Indeed, *Wolk* and subsequent cases make clear that the safe harbor is **only** available if the service provider's control or influence does not "take the form of prescreening content, rendering extensive advice to users regarding content and editing user content[.]" *Viacom Int'l Inc.,* 940 F. Supp. 2d at 118 (S.D.N.Y. 2013), quoting *Wolk,* 840 F.Supp.2d at 748.[7] Here, it is undisputed that Shutterstock prescreened photography (**Ex. 38**, 55:23-57:14); rendered extensive advice to its users regarding

---

[7] *See also Agence at* 567 (every case reviewed by the Court where a party was held to be a service provider involved an entity providing a useful service to others "rather than itself selling or licensing copyrighted material.").

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

photography (**Ex. 14**); and edited McGucken's photography by stripping his metadata and adding its own watermarks (**Exs. 3, 20, 48**). It has sole control over every photograph that it displays and offers for license. And while the defendants in *Wolk* and *Viacom* did not directly control, sell, or license the content on their platforms, Shutterstock actively engages in all three activities, including actively "previewing" the photography it offers before displaying and listing those works, setting prices, and being solely responsible for its subscription sales and licensing.

Shutterstock's reliance on *Steinmetz v. Shutterstock, Inc.,* 2022 WL 4342174 (S.D.N.Y. Sept. 19, 2022) also fails. That court found that Shutterstock "provides a forum, or the 'facilities,' that allows independent contributors to connect with and make their images available for licensing to users in need of content." Id. at *5.[8] And it found that Shutterstock does not "curate[] the portfolio connected with its contributor platform." Id. at *7. But these conclusions ignore substantial, undisputed evidence that Shutterstock heavily curates its portfolio and the key fact that there is **no** contact between Shutterstock's contributors and licensees. It is Shutterstock alone who decides whether to make a photograph available for public licensing. And there is no "forum" or "facility" for sharing, only a paid licensing site.

The *Steinmetz* court found Shutterstock to be a service provider because it saw no evidence that Shutterstock paid royalties to the contributor at issue, licensed the image in issue to any Shutterstock user, or **"**in any way profited from having the image[s] in its portfolio." Id. at *6. Conversely, the record here reflects Shutterstock's extensive licensing activity, including its sales for 938 licenses, and payments to contributors. **Ex. 21**. Shutterstock is not a "service

---

[8] The *Steinmetz* decision is an outlier given the procedural manner in which the Court reached its decision. The court there set ordered a briefing schedule and then disregarded the order. The parties filed voluminous cross-oppositions after close of business on a Friday and the Court issued a full ruling the *very next* business day. It would have been near impossible for the Court to fully review those voluminous oppositions in connection with the ruling. And the ruling issued *before* the deadline for the parties to file their reply briefs. The issues were not fully briefed.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

provider," which is terminal to the defense.

### 2. Shutterstock does not qualify for the "safe harbor" under Section 512(i)

Even if it could prove it was a "service provider," Shutterstock would still need to "meet a set of threshold criteria" to take advantage of the "safe harbor." *Viacom Int'l*, 676 F.3d at 27. Shutterstock must prove that it "adopted and reasonably implemented […] a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers" *and* "accommodates and does not interfere with standard technical measures." 17 U.S.C.A. § 512(i). The latter requires proof that an infringer "accommodate[d] standard technical measures used by copyright owners to identify or protect copyrighted works." *Michael Grecco Prods., Inc.,* 345 F. Supp. 3d at 509 (citation omitted). Shutterstock cannot meet these obligations.

### a. Shutterstock did not adopt and implement a "repeat infringer" policy

Shutterstock cannot prove it "adopted and reasonably implemented" a repeat infringer policy. 17 U.S.C. § 512(i)(1)(A). Sites that "fail to terminate users despite their persistent and flagrant infringement are not eligible for protection under the safe harbor." *Capitol Recs., LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049, at *6 (S.D.N.Y. Mar. 25, 2015) (citations omitted). Shutterstock knew that "Hane Street" was a massive infringer as early as March of 2020. **Ex. 18**. Yet, it failed to suspend this account until February of 2021 and left most of their photography online until at least July of 2022. **Ex. 43, 25**. In light of this and the other artists who have sued Shutterstock for copyright infringement, this requirement cannot be met.

### b. Shutterstock frustrated standard technical measures

Shutterstock admits that it strips the metadata – a standard technical measure in the context of digital photography – from every photograph that it procures and approves for use on

- 13 -

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

its site, which removes important author and copyright information. **Ex. 38** at 238:13-242:5. It is widely accepted in the photography industry that a photograph's metadata constitutes a standard technical measure. **Ex. 30, pg. 14-15**. Shutterstock even has protocols in place to address metadata. **Exs. 46; 38** at 95:19-96:12. Shutterstock received metadata identifying McGucken as the author and owner of the Subject Photography and then knowingly removed that metadata and approved it for licensure without his consent. **Ex. 19**. Shutterstock failed to accommodate a standard technical measure, which further disqualifies it from the safe harbor.

Shutterstock's claim that standard technical measures do not exist is meritless given the above. At the very least, whether deletion of metadata constitutes interference with standard technical measures is a genuine issue of material fact that cannot be resolved at this stage. See *Gardner v. CafePress Inc.*, 2014 WL 794216, at \*6 (S.D. Cal. Feb. 26, 2014) (dispute of material fact as to whether stripping copyright metadata is a "standard technical measure"). Shutterstock's "safe harbor" defense fails under 17 U.S.C. § 512(i).

### 3. Shutterstock's safe harbor defense fails under Section 512(c)

If Shutterstock proves it is a "service provider" that meets all of the above requirements (which it cannot do), then it must also prove that it meets the Section 512(c) requirements:

> A service provider shall not be liable ... for infringement of copyright by reason of the **storage at the direction of a user** of material that r**esides on a system or network controlled or operated by or for the service provider**, if the service provider—
>
> (A) (i) does not have **actual knowledge** that the material or an activity using the material on the system or network is infringing; (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from **which infringing activity is apparent**; or (iii) upon obtaining such knowledge or awareness, **acts expeditiously to remove, or disable access to, the material**;
>
> (B) does not receive a **financial benefit** directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

(C) upon notification of claimed infringement as described in paragraph (3), responds **expeditiously to remove, or disable access to, the material** that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1)(emphasis added). Shutterstock cannot prove that the Infringing Copies were stored "at the direction of the user" as required, or that it lacked "knowledge of infringement," received "no direct financial benefit from the infringing activity," and properly complied with DMCA takedown requests. *Hollywood Fan Sites*, 69 F. Supp. 3d at 358, citing 17 U.S.C. § 512(c)(1)(A)-(C), (2). In actuality, Shutterstock selected and published the Infringing Copies, knew of, and financially benefited from, the infringement, and refused to comply with takedown requests. The defense thus fails.

### a.    The Infringing Copies were not stored "at the direction of the user" and do not entirely "reside on a system" controlled by Shutterstock

Shutterstock misrepresents its content review process and cannot prove that the Infringing Copies were displayed on its website and its partner sites "at the direction of" of its users. This is fatal, as the "§ 512(c) safe harbor is only available when the infringement occurs 'by reason of the storage *at the direction of a user* of material that resides on a system or network controlled or operated by or for the service provider.'" *BWP Media USA*, 922 F.3d at 57–58 (emphasis by court). "Storage," in this context, "has a unique meaning," as Congress explains: "[e]xamples of such storage include providing server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users." *Mavrix Photographs, LLC v.*, 873 F.3d at 1052, citing S. Rep. 105-190, at 43 (1998). Storage as used here "encompasses the access-facilitating processes" through which the public accesses the infringing content. Id., citing, *Shelter Capital*, 718 F.3d at 1016. Rather than requiring "that the infringing conduct *be* storage," the statutory language allows for infringement "*by reason of the storage* at the direction of a user." Id. at 1052 (emphasis in original, citations omitted). It is thus error to

"focus[] on the users' submission of infringing photographs" because the focus should be on the site's "screening and public posting of the photographs." Id. at 1053. Here, the focus should be on Shutterstock's "role in making material stored by a user **publicly accessible** on its site." Id. (emphasis added), citing *Shelter Capital*, 718 F.3d at 1018; S. Rep. No. 105-190, at 43-44 (1998). Indeed, "public accessibility is the critical inquiry" so the "inquiry turns on the role" of Shutterstock in "screening and posting users' submissions." Id.

Shutterstock exclusively selects its publicly accessible content. Every photograph on Shutterstock's licensing site is there "at the direction of" Shutterstock because it alone reviews, approves, publishes to its public site, distributes, and licenses its photographs. See, e.g., **Ex. 38**, 55:23-57:14; 60:18-22; 61:22-63:17; 65:17-66:9; 72:17-73:5; 126:9-14. Indeed, Shutterstock's "vetted" and "verified" contributors are not "users," but rather paid partners, and they do not do any "sharing" with Shutterstock's customers. Id. at 126:9-14; 141:21-142:5. Shutterstock in fact prevents sharing at the direction of users, making it impossible for its contributors to upload content directly to the publicly accessible Shutterstock site. **Ex. 38** at 61:22-63:17.

Shutterstock alone was responsible for curating, posting, and making the Infringing Copies publicly accessible and certainly cannot prove that it had **no** role in making the Infringing Copies accessible, as is required for the defense. *Mavrix Photographs, LLC*, 873 F.3d at 1056 (defense available "if the service provider played *no role* in making that infringing material accessible on its site")(emphasis added). Its own records establish that it, and it alone, "approve[d]" the images, before they were displayed to the public as part of Shutterstock's licensing portfolio. **Exs. 44** (representative exemplar)**, 38** at 130:12-21. Indeed, it concedes that it is a curator and reviews every single contributor photograph for quality and composition, lighting, subject matter, and other unique concerns to ensure that the work meets Shutterstock's

- 16 -

standards before displaying the photograph on its public site. **Exs. 38** at 48:7-15; 49:14-25; 50:8-51:4; 51:16-25; 53:12-24; 55:23-56:13; 56:24-57:14; 57:7-14; 61:22-62:4; 62:6-14; 63:9-17; 67:3-25; 72:17-73:5; 193:15-196:20; **47**. So owing, Shutterstock's curation team played not just a *major* role, but the *exclusive* role, in reviewing, selecting, approving, modifying, and publishing the Infringing Copies on its publicly available site. No work is displayed "at the direction of users" as Shutterstock alone reviews, approves, publishes to its public site, copies, distributes, and directly licenses the works to third parties and the public. **Ex. 38**, 55:23-57:14.

It is beyond peradventure that Shutterstock, not the contributor, "exercised control" and "selected" the material at issue. *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021)(citation omitted). And Shutterstock was responsible for giving the Infringing Copies "separate URLs that could be viewed by anyone at any time." *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42, 59 (2d Cir. 2019)(denying safe harbor at summary judgment stage for this reason). As such, the Infringing Copies were not "stored at the direction of" anyone but Shutterstock and it would be error to focus on the users' submission of the photography rather than on Shutterstock's "role in making those photographs publicly accessible[.]" *Mavrix Photographs, LLC*, 873 F.3d at 1056. **Exs. 38** at 226:9-18; 233:9-234:12**; 43, 45**.

Shutterstock is also ineligible because it cannot prove that the Infringing Copies "reside[] on a system or network controlled or operated by or for the service provider," as is required by 17 U.S.C. §512(c). This is so because it distributed the Infringing Copies to other networks and systems controlled by HelloRF, TinEye, and Stockfresh. **Exs. 24-27, 38** at 136:6-23; 140:8-141:7, **Ex. 50**. The safe harbor is thus unavailable.

Shutterstock's cited authority is inapposite. In *Ventura Content, Ltd.*, the court found the defendant eligible for safe harbor protection even though its review process included some

screening, but that case is inapposite because the infringer there did "not review whether the pornography submitted by users [wa]s [']new and exciting['] or me[t] any other discretionary standards." *Ventura Content, Ltd. v. Motherless, Inc*., 885 F.3d 597, 607 (9th Cir. 2018). Instead, the only criteria for the brief, automated review was that "anything legal stays." Id. Unlike the *Motherless* defendant, Shutterstock reviews the entire photograph for aesthetic and quality reasons and to ensure the work meets it "discretionary standards" and not just to ensure that it does not violate the law. Only after Shutterstock decides that the content, quality, and aesthetics of a work meet its standard will it approve a photograph and offer it for license in full-size and other sizes at specific URLs on its publicly accessible website. **Ex. 38** at 55:23-57:14.

Shutterstock's reliance on *Steinmetz* here fails in light of Shutterstock's curation process. The *Steinmetz* court, in holding that the images were stored at the direction of Shutterstock's contributors, overlooked key evidence. For example, the court found that "Defendant neither seeks out contributors nor curates the portfolio connected with its contributor platform." *Steinmetz v. Shutterstock, Inc.*, 2022 WL 4342174, at *7 (S.D.N.Y. Sept. 19, 2022). Here, there is undisputed evidence that Shutterstock seeks out contributors and curates its portfolio. **Exs. 38** at 35:21-36:4; **42**. And the *Steinmetz* court found that the contributor platform is "user-directed" but that cannot be correct given that only Shutterstock can make photography accessible on its public site. Id. The defense fails.

b.    **Shutterstock knew or was aware of the infringement and did not expeditiously disable access to the infringing content**

Shutterstock had "knowledge or awareness" of the infringement and failed to act "expeditiously to remove, or disable access to, the material" as is required for the safe harbor.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

See 17 U.S.C. 512(c)(1)(A)(iii).[9] Shutterstock had both actual and red flag knowledge. The latter can be acquired "from DMCA notices, informal notices, or other means." *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1107 (C.D. Cal. 2009).[10] The relevant inquiry is not whether the service provider should have known that the material was infringing, but whether the service provider "deliberately proceeded in the face of blatant factors of which it was aware." *Ventura Content, Ltd.*, 2013 WL 11237204, at *6 (C.D. Cal. July 3, 2013), aff'd, 885 F.3d 597 (9th Cir. 2018)(citations omitted). A service provider was aware "of facts or circumstances" making it obvious that "specific copyrights owned by the Plaintiff were being infringed." Id. at *7. Here, Shutterstock received and reviewed metadata specifically identifying McGucken as the Subject Photography's creator and owner, yet it approved his work for use on its site without his consent. **Ex. 19**. Shutterstock thus had at that moment reason to suspect that the Infringing Copies infringed McGucken's copyrights. And Shutterstock had notice as of March 2020 that Hane Street was an infringer as reflected in the *Itasca Images* action. **Ex. 18**. Yet, Shutterstock exploited the work anyways.

The safe harbor for "an innocent service provider disappears [...] at the moment it becomes aware that a third party is using its system to infringe." *Disney Enters., Inc.*, 2013 WL 6336286, at *26-27 (internal quotation marks and citations omitted). Shutterstock was aware of the Infringing Copies and refused to remedy the infringement. Numerous courts have held that response times of **18 and 23 days** between notice and removal "cannot be considered expeditious." *Feingold v. RageOn, Inc.*, 472 F. Supp. 3d 94, 102 (S.D.N.Y. 2020) (emphasis

[9] Shutterstock argues that it had no obligation to remove all of the Infringing Copies because it did not receive DMCA takedown notices for all of those works. But, a takedown notice is *not* required under 17 U.S.C. § 512(c)(1)(A)(iii). Such a notice is only required under 17 U.S.C. § 512(c)(1)(C).
[10] Aff'd sub nom., *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 667 F.3d 1022 (9th Cir. 2011), opinion withdrawn and superseded on reh'g, 718 F.3d 1006 (9th Cir. 2013), and aff'd sub nom. *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006 (9th Cir. 2013).

added); see also *Kinsley v. Udemy, Inc.*, 2021 WL 1222489, at *5 (N.D. Cal. Mar. 31, 2021),

citing *Seide v. Level-(1) Glob. Sols., LLC*, 2016 WL 4206076, at *5 n.5 (N.D. Ill. Aug. 10, 2016)

(collecting cases, noting that "response times to remove infringing material from entities"

ranging f'rom **5 to 14 days** are expeditious.").

Shutterstock continued to exploit McGucken's photography available after it was undisputedly

"aware" of the infringement. Shutterstock claims that it removed the images prior to

McGucken's complaint, but clear evidence contradicts these claims. For example, while

Shutterstock argues that it removed the image subject to McGucken's takedown notice in

January 2021, the evidence reflects that it was still being displayed at least as of July 2022. **Ex.**

**24** at MCG002031. Indeed, Shutterstock failed to fully remove the Infringing Copies from its site

for at least three months after this action was filed. **Ex. 44**. And Shutterstock failed to advise its

licensees to remove the Infringing Copies from their sites for at least four months, and its

licensees continue to exploit the Infringing Copies **as of today**. McGucken Decl. ¶ 14, **Ex. 51**.

Shutterstockalso failed to "disable access" to the Infringing Copies for StockFresh and HelloRF

until at least August and September 2022, and TinEye has continued to display the Infringing

Copies as of the date of this filing. McGucken Decl. ¶ 12-13; **Exs. 17, 25, 26, 50**. This was not

expeditious.

   c.    **Shutterstock financially benefited from, and had the right and ability to control the infringement**

   Shutterstock also cannot claim the safe harbor because it "receive[d] a financial benefit

directly attributable to the infringing activity," and had "the right and ability to control such

activity[.]" 17 U.S.C. § 512(c)(1). A service provider is eligible for the safe harbor only if it

"does not receive a financial benefit directly attributable to the infringing activity, in a case in

which the service provider has the right and ability to control such activity[.]" *UMG Recordings,*

*Inc.*, 718 F.3d at 1026, quoting 17 U.S.C. § 512(c)(1)(B).

The financial benefit "need not be substantial or a large proportion of the service provider's revenue." *Mavrix Photographs, LLC,* 873 F.3d at 1059, citing *Ellison*, 357 F.3d at 1079; see also *Bodyguard Prods., Inc.,* 2022 WL 6750322, at *10 ("no requirement that the draw be substantial.)" (citations omitted). Shutterstock financially benefitted by selling 938 licenses for the Infringing Copies as part of its rigorously curated portfolio, which is the primary draw for Shutterstock's customers, and using the Infringing Copies to draw customers on its site and partner sites. **Exs.  21; RJN, Ex. 33** at pgs. 18, 45. And Shutterstock used and authorized the use of the Infringing Copies on its site and third-party sites, including TinEye, HelloRF, and StockFresh, to draw traffic to its site and sell licenses and subscriptions to those viewers.[11] **Exs. 27, 38** at 136:6-22, 139:8-140:6, 141:9-19.

Shutterstock admits that it licensed 165 of McGucken's photographs and generated revenues from that licensing, and paid a portion of those revenues to contributors. Motion, fn 11. Shutterstock thus "directly profited" by contracting with third parties and by reproducing the works "in its own promotional materials in an effort to draw customers to its website[.]"*Venus Fashions, Inc. v. ContextLogic, Inc*., 2017 WL 2901695, at *28 (M.D. Fla. Jan. 17, 2017), citing *Columbia Pictures Inds., Inc. v. Fung*, 710 F.3d 1020, 1045 (9th Cir. 2013). Shutterstock's sale of the 938 licensees and use of the Infringing Copies in subscription packages and on its site and partner sites meet the "financial benefit" requirement.

Shutterstock also had the "right and ability to control" the "infringing activity." This exists when a site "t[ells] its users what to upload ... or curate[s] uploaded content in any

---

[11] Under Shutterstock's contract with TinEye, the latter offered a 15% discount to its viewers who visited the Shutterstock site and bought licenses, and Shutterstock had a similar agreement with StockFresh. **Exs. 24, 25, 27.**

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

meaningful way[.]" *Kinsley*, 2021 WL 1222489, at \*4, quoting *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 613 (9th Cir. 2018). Shutterstock does both. It directs its users as to what to upload and heavily curates the material that is uploaded, rejecting certain submissions for aesthetic and marketability reasons before making the accepted photographs available to its customers for licensure. In fact, it has the "unfettered ability to control access to" the photographs on its site, which has been "found to be "total dominion" over the content. *Arista Recs. LLC v. Usenet.com, Inc*., 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009)(citation omitted).

Right-and-ability also exists here "based on [Shutterstock's] ability to remove" the photography from its platform and block access. *Agence France Presse*, 934 F. Supp. 2d at 575. Indeed, a defendant need not have "formal power to control" a user but only the "the right and ability to block [their] access[.]"*Arista Recs. LLC v. Usenet.com, Inc*., 633 F. Supp. 2d at 157, citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1163 (2d Cir.1971). That is the case here – Shutterstock provides sole direction in approving photographs for public viewing and removing those works. **Ex. 38** at 57:7-14; 60:18-22; 55:23-57:14; 61:22-63:17; 65:17-66:9; 72:17-73:5. It can also block users "for any reason[,]" which is evidence of the right and ability to supervise." Id. (citation omitted). Shutterstock has complete control over all aspects of publication of photography to its public site and can remove material and suspend accounts at any time. It did not just have the "right and ability" to control the Infringing Copies, it had the sole, unfettered right to do so. Shutterstock directly curated its photography, which it publicly published at dedicated URLs. The safe harbor is unavailable.

      **d.**    **Shutterstock failed to properly follow DMCA agent requirements**

Shutterstock "has the burden of proving that it properly designated a copyright agent and

that it responded to notifications as required." *Disney Enterprises, Inc.*, 2013 WL 6336286, at *26, citing *Perfect 10, Inc.*, 2009 WL 1334364, at *8. Shutterstock did not "respond to" McGucken's "notifications as required." As required would include Shutterstock's expeditious deletion of the Infringing Copies from all sites, servers, and licensee and partner sites. 17 U.S.C. § 512(d)(3). But, as set forth above, Shutterstock failed to take proper, timely remedial action.

### B.    Shutterstock directly infringed McGucken's copyrights

Shutterstock committed copyright infringement when it exploited McGucken's Subject Photography without consent. To establish infringement, McGucken need only establish two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282 (1991). There is no knowledge requirement. *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004). McGucken can ably discharge this burden.

### 1.    McGucken owns valid copyrights in the Subject Photography

A "certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999). McGucken owns certificates of registration for the Subject Photography, establishing his copyright ownership. McGucken Decl. ¶ 5, **Exs. 5, 49**. He has also proffered uncontroverted testimony that he created and owns the copyrights for the Subject Photography. McGucken Decl. ¶¶ 3, 5; Burroughs Decl. ¶ 33, **Ex. 39** at 43:24-44:24; 125:23-126:6; 216:20-215:4. This requirement is met. Shutterstock disputes the registrations for 47 images by claiming they are invalid under Section 1114.1. But Section 1114.1, which limits a registration to 750 photographs, went into effect on February 20, 2018, *after* McGucken registered the works at issue. 37 CFR § 202.4(i)(2); https://www.copyright.gov/rulemaking/group-photographs/, last

visited Feb. 6, 2023; It is thus irrelevant and there no such limitation in the prior rule. The

registrations at issue, VA0002089199, VA0002089207, and VA00020892, are dated February

19, 2018. These 47 images are thus not subject to Section 1114.1 and are validly registered.

### 2.    Shutterstock violated McGucken's copyrights

McGucken as the "owner of a copyright," has the "exclusive right to—or to license

others to—reproduce, perform publicly, display publicly, prepare derivative works of, and

distribute copies of, his copyrighted work." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d

Cir. 2010), citing 17 U.S.C. § 106. A "party who violates the exclusive rights of the copyright

owner is an infringer[.]" *Warren v. John Wiley & Sons, Inc.*, 952 F.Supp.2d 610, 616

(S.D.N.Y.2013). Shutterstock violated McGucken's rights by reproducing, displaying,

distributing, and creating unlawful derivatives of, the Subject Photography:

**Reproduction**: Infringement occurs when a work is reproduced without the artist's

consent. *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008).

Shutterstock violated this right by reproducing the Infringing Copies – which are, at most,

clumsily cropped or rotated identical copies of the Subject Photography – on its site and its

licensee and partner sites. McGucken Decl. ¶ 7, **Exs. 3, 20**. And when it "reproduced

[McGucken's] copyrighted photographs and created thumbnail copies of those photographs;"[12]

"strip[ped] its resized images of their metadata and hous[ed] them at separate URLs where they

were able to be viewed by anyone;"[13] made "additional copies of the same images" that

"appeared in varying sizes at distinct URLs[,]"[14] and authorized licensees to make copies by

downloading the infringing copies from its site. **Id.**; see also **Exs. 4, 17, 19, 21, 22.**

---

[12]*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 355 (S.D.N.Y. 2014).
[13] *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42, 52 (2d Cir. 2019).
[14] *Ibid.*, 922 F.3d 51–52 (citation omitted).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

Shutterstock repeatedly violated McGucken's reproduction rights for all photographs at issue.

**Display**: Shutterstock also violated McGucken's exclusive display right by publishing the Infringing Copies in multiple sizes across various Shutterstock URLs and directing third parties to display the works on their websites. **Id**. To "display" a work is to "show a copy of it, either directly or by means of a film, slide, television image, *or any other device or process*." *McGucken v. Newsweek LLC*, 2022 WL 836786, at *5 (S.D.N.Y. Mar. 21, 2022)(emphasis by Court, citations omitted). A "display occurs, and § 106(5) is violated, each time an individual computer user accesses the relevant page on a website that displays the protected work." *APL Microscopic, LLC v. United States,* 144 Fed. Cl. 489, 498 (2019), quoting 17 U.S.C. § 101.

Shutterstock displayed the Infringing Copies to the visitors to its website and authorized 938 licensees to display McGucken's work to their viewers and customers. **Exs. 3, 20, 21, 22, 24, 25, 26, 27, 38** at 130:23-131:2. It displayed the Infringing Copies on its website at multiple URLs and provided the Infringing Copies to others, including those 938 licensees, and authorized further displays by licensees and on partner sites TinEye, HelloRF, and StockFresh, while authorizing their respective displays. **Id.** This violated McGucken's exclusive display right, which protects his right to display and authorize a display of his work. 17 U.S.C. §106 ("exclusive rights to do and **to authorize**")(emphasis added).

**Distribution:** McGucken has the exclusive right to "distribute copies … of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). A "distribution" of a work occurs when the work is publicly disseminated. See *Arista Recs., Inc. v. Mp3Board, Inc.*, 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002). Thus, "the act of transmitting the webpage—and the Work therein—to a user would infringe on this right." *APL Microscopic, LLC*, 144 Fed. Cl. at 498. Shutterstock's distribution of

the Infringing Copies violated McGucken's exclusive right to distribute the Subject Photography.

Shutterstock transmitted the Infringing Copies to the public, its 938 licensees, and its partners including TinEye, HelloRF, and StockFresh. **Exs. 3, 38** at 22:3-23:24. It also distributed via download high-resolution copies of the Infringing Copies to its 938 licensees and authorized its licensees and partners to further distribute Infringing Copies to the public. **Exs. 20, 21, 22, 24, 25, 26, 27, 38** at 130:23-131:2, **50, 51**. This violated McGucken's distribution right.

**Unlawful derivatives:** An author of a work has the exclusive right to create and authorize the creation of derivatives. 17 U.S.C. § 106(2). Works that include other modifications while still representing the "original work of authorship" are derivatives. *Warner Bros. Entm't Inc. v. RDR Books,* 575 F.Supp.2d 513 (S.D.N.Y. 2008). Shutterstock or its authorized contributors cropped, rotated, or resized the Subject Photography to create the modified Infringing Copies. **Exs. 3, 48**. And Shutterstock added a "shutterstock" watermark to all Infringing Copies, modifying its aesthetic and thus creating derivatives. **Ex. 38** at 72:17-73:19. This creation and authorization of the Infringing Copies violated McGucken's exclusive rights.

**Volitional conduct:** Shutterstock implausibly asserts that it did not engage in any volitional conduct in reviewing, displaying, reproducing, distributing, and creating unlawful derivatives of the Infringing Copies. The "person who actually presses the button" has "caused" the "copying or distribution" and thus committed a volitional act. *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321 (2d Cir. 2022). "Direct liability" thus attaches to "the person who actually presses the button" to display or distribute the work. Id. Shutterstock, and not its contributors, "pressed the button" to display and distribute the works and thus engaged in volitional conduct.

Shutterstock also acted volitionally when it curated the Infringing Copies before displaying to the public because it cannot prove that it played "no role in selecting the images."

*BWP Media USA Inc. v. Polyvore, Inc*., 922 F.3d 42, 50 (2d Cir. 2019). While Shutterstock

claims that its review and approval process is "passive" and unaided by human intervention, that

is appreciably false – Shutterstock specifically employs at least 200 reviewers who are

responsible for approving or rejecting content based on subjective criteria. **Ex. 38**, 68:6-8. While

there may be an automated phase to the process, the primary review phase, which includes the

selection and approval of the works for use on the site, is active and handled by trained

Shutterstock employees. The review process is thus not "automated", which would mean that

"no individual sees or approves images before or while they are uploaded[.]" *Gardner v.*

*CafePress Inc.*, 2014 WL 794216, at *1 (S.D. Cal. Feb. 26, 2014); see also *Arista Recs. LLC v.*

*Usenet.com, Inc*., 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009)(citation omitted); *Disney Enters.,*

*Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1309 (S.D. Fla. 2011) ("automated conduct of

software" is non-volitional only if **unaided by human intervention**) (emphasis added).

In another infringement case, Shutterstock sought to "escape liability by arguing" that it

engaged in no "volitional conduct" but the Court rejected the argument, finding that "volitional

conduct" generally exists even if the work was supplied by a third party unless the infringing

work was "placed onto the website by that third party." *Penske Media Corp. v. Shutterstock, Inc*.,

548 F. Supp. 3d 370, 380 (S.D.N.Y. 2021)(citations omitted). Given that Shutterstock "places"

the photographs on its website, its volitional conduct cannot be disputed.

Shutterstock is directly liable for infringement.

### C.    Shutterstock is vicariously liable for third-party infringement

Shutterstock is also liable for vicarious infringement because it "profit[ed] from direct

infringement while declining to exercise a right to stop or limit it." *Hollywood Fan Sites*, 69 F.

Supp. 3d at 357, citing *In re Cellco*, 663 F.Supp.2d at 370 (citation omitted). This liability

attaches "even in the absence of actual knowledge that the copyright monopoly is being impaired." Id. (citation omitted). It requires *neither* knowledge *nor* that the defendant "receive substantial financial benefit from infringement." *Disney Enterprises, Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *39 (S.D. Fla. Sept. 20, 2013)(emphasis added).

A "direct financial interest arises where the infringing activity is a 'draw' for customers and significant financial benefits 'flow directly' from the infringing activity that the defendant helps to facilitate." *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc*., 2021 WL 5359671, at *24 (D. Md. Nov. 17, 2021), quoting *Goldstein v. Metropolitan Regional Information Systems, Inc*., 2016 WL 4257457, at *5 (D. Md. Aug. 11, 2016). Shutterstock has a clear financial interest in the infringing activity, as discussed in **Section IV(A)(3)(c)**, given that it sold licenses for the works and used them in promotion**.** This meets the low threshold, as the "dominant view is that any for-profit enterprise could be found vicariously liable for copyright infringement however remote, unquantifiable, and unidentifiable the benefit it receives from copyright infringement may be." *Disney Enterprises, Inc.,* 2013 WL 6336286, at *39.

Shutterstock also had the right to control, stop, or limit the infringement by these third parties. Control is interpreted "expansively," and infringers "have the capacity to control the activities of their users simply by virtue of providing the means to commit direct infringement." *Id.*, 2013 WL 6336286, at *40, citing *Gershwin Publ'g Corp.,* 443 F.2d at 1173. Shutterstock provided the Infringing Copies to its customers as part of the 938 licenses for the Infringing Copies and these customers then infringed McGucken's rights a massive number of times by displaying and otherwise exploiting the Infringing Copies. **Exs. 17, 21**; **22; 50; 51.** Shutterstock waited at least four months to take any steps to "stop or limit" the infringement and is thus vicariously liable for its licensees' infringement. **Ex. 23, 41.**

Shutterstock is also liable for the infringement of the third-party advertising partners to which it provided the Infringing Copies with knowledge that these sites and partners would display the photography. Shutterstock had the right and ability to supervise TinEye, HelloRF, and StockFresh's exploitation of the Infringing Copies because it distributed those copies through its proprietary API, partially owns HelloRF, and has partnership agreements with TinEye and StockFresh. **Exs. 27; 34; 38** at 136:6-23; 140:8-141:7. Shutterstock's licensees and third-party partners continued to exploit the works well into this litigation. **Exs. 24-26, 50-51.**

Shutterstock was able to remove the infringing works, yet "declin[ed] to exercise" that right, rendering it liable for vicarious infringement. *Hollywood Fan Sites*, 69 F. Supp. 3d at 357; **Ex. 38** at 320:22-321:17, 327:9-328:6. Shutterstock could have removed the Infringing Copies from the third-party sites by providing its licensees prompt notice of the infringement and deleting its partner sites' links to the Infringing Copies via Shutterstock's API, disabling access to, or updating, its proprietary API, or contacting the sites to ensure removal, but it failed to timely take those steps. **Ex. 38** at 320:22-321:17, 327:9-328:6. Shutterstock is thus vicariously liable for the infringement of its licensees and partners.

### D.    Shutterstock is contributorily liable for third-party infringement

"To establish a claim for contributory copyright infringement, a plaintiff must allege that the defendant with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct of another." *Gershwin Publ'g Corp*., 443 F.2d at 1162 (internal quotation marks omitted). "The knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know or have reason to know' of the direct infringement." *Arista Recs., LLC v. Doe 3*, 604 F.3d at 118 (citation and emphasis omitted).

Shutterstock knew, or should have known, of the infringement because it received the

- 29 -

metadata embedded in the Subject Photography, which identified McGucken as the copyright owner, during the approval process and before it licensed the Infringing Copies. **Exs. 19**; **39** at 95:19-96:12. Shutterstock is supposed to reject content when contributor names do not match the submitted content but did not do so here and allowed, if not facilitated, ongoing infringement. **Ex. 38** at 95:9-18. McGucken also directly advised Shutterstock in December 2020 of its infringement. **Ex. 29**. Shutterstock received further notice of the instant infringement when McGucken filed his complaint on February 2, 2022 and amended complaint on April 29, 2022.[15] Burroughs Decl. ¶32; **Ex. 32**. Finally, Shutterstock knew as of March 2020, that at least one of the contributors at issue, "Hane Street," was a contributor on Shutterstock of infringing material, as identified in *Itasca Images*, 0-21-cv-00287, yet never investigated this contributor's purported rights in the Infringing Copies. **Ex. 18**.

With this knowledge, Shutterstock distributed the Infringing Copies to its licensees and allowed all 938 of them to continue infringing McGucken's rights more than a year after the termination of the "Hane Street" account and well into this litigation..[16] **Exs. 23, 41, 50, 51**. Shutterstock also delivered, via its API, the Infringing Copies to TinEye StockFresh, and HelloRF, who continued to make them available to the public well after notice of the infringement. **Exs. 24, 25, 26, 50**. Despite knowledge of its own and third-party infringement, Shutterstock induced, caused or materially contributed to the infringement of its licensees and its partner sites. See Section IV(B)(2), *supra*; **Exs. 21, 22**. Shutterstock is thus contributorily liable.

---

[15] Shutterstock's argument that McGucken "never identified thumbnails" in his complaint is similarly meritless as McGucken specifically noted in his complaint that "the claims made herein are as to any image displayed, published, licensed, distributed and/or sold by Defendants, and/or each of them, that incorporate without permission, in whole or in part, the Subject Photography." (Dkt. #17, ¶10.)

[16] This conduct is distinct from that at issue in McGucken's direct infringement claims, and the allegations are not necessarily that Shutterstock is "both directly and secondarily liable based on the same conduct." Motion, fn 18. As Shutterstock's own cited authority indicates, "the claims for direct and indirect infringement are based on separate acts and are not mutually exclusive." *Pickholtz v. Rainbow Techs., Inc.*, 260 F. Supp. 2d 980, 990 (N.D. Cal. 2003).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

E.    **Shutterstock violated 17 U.S.C. § 1202(a)**

Shutterstock violated 17 U.S.C. § 1202(a) by adding false CMI to the Infringing Copies in the form of a "shutterstock" watermark and distributing multiple copies of those works. **Ex. 38** at 73:7-19,  155:10-22; 157:13-22. This section makes it unlawful to "knowingly, and with the intent to 'induce, enable, facilitate, or conceal infringement,' either 'provide' or 'distribute' ... false 'copyright management information' or 'CMI.'" *Aaberg v. Francesca's Collections, Inc.*, 2018 WL 1583037, at *6 (S.D.N.Y. Mar. 27, 2018), quoting 17 U.S.C. § 1202(a).

Liability exists when "the defendant both knew that the CMI was false, and provided or distributed the false CMI with the intent to induce, enable, facilitate, or conceal infringement." *Trombetta v. Novocin*, 2020 WL 1304120, at *4 (S.D.N.Y. Mar. 19, 2020) (internal citations and quotation marks omitted). Shutterstock (a) "stripped" or removed the metadata identifying McGucken as the author and owner from the Subject Photography; (b) added false CMI, in the form of its corporate watermark;[17] and (c) distributed false CMI with the intent to "conceal" McGucken's ownership and "enable and facilitate" mass infringement through its platform.

Shutterstock received McGucken's CMI when it approved the use of his photography. **Ex. 19**. Shutterstock knew the CMI applied to the Infringing Copies was false when the action was filed on February 2, 2022. Yet it failed to timely remove the watermarked Infringing Copies from either its own site or the sites of its partners that it knew to be exhibiting the false CMI to the public. This violates this Section. See *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 378 (S.D.N.Y. 2019), aff'd, 970 F.3d 167 (2d Cir. 2020)(the "false attribution to Fisher's law firm

---

[17] The addition of a "watermarked corporate name or symbol may refer to the author or copyright owner when displayed on a copyrighted work in connection with the marketing of that work for sale or license," so "such watermarks do constitute CMI for the purpose of stating a violation of § 1202(a)." *Michael Grecco Prods., Inc.,* 372 F. Supp. 3d at 138, citing 17 U.S.C. § 1202(c)(2)–(3), (7).

would have wrongfully implied that BuzzFeed had permission to use the Photograph, thus concealing its infringement.").

Shutterstock acted knowingly because it acted "with knowledge and intent in placing watermarks on the Copyrighted Works in order to conceal copyright infringement." *Michael Grecco Prods.*, 372 F. Supp. 3d at, 139. While scienter is more often "appropriate for resolution by the trier of fact," here it is beyond dispute that Shutterstock knowingly added its watermark to the Infringing Copies and continued to distribute, and authorize the distribution of, the watermarked Infringing Copies with knowledge of the infringement. Id., citing *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 693 (2d Cir. 2009)(remaining citation omitted); see also *Shihab v. Complex Media, Inc.*, 2022 WL 3544149, at *4 (S.D.N.Y. Aug. 17, 2022)(scienter is satisfied based on a defendant's awareness that distributing copyrighted material without proper CMI "will conceal *his own* infringing conduct[.]") (emphasis by court), citing *Mango*, 970 F.3d at 171. Shutterstock violated § 1202(a).

Shutterstock claims that its "watermark accurately identifies Shutterstock as the source or distributor of the images." Motion, pgs. 20-21. But all infringers are the source of the copy and McGucken was the *legal* source and distributor of the Subject Photography. Shutterstock falsely identified itself as the source of the Subject Photography, concealing *its own* infringement.

Shutterstock cites *Zuma Press, Inc. v. Getty Images (US), Inc.*, but there the court held that the defendant lacked the requisite intent under Section 1202(a) because the "[plaintiff] caused [defendant] to confuse [plaintiff]'s images with images that [defendant] had been authorized to use." 349 F.Supp.3d 369, 370 (S.D.N.Y. 2018), on reconsideration in part, 2019 WL 316001 (S.D.N.Y. Jan. 24, 2019). There is no such evidence here.

Shutterstock "misrepresented itself as the copyright owner" in a way that concealed the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

fact it was not the true owner, and thus violated this section. *Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 382 (S.D.N.Y. 2021). A previous court rejected Shutterstock's challenge to a 1202 claim because, *inter alia*, "Shutterstock does not provide support for its position and resorts largely to arguing without citation to precedent other than for generic statements about pleading standards." Id. at 381. The challenge here fails as well.

### F.    Shutterstock violated 17 U.S.C. § 1202(b)

To prove a 1202(b) claim, a plaintiff must show 1) the existence of CMI on the [use] at issue; 2) removal and/or alteration of that information; and 3) that the removal and/or alteration was done intentionally. *Aaberg,* 2018 WL 1583037, at *6, citing *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010) (collecting cases). McGucken has satisfied these requirements. His photography was routinely published with attribution, credit, and other CMI, as Shutterstock itself acknowledges on page 22 of its Motion.[18] **Exs. 3, 4, 48, 39** at 150:24-151:9. Shutterstock received this CMI when it approved and selected his artwork for use on its commercial website. **Ex. 19.** Yet, Shutterstock intentionally removed this CMI from the photographs, knowing it would enable and conceal the infringement, and added its own watermark before publicly displaying the work. **Ex. 3, 48**. This violated 1202(b).

### H.    Shutterstock's exploitation of the Subject Photography was not "fair use"

"Fair use is an affirmative defense," so Shutterstock "bears the burden of proving it." *Fox News Network, LLC v. Tveyes, Inc*., 883 F.3d 169, 176 (2d Cir. 2018)(citation omitted). Courts consider four factors in their fair use evaluations: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or

---

[18] McGucken Flickr account includes his name and the title for the works and identified him as the author.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

value of the copyrighted work. 17 U.S.C. § 107. All of these factors favor McGucken.

**Purpose and character:** In analyzing the first factor, "the primary inquiry is whether the use 'communicates something new and different from the original or [otherwise] expands its utility,' that is, whether the use is 'transformative.'" *Fox News Network, LLC,* F.3d at 176 (citation omitted). Here, Shutterstock cannot show that it "transformed" the work. The "character" of the works are the same because the Infringing Copies are near-verbatim reproductions of the Subject Photography. The "purpose" of the works are also the same: McGucken created the Subject Photography so that it would be visually compelling and he could license it to his customers; Shutterstock selected the Infringing Copies because they were visually compelling and it believed it could license the works to its customers, which it did, 938 times. Shutterstock also used the Subject Photography in multiple sizes, including thumbnails, to draw viewers and potential business, just like McGucken. It is settled that "[u]sing a photo for the precise reason it was created does not support a finding that the nature and purpose of the use was fair." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.* 196 F. Supp. 3d 395, 407 (S.D.N.Y. 2016). This first factor weighs in favor of McGucken.

**Nature of work:** The inherent creativity of the Subject Photography establishes that this factor favors McGucken. *Baraban v. Time Warner, Inc.*, 2000 WL 358375, at *4 (S.D.N.Y. Apr. 6, 2000). He made many artistic decisions, including composition, angles, choice of lens, lighting, and setting, to create the Subject Photography. And "[a]lthough they document [] real event[s], [plaintiff]'s photos are creative because they were the product of many technical and artistic decisions." *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1161 (9th Cir. 2022). The creative nature of the Subject Photography favors McGucken.

**Amount and substantiality of the portion used:** The amount and substantiality of the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

portion used favors McGucken. Generally, "the more of a copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir.1998). Here, Shutterstock copied and exploited almost the entirety of the Subject Photography and "fair use is [less] likely ... when the copying is extensive, or encompasses the most important parts of the original." *Fox News Network, LLC,* 883 F.3d at 179. The use was not "fair."

**Market harm:** Shutterstock cannot carry its burden of proving that its commercial use of McGucken's Subject Photography did not harm the market for McGucken's photography in general, as is required. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 992 F.3d 99, 121 (2d Cir. 2021) ("the ultimate burden of proving that the secondary use does not compete in the relevant market is appropriately borne by the party asserting the defense[.]"). That is particularly difficult here because the Court may presume market harm "when a commercial use amounts to mere duplication of the entirety of an original[,]" and Shutterstock exploited "mere duplication[s]" of the Subject Photography on its commercial website to sell licenses for the Infringing Copies. *Sands v. What's Trending, Inc.*, 2021 WL 694382, at *4 (S.D.N.Y. Feb. 23, 2021), quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591 (1994)(remaining citations omitted). Shutterstock, by providing McGucken's photography to Shutterstock customers without payment to McGucken, is in "effect depriving [McGucken] of licensing revenues from [Shutterstock] or from similar entities." *Fox News Network, LLC*., 883 F.3d at180. This factor also favors McGucken and Shutterstock's fair use defense fails.

## V.    CONCLUSION

Shutterstock violated McGucken's copyrights and fails to establish any defense that would allow it to evade liability for infringement. This motion should be denied in its entirety and McGucken's motion should be granted.

Respectfully submitted,

Dated: February 17, 2023                    By:     */s/ Scott Alan Burroughs*
New York, New York                                  Scott Alan Burroughs, Esq.
                                                    Laura M. Zaharia, Esq.
                                                    DONIGER / BURROUGHS
                                                    247 Water Street, First Floor
                                                    New York, New York 10038
                                                    scott@donigerlawfirm.com
                                                    lzaharia@donigerlawfirm.com
                                                    (310) 590-1820
                                                    Attorneys for Plaintiff
                                                    Elliot McGucken

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION