UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELLIOT McGUCKEN,

                              Plaintiff,

              -v.-

SHUTTERSTOCK, INC., et al.,

                              Defendants.

22 Civ. 00905 (JHR)

OPINION AND ORDER

JENNIFER H. REARDEN, District Judge:

Plaintiff Dr. Elliot McGucken, a photographer, brings this copyright infringement suit against Defendant Shutterstock, Inc. ("Shutterstock"), operator of the popular online image licensing platform, alleging that the upload of hundreds of his photographs by third parties without his permission violated his copyrights.  *See* ECF No. 17 (Am. Compl.).  Plaintiff asserts claims for direct and secondary copyright infringement, in violation of 17 U.S.C. § 106, and false copyright management information ("CMI"), in violation of 17 U.S.C. § 1202.  Defendant disputes that it is liable for direct or secondary infringement and argues that, regardless, it is shielded from liability by the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.

Following discovery, each party moved for summary judgment, ECF Nos. 88 (Pl. Mot.) and 91 (Def. Mot.), and to disqualify the opposing party's expert witness, ECF Nos. 85 (Def. Mot. *in Limine*) and 99 (Pl. Mot. *in Limine*).  Because there are no genuine disputes of material fact as to whether Defendant satisfied the statutory requirements for safe harbor protection under the DMCA, or as to Defendant's liability for false CMI, Defendant's motion is GRANTED and Plaintiff's motion is DENIED.  In addition, because the Court does not rely on testimony from either party's expert, both motions to exclude expert testimony are DENIED as moot.

## I.  BACKGROUND[1]

### A.  The Shutterstock Platform

The Shutterstock platform is an online marketplace for photographic images and other content.  Def. 56.1 ¶ 1; Pl. Counter 56.1 ¶ 1.  It hosts more than 424 million images available for license, and approximately 200,000 images are added every day.  Def. 56.1 ¶ 2; *see also* ECF No. 94 (Shimmin Decl.) ¶ 2.  Except for those who have been previously suspended from the platform, anyone who agrees to Shutterstock's "Contributor Terms of Service" and "Contributor Guidelines" can become a "Contributor" and upload their images to Shutterstock for licensing.  Def. 56.1 ¶¶ 3-5; *see also* Shimmin Decl. Ex. A (Contributor Terms of Service); Shimmin Decl. Ex. D (Submission and Account Guidelines).

When a Contributor uploads an image to Shutterstock, it is reviewed for "spamming (*i.e.*, submitting hundreds of virtually identical images)," "watermarks that might suggest [it was]

---

[1] Except where otherwise noted, the Background section consists of undisputed facts drawn from the parties' Rule 56.1 statements.  *See* ECF No. 96 (Def. 56.1), 105 (Pl. 56.1), 122 (Def. Counter 56.1), 126 (Pl. Counter 56.1).  "While the parties *nominally* dispute [many] of each other's factual assertions, the majority of the parties' disagreements go to the phrasing, weight, or impact of a fact instead of actually disputing the fact itself."  *Julian v. MetLife, Inc.*, No. 17 Civ. 957 (AJN), 2021 WL 3887763, at *6 (S.D.N.Y. Aug. 31, 2021) (quotation marks omitted).  Accordingly, where the Court includes citations to a party's counter-Rule 56.1 statement, that party "do[es] not dispute the fact, . . . has not offered admissible evidence to refute that fact, or . . . simply seeks to add [their] own 'spin' on the fact or otherwise dispute the inferences from the stated fact."  *Thomason v. Target Corp.*, 20 Civ. 8982 (JPC), 2022 WL 1137165, at *1 n.1 (S.D.N.Y. Apr. 18, 2022).

In addition, the Court takes judicial notice of Defendant's 2018 and 2021 Form 10-Ks.  *See Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 ("The Court can take judicial notice of public disclosure documents that must be filed with the [SEC]."); *see also Donoghue v. Astro Aerospace Ltd.*, No. 19 Civ. 7991 (JPO), 2021 WL 1964294, at *1 (S.D.N.Y. May 17, 2021) ("Courts resolving summary judgment motions regularly accept SEC filings for the truth of their contents.")  The Court does not, however, take judicial notice of Defendant's 2011 Form S-1 Registration Statement.  Plaintiff requests that the Court judicially notice this document, but offers no explanation for how facts that underlie this case, which developed in 2018—when Plaintiff's first photographs were uploaded to Shutterstock—at the earliest, "can be accurately and readily determined from" an SEC registration statement filed years earlier, Fed. R. Evid. 201(b)(2).

pulled from a third-party site," quality issues like "poor focus" or "composition," and "the material depicted therein (*e.g.*, pornography, hateful imagery, trademarks, copyrighted materials, people's names and likenesses without a model release)."  Def. 56.1 ¶ 10; *see also* Pl. 56.1 ¶¶ 17, 18 (conceding that Shutterstock rejects images based on their "lighting, blurriness, composition, or framing").  In addition, Shutterstock reviewers consider limited metadata fields, namely the image's description, title, and keywords.  *See* Burroughs Decl. Ex. 12 (How Is Content Reviewed Fact Page); Burroughs Decl. Ex. 38 (Shimmin Dep. Tr.) at 95-96; Burroughs Decl. Ex. 46 (How to Review Metadata – Reviewer Guidelines).  The "vast majority" of images uploaded to Shutterstock are reviewed by just one reviewer "for at most roughly twenty seconds."  Def. Counter 56.1 ¶ 19.

If an image passes Shutterstock's review, it is ingested into the Shutterstock platform. All metadata associated with the image is automatically removed to avoid computer viruses and prevent the dissemination of personally identifiable information.  Def. 56.1 ¶ 15.[2]  The Shutterstock system then automatically creates multiple small-sized, low-resolution copies (*i.e.*, thumbnails) of the image, and adds a "Shutterstock" watermark to all copies of the image displayed for license on its public-facing website (except very small thumbnails) "in order to prevent third parties from using the images without a license."  *Id.* ¶¶ 16-18; *see also* Pl. Counter 56.1 ¶¶ 16-18.

Following ingestion, the image becomes available for licensing through Shutterstock. *See* Def. 56.1 ¶ 12; Pl. 56.1 ¶ 15.  Simultaneously with becoming available on the Shutterstock platform, the image also becomes accessible through third-party platforms such as TinEye,

---

[2] This paragraph is one of several where the parties have included citations to their expert's report or testimony.  In each case, the non-expert evidence supports the Court's recitation of facts.  *See infra* Section III.C (addressing implications of the Court's non-reliance on parties' motions to exclude expert testimony).

StockFresh, and HelloRF that use the Shutterstock application programming interface ("API").

Def. 56.1 ¶¶ 71-72, 74; Pl. Counter 56.1 ¶¶ 71-72, 74.  Because the Shutterstock API provides

real-time access to the same content available on Shutterstock's website, an image that is

removed from Shutterstock automatically becomes completely unavailable for license via the

API."  Def. 56.1 ¶¶ 74-75.

Licensees can choose a monthly subscription option and gain access to all of

Shutterstock's photography (though such licensees are limited in their number of downloads per

month), or they can license individual photographs at a rate specific to each image.  Pl. 56.1 ¶ 9;

Def. Counter 56.1 ¶ 9.  When an image is licensed through Shutterstock, Defendant keeps a

portion of the license fee paid for contributor-uploaded images and pays the rest to the

contributor.  Def. 56.1 ¶ 13; Pl. Counter 56.1 ¶ 13.

The Shutterstock platform includes a "DMCA Policy" that sets forth the procedure for

submitting notices of copyright infringement pursuant to the DMCA," Def. 56.1 ¶ 22; Pl.

Counter 56.1 ¶ 22, and identifies and provides the contact information for Shutterstock's

designated agent for receiving takedown notices, Def. 56.1 ¶ 23.  In addition, Defendant's

Contributor Terms of Service reserves Defendant's right to "suspend access to [any] Content

[uploaded by contributor] and terminate [the contributor's] account" in the event it "receives a

[copyright infringement] complaint about [the contributor's] Content."  Contributor Terms of

Service § 12(e).

## B.  Plaintiff's Images

Plaintiff is an accomplished photographer who has earned numerous awards for his

photography.  Pl. 56.1 ¶ 1; Def. Counter 56.1 ¶ 1.  On December 30, 2020, Plaintiff's attorney

emailed Defendant stating that an "image owned by [Plaintiff]" was "being sold on" Defendant's

website without Plaintiff's permission (the "Noticed Image").  ECF No. 93 (Lackman Decl.) Ex.

D (Noticed Image Claim) at 3-4; *see also* Def. 56.1 ¶ 32; Pl. 56.1 ¶ 47.  The image had been

submitted to Shutterstock on or about April 20, 2020, by Contributor Moajjem Hossain a/k/a

Hane Street ("Hane Street").  *See* Def. 56.1 ¶ 37; Pl. Counter 56.1 ¶ 37.  On January 4, 2021,

Defendant replied to Plaintiff's email, requesting a DMCA-compliant takedown notice.[3]  *See*

Noticed Image Claim 2-3; Def 56.1 ¶ 33; Pl. Counter 56.1 ¶ 33.  Plaintiff provided such a notice

on January 15, 2021, identifying two Shutterstock URLs that contained his image.  *See* Lackman

Decl. Ex. E (Takedown Notice Email Correspondence); Lackman Decl. Ex. F (Takedown

Notice); Def. 56.1 ¶ 34; Pl. Counter 56.1 ¶ 34.  Four days later, Defendant removed the image

from both URLs.  *See* Takedown Notice Email Correspondence 2.

The following year, on February 2, 2022, Plaintiff filed suit, alleging that Defendant

infringed his copyrights in the Noticed Image, 323 other images submitted by Hane Street

between April 22 and November 18, 2020, and one image submitted by Shutterstock Contributor

Gouranga Charan Bishoi ("Bishoi") on or about March 19, 2018.  *See* Def. 56.1 ¶¶ 41-43; Pl.

Counter 56.1 ¶¶ 41-43.  On April 29, 2022, Plaintiff filed an Amended Complaint, identifying

twelve more images in which his copyright was allegedly infringed, for a total of 337.[4]  *See* Def.

56.1 ¶ 47; Pl. Counter 56.1 ¶ 47.  The twelve additional images had been submitted between May

3, 2021 and April 8, 2022 by Shutterstock Contributor Muhammad Raza a/k/a Raza 76j

("Raza").  *See* Def. 56.1 ¶ 48; Pl. Counter 56.1 ¶ 48.

---

[3] Plaintiff disputes that his December 30 email "was not in compliance with the DMCA."  Pl.
Counter 56.1 ¶ 33.

[4] Defendant disputes Plaintiff's ownership of forty-seven of the 337 images because their
copyrights were allegedly registered as part of "Group Registration[s]" containing more than the
750-photograph maximum permitted by the Copyright Office.  Def. 56.1 ¶¶ 78-83.  For his part,
Plaintiff contends that the 750-photograph maximum went into effect the day after these forty-
seven copyrights were registered.  *See* Pl. Counter 56.1 ¶ 82.

Though Plaintiff indisputably used image metadata identifying him as the copyright owner and author, Pl. 56.1 ¶ 3; Def. Counter 56.1 ¶ 3, as it pertains to the images in issue here, he estimates that only approximately sixty to seventy-five percent contained such metadata, *see* Lackman Decl. Ex. H (McGucken Dep. Tr.) at 168-69. As to the remaining twenty-five to forty percent, any metadata associated with Plaintiff's images was removed by Shutterstock upon ingestion. *See* Def. 56.1 ¶¶ 15, 55; Pl. Counter 56.1 ¶¶ 15, 55 (disputing only that metadata is removed "automatically").

Of Plaintiff's 337 images at issue in this case, 165 were licensed on the Shutterstock platform—some multiple times. *See* Def. 56.1 ¶ 64; Pl. Counter 56.1 ¶ 64. The remaining 172 images were never licensed. Def. 56.1 ¶ 66; Pl. Counter 56.1 ¶ 66. In total, Shutterstock "issued 938 licenses to third-party customers." Def. 56.1 ¶ 64; *see also* Pl. Counter 56.1 ¶ 64. Approximately sixty-five of the 938 licenses were licensed under" Shutterstock's "free trial subscription," meaning Shutterstock did not directly receive any revenue from them. Def. 56.1 ¶ 65.[5] The remaining 873 licenses generated $2,131.60 in revenue, which was split between Defendant and Contributors. *See* Def. 56.1 ¶ 64; Pl. Counter 56.1 ¶ 64.

While the parties purportedly dispute precisely when the 337 images were removed from the Shutterstock platform, their disagreement is semantic. The Bishoi contributor account was terminated, and its images removed, on January 23, 2019, after Shutterstock's matching software detected potential infringement regarding certain other images uploaded by Bishoi. Def. 56.1 ¶ 45. The Hane Street account was similarly terminated, and its images removed, on February 11, 2021, following a complaint by an unrelated third-party regarding unrelated images. *See id.* ¶

---

[5] Plaintiff contends that "Shutterstock uses images such as [his] to advertise its subscriptions and attract new customers," thereby "generat[ing] revenue . . . attributable to the infringement of [his] works." Pl. Counter 56.1 ¶ 65.

46. Finally, the Raza account was terminated, and its images removed, on April 18, 2022, after Defendant received notice of "unrelated infringing activity from a 'Good Samaritan.'"  *Id.* ¶ 50. Though the Contributor accounts were terminated, some thumbnails remained on the Shutterstock platform backend.  For example, "image previews" for the Raza-uploaded images were not removed from Shutterstock until May 11, 2022.  *See* Burroughs Decl. Ex. 44 (Raza Removed Image Preview Log)[6]; Def. 56.1 ¶ 63.  However, because they were backend copies, these previews "were not visible on or linked to Shutterstock's website, and could not be found by the general public."  Def. Counter 56.1 ¶ 50.  Likewise, thumbnails of Plaintiff's images remained accessible on StockFresh, TinEye, and HelloRF until at least July, August, and September 2022, respectively.  *See* Pl. 56.1 ¶ 52; Def. Counter 56.1 ¶ 52.

## II.  LEGAL STANDARD

Summary judgment is appropriate when the admissible evidence, in conjunction with the pleadings, demonstrates "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, the Court "constru[es] all the evidence in the light most favorable to the non-movant," *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92,

---

[6] Plaintiff attempts to offer this exhibit as proof that the Bishoi and Hane Street images were also not "fully remove[d] . . . until at least May 2022."  Pl. Counter 56.1 ¶¶ 45, 46.  But this exhibit relates to the "submitter id" associated with the Raza account.  *See* Burroughs Decl. Ex. 45 (Raza Submitter Account) at 1.  The thumbnails associated with the Bishoi and Hane Street images were removed on February 16, 2022 and May 17 and 18, 2021, respectively.  *See* Def. 56.1 ¶¶ 62, 61.

96 (2d Cir. 2009)), and "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," *Roe*, 542 F.3d at 35 (quoting *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001)).  However, the non-moving party "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  He must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Where, as here, "both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id.* (quotation omitted).

## III. DISCUSSION

### A.  DMCA Safe Harbor

"[D]efendants who fall within the DMCA's Safe Harbor provisions, 17 U.S.C. § 512, cannot be held liable for copyright infringement."  *Steinmetz v. Shutterstock, Inc.*, 629 F. Supp. 3d 74, 80 (S.D.N.Y. 2022); *see* 17 U.S.C. § 512(a)-(d).  "In order to be eligible for protection under the Safe Harbor provisions, a defendant must meet certain threshold requirements."  *Id.*

8

"These include that it must (1) be a 'service provider' as defined by the statute; (2) have adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers; and (3) not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works."  *Id.*  "If a defendant meets the threshold requirements, it must also meet additional specific conditions for protection under § 512(c)."  *Id.*  Section 512(c) immunizes a service provider from liability for copyright infringement stemming from its "storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  17 U.S.C. § 512(c)(1).

As set forth below, as a "service provider" that has satisfied both the general "conditions of eligibility" and each element of the Section 512(c) safe harbor, Defendant is immune from liability for copyright infringement stemming from its "storage at the direction of a user of" infringing material.

### 1.   Whether Shutterstock Is a "Service Provider"

The threshold question when considering applicability of a DMCA safe harbor is whether Defendant is a "service provider."  As relevant here, the DMCA defines a "service provider" as "a provider of online services or network access, or the operator of facilities therefor."  *Id.* § 512(k)(1)(B).

Shutterstock squarely falls within this definition because it "provide[s] [an] online service[]" and "operat[es] . . . facilities," *id.*, "that allow[] independent contributors to connect with and make their images available for licensing to users in need of content," *Steinmetz*, 629 F. Supp. 3d at 81; *see Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 724, 744 (S.D.N.Y. 2012), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014) (holding that Photobucket, a website that "enables users . . . to upload digital photographs and videos so that they may be stored and viewed on the website," is a service provider); *Viacom Int'l Inc. v.*

*YouTube, Inc.* (*Viacom I*), 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010), *aff'd in relevant part*, 676 F.3d 19 (2d Cir. 2012) (holding that YouTube, a website "onto which users may upload video files" that are "then made available for viewing," is a service provider); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1143 (N.D. Cal. 2008) (treating Veoh, a website "that enables the sharing of user-provided video content over the Internet," as a service provider).

Plaintiff urges the Court to disregard *Steinmetz*, a case considering the very same defendant, and this common, albeit capacious, understanding of "service provider," on the ground that "Shutterstock provides no public services."  ECF No. 129 (Pl. Opp. Br.) at 10. Plaintiff principally relies on *Agence France Presse v. Morel*, which rejected the contention that Getty Images (another image licensing website) was, as a matter of law, a "service provider" because "licensing copyrighted material online more closely resembles the mere sale of goods . . . than facilitating users' activities online."  934 F. Supp. 2d 547, 566 (S.D.N.Y. 2013).  *Agence France Presse*, however, "is an outlier in the DMCA case law" and is "[c]ontrary to the broad reading given by almost every court confronted with similar services and circumstances." *Steinmetz*, 629 F. Supp. 3d at 82; *see also Greg Young Publ'g, Inc. v. Zazzle, Inc.*, No. 16 Civ. 4587 (SVW), 2017 WL 2729584, at *6 (C.D. Cal. May 1, 2017) ("[*Agence France Presse*] is an outlier for a reason: its analysis is not persuasive" and its "premise is faulty.").  The Court declines to follow *Agence France Presse* here and holds that Defendant is a service provider for purposes of the DMCA's safe harbor provision.

### 2.  Repeat Infringers

To qualify for any safe harbor, Defendant must have "(i) adopt[ed] a policy that provides for the termination of service access for repeat copyright infringers; (ii) inform[ed] users of the service policy; and (iii) implement[ed] the policy in a reasonable manner."  *Wolk*, 840 F. Supp. 2d at 744; *see also* 17 U.S.C. § 512(i)(1)(A).

The *Steinmetz* Court has already made such findings with respect to this exact Defendant:

> Defendant also has implemented a policy for repeat infringers that complies with the DMCA.  The policy is set forth in the [Contributor Terms of Service] and puts contributors on notice that Defendant retains the right to limit access or terminate accounts for copyright infringement.  Defendant also reasonably enforces its policy by enabling copyright owners to submit takedown notices and responding to such notices.  Defendant keeps records to identify repeat infringers and regularly terminates contributors' accounts due to infringing activity, including in this case.  This is sufficient to satisfy the repeat infringer prong.

629 F. Supp. 3d at 83 (citing cases); *see also* Contributor Terms of Service; Submission and Account Guidelines.

Plaintiff's sole argument to the contrary is that Defendant "failed to terminate" the Hane Street account for roughly a year following notice of infringement in a separate, unrelated case, and that "[i]t also failed to terminate 'Raza 76J[]' . . . for two months after notice" in this case. ECF No. 106 (Pl. Br.) at 24.  Even setting aside that the "repeat infringer policy requirement does not focus on the particular infringement at issue," and instead "addresses how the site is generally managed," *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 614 (9th Cir. 2018) (concluding that "[n]o trier of fact could conclude from the evidence in the record that [defendant] had failed to reasonably implement a repeat infringer policy"), these two accounts were terminated shortly after Defendant received Hane Street's *second* and Raza's *first* notice of infringement, *see* Def. Counter 56.1 ¶¶ 78, 80.  The Court agrees with the *Steinmetz* Court that Defendant has "adopted," "informed users of," and "implemented a repeat infringer policy" in compliance with 17 U.S.C. § 512(i)(1)(A).

### 3.  Standard Technical Measures

In addition, Defendant must have "accommodate[d] and . . . not interfere[d] with standard technical measures." 17 U.S.C. § 512(i)(1)(B).  As defined by the DMCA, "standard technical measures" are:

[T]echnical measures that are used by copyright owners to identify or protect copyrighted works and—

(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

*Id.* § 512(i)(2).

In arguing that Defendant fails to satisfy this test, Plaintiff points to his use of metadata, unpersuasively arguing that "[i]t is widely accepted in the photography industry that a photograph's metadata constitutes a standard technical measure." Pl. Br. 25. "[A]s the party asserting that metadata is a standard technical measure," however, Plaintiff "has the burden of proving it." *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42, 57 n.9 (2d Cir. 2019) (Walker, J., concurring) (citing *Nat'l Commc'ns Ass'n, Inc. v. AT&T Corp.*, 238 F.3d 124, 131 (2d Cir. 2001)). Yet Plaintiff "has not come close to establishing that there is a broad consensus among copyright owners and service providers that preserving metadata should be" considered a "standard technical measure." *Id.* at 56 (considering a document "entitled 'Guidelines for Handling Image Metadata,' authored by the Metadata Working Group, which is made up of representatives from Adobe, Apple, Canon, Microsoft, Nokia, and Sony," as "wholly deficient in establishing that preserving metadata is 'standard.'").

It is undisputed that Plaintiff's original photographs contain metadata identifying him as the artist and copyright owner, *see* ECF No. 92 (McGucken Decl.) Ex. 3 (Pl.'s Images), and that Defendant "removes any and all metadata associated with the images uploaded by contributors," Def. 56.1 ¶ 15; *see also* Pl. Counter 56.1 ¶ 25 ("Shutterstock strips all author metadata from all photographs that it displays on its site."). At least for some of Plaintiff's images uploaded to Shutterstock, though, there was no such metadata. *See* Def. Counter 56.1 ¶ 3; *see also Steinmetz*,

629 F. Supp. 3d at 83 (rejecting contention that Defendant "interfered with standard technical measures" because Plaintiff "offer[ed] no evidence showing that the same metadata existed in the file uploaded to Defendant's website").

As to the remaining images, Plaintiff has offered no evidence that the use of metadata is a "standard technical measure." Indeed, Plaintiff's purported evidence consists solely of two sentences in the twenty-one-page expert report of Thomas Maddrey—the subject of Defendant's motion *in limine. See* ECF No. 90 (Maddrey Decl.) Ex. 30 (Maddrey Expert Report). In those sentences, Maddrey merely asserts that "[p]hotographers rely on the inclusion of 'metadata' to organize, sort, and track their works both inside their studios and across the internet," and that Plaintiff "specifically noted using automated metadata population to include the copyright symbol, his name, and contact information." *Id.* at 14-15. Plaintiff has offered no evidence that metadata's supposed status as a "standard technical measure" was, *inter alia,* "developed pursuant to a broad consensus of copyright owners and service providers." 17 U.S.C. § 512(i)(2)(A).[7]

---

[7] Plaintiff contends that, "[a]t the very least, whether deletion of metadata constitutes interference with standard technical measures is a genuine issue of material fact that cannot be resolved at this stage." Pl. Opp. Br. 14 (citing *Gardner v. CafePress Inc.*, No. 13 Civ. 1108 (GPC), 2014 WL 794216, at *6 (S.D. Cal. Feb. 26, 2014)). In *Gardner*, the defendant asserted that the plaintiff "offered no evidence that using metadata as a copyright protection tool has been 'developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process.'" 2014 WL 794216, at *6. Nonetheless, the court held that the plaintiff "offered sufficient evidence to create a dispute of material fact as to whether CafePress's deletion of metadata when a photo is uploaded constitutes the failure to accommodate and/or interference with 'standard technical measures.'" *Id.* This Court fails to understand how, absent evidence that the use of metadata as a means to protect one's copyright is a "standard technical measure" in the first place, the deletion of metadata could, by itself, ever "constitute[] the failure to accommodate and/or interference with 'standard technical measures.'" *Id.*

Accordingly, Defendant has "accommodate[d] and . . . not interfere[d] with standard technical measures." *Id.* § 512(i)(1)(B).

### 4.  17 U.S.C. § 512(c)

As stated above, Section 512(c) immunizes a service provider from liability for copyright infringement stemming from its "storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  17 U.S.C. § 512(c)(1).

To qualify, a defendant must not have "actual" or "red flag" knowledge of infringement. *Viacom Int'l, Inc. v. YouTube, Inc.* (*Viacom II*), 676 F.3d 19, 30-32 (2d Cir. 2012); *see also* 17 U.S.C. § 512(c)(1)(A).  If it does, or if it receives notification of infringement, it must act "expeditiously to remove, or disable access to," the infringing material.  *Id.* § 512(c)(1)(A)(iii), (C).  In addition, the defendant must "not receive a financial benefit directly attributable to the infringing activity" if it "has the right and ability to control such activity."  *Id.* § 512(c)(1)(B). Finally, a defendant must have "designated an agent to receive notifications of claimed infringement."  *Id.* § 512(c)(2).  Shutterstock has satisfied each of these requirements:

#### a.  Stored at the Direction of Users

To qualify for the safe harbor under Section 512(c), the infringing material must have been stored on Defendant's system "at the direction of a user."  17 U.S.C. § 512(c)(1).  Here, too, *Steinmetz* is instructive as to the mechanics of Defendant's platform and confirms that Shutterstock images are indeed stored "at the direction of a user":

> Defendant neither seeks out contributors nor curates the portfolio connected with its contributor platform.  Instead, anyone can sign up to be a contributor, so long as they agree to the [Contributor Terms of Service], and anyone can submit an image for licensing, subject only to a limited review for objectionable content for which it might be rejected.  At bottom, the contributor platform is user-directed.  The fact that Defendant has the ability to reject content does not make it ineligible for the Safe Harbor.  The review process keeps out images that are either not valuable (high quality) to users or customers (a service of its own) or content that, if posted, would violate other laws, *i.e.*, pornography or hate speech, and possibly subject Defendant

> to liability under other laws.  Furthermore, given that 200,000 images are added to
> the platform daily, no reasonable factfinder could conclude that Defendant engages
> in the type of thorough review and approval process suggested by Plaintiff and
> which might support a finding that the images were not stored at the direction of
> contributors (users).

629 F. Supp. 3d at 84.

Defendant argues that "[t]he *Steinmetz* court[] . . . overlooked key evidence," while "[h]ere, there is undisputed evidence that Shutterstock seeks out contributors and curates its portfolio," and that "only Shutterstock can make photography accessible on its public site."  ECF No. 134 (Pl. Reply) at 12.  That is not, however, what Plaintiff's evidence shows.  Plaintiff first directs the Court to the testimony of Heather Shimmin, Defendant's Rule 30(b)(6) corporate representative.  But Ms. Shimmin merely testified that she *personally* "encourage[s] other photographs [sic] that [she] know[s] in the community to join Shutterstock."  Shimmin Dep. Tr. 35:21-25.  Plaintiff then points to Defendant's "Curated Collections" page, Burroughs Decl. Ex. 42 (Curated Collections Page), which makes clear that those specific collections are curated from the Shutterstock portfolio as a whole—not that the entire Shutterstock portfolio is somehow curated.

Elsewhere, Plaintiff cites Judge Walker's concurrence in *Polyvore* for the proposition that images stored on Shutterstock are not stored "at the direction of users" because each image is given a "separate URL[] that could be viewed by anyone at any time."  Pl. Br. 27 (quoting *Polyvore*, 922 F.3d at 59 (Walker J., concurring)).  Plaintiff's use of *Polyvore* is inapposite because "[t]here [was] a question of material fact as to whether Polyvore's additional copies were made solely to facilitate access by users."  *Polyvore*, 922 F.3d at 58 (Walker J., concurring) ("Without facts in the record about the purpose and function of these additional copies, I am unable to determine whether the copies here were made to 'render' user-uploaded content 'viewable over the Internet to most users.'" (quoting *Viacom II*, 676 F.3d at 39)).  Here, in

contrast, there is no such question of fact: "Shutterstock's system automatically creates multiple small-sized, low-resolution copies (*i.e.*, thumbnails) of every contributor-supplied image posted to its website for license so that the potential customer can get a sense of how the image might look."  Shimmin Decl. ¶ 16; *see also Viacom II*, 676 F.3d at 40 (Thumbnails "serve[] to help . . . users locate and gain access to material stored at the direction of other users" and are "protected by the § 512(c) safe harbor.").

### b.  Knowledge and Expeditious Removal

Two distinct provisions require a service provider with knowledge of infringement to "act" or "respond" "expeditiously to remove, or disable access to," the infringing material.  17 U.S.C. §§ 512(c)(1)(A)(iii), (C).  Section 512(c)(1)(A)(iii) applies when a service provider obtains "actual knowledge" of infringing material, whereas Section 512(c)(1)(C) applies when a copyright owner (or person authorized to act on their behalf) provides "notification of claimed infringement."

A DMCA notice "that fails to comply substantially with the" required elements outlined in Section 512(c)(3)(A) "shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge," unless (1) the notification "substantially complies" with elements (ii) (identifying "the copyrighted work claimed to have been infringed"), (iii) (identifying "the material that is claimed to be infringing"), and (iv) (providing "[i]nformation reasonably sufficient to permit the service provider to contact the complaining party"); and (2) the service provider has not "promptly attempt[ed] to contact the person making the notification or take[n] other reasonable steps to assist in the receipt of notification that substantially complies with all the" notification requirements.  *Id*. § 512(c)(3).

There is no evidence that, prior to the commencement of this action, Defendant had any knowledge that the images referenced in the Amended Complaint, aside from the Noticed Image,

had been uploaded to Shutterstock.  With regard to the Noticed Image, Plaintiff's original

December 30, 2020 email, stating that an "image owned by" him was "being sold on"

Defendant's website without permission, did not "comply substantially" with DMCA

notification requirements, *id.* § 512(c)(3)(B)(i), because, *inter alia*, it was not made "under

penalty of perjury," *id.* § 512(c)(3)(A)(vi); *see also Perfect 10, Inc. v. CCBill LLC*, 488 F.3d

1102, 1112 (9th Cir. 2007) ("We . . . do not require a service provider to start potentially

invasive proceedings if the complainant is unwilling to state under penalty of perjury that he is

an authorized representative of the copyright owner, and that he has a good-faith belief that the

material is unlicensed.").  Thus, the email was not a proper "notification of claimed

infringement" that triggered Defendant's Section 512(c)(1)(C) obligation to "expeditiously . . .

remove, or disable access to, the material that is claimed to be infringing."  Nor could it confer

"actual knowledge" of infringing activity for purposes of Section 512(c)(1)(A) because on

January 4, 2021 (two business days later), Defendant "promptly . . . contact[ed] the person

making the notification" to request a DMCA-compliant notice.  17 U.S.C. § 512(c)(3)(B)(ii); *see

also* Noticed Image Claim 2-3.

     Once Plaintiff provided Defendant with a DMCA-compliant takedown notice stating that

the Noticed Image was available at two different URLs, Defendant removed it within four days.

*See* Def. Exs. E, F.  Plaintiff concedes that this was "expeditious."  Pl. Br. 29 (quoting case for

the proposition that "response times to remove infringing material from entities' websites or

systems ranging from 5 to 14 days are expeditious" (citation omitted)).

     Undeterred, Plaintiff urges that "Shutterstock failed to *fully* remove" any of his images

"from its site for at least three months after this action was filed."  *Id.* (emphasis added).  In so

doing, Plaintiff directs the Court to evidence showing only that thumbnails for the twelve Raza-

uploaded images were not deleted until May 11, 2022.  *See* Raza Removed Image Preview Log.

As noted above, the thumbnails associated with the Bishoi and Hane Street images were removed on February 16, 2022 and May 17 and 18, 2021, respectively.  *See* Def. 56.1 ¶¶ 62, 61. The twelve Raza thumbnails "were not visible on or linked to Shutterstock's website, and could not be found by the general public."  Def. Counter 56.1 ¶ 50.  "Moreover, Plaintiff did not send any takedown notices or otherwise notify Shutterstock regarding these thumbnails."  *Id.*  Because these thumbnails were not specifically noticed by Plaintiff, Defendant is not liable for their retention.  *See Steinmetz*, 629 F. Supp. 3d at 84 ("[N]o DMCA liability attaches for the delayed removal of [lingering back-end] copies, even if . . . the failure to remove those copies at the outset violated Defendant's internal policies," because "Plaintiff never specified . . . the URLs where he was able to view his image."); *Wolk*, 840 F. Supp. 2d at 747 (rejecting argument that a "DMCA-compliant notice of any and all other unidentified alleged infringements of [the identified works] that may appear on the Photobucket site . . . provid[ed] Photobucket with the requisite knowledge necessary to require it to remove those alleged infringements").

Finally, Plaintiff argues that none of his 337 images was expeditiously removed because they remained accessible on "TinEye and StockFresh and HelloRF . . . until at least July, August, and September 2022, respectively."  Pl. Br. 29.  TinEye, StockFresh, and HelloRF are independent applications that merely use the Shutterstock API to receive "access to—not copies of—the images in Shutterstock's library."  Shimmin Decl. ¶ 63.  The Shutterstock API "provides real-time access into Shutterstock's content library," meaning that "[w]hen an image is removed, it automatically becomes completely unavailable . . . through . . . the API."  *Id.* ¶ 65.  Any continued access to Plaintiff's images through these platforms is attributable to "their failure to refresh their cache," for which Defendant is not liable.  *Steinmetz*, 629 F. Supp. 3d at 84.

In short, Defendant expeditiously removed the single image (available at two URLs) for which it had knowledge of infringement.

### c. No Right to Control Infringement or Financial Benefit

A service provider which "has the right and ability to control" infringing activity, and who seeks to avail itself of the Section 512(c) safe harbor, must "not receive a financial benefit directly attributable to the infringing activity." 17 U.S.C. § 512(c)(1)(B). The "'right and ability to control' infringing activity under § 512(c)(1)(B) requires something more than the ability to remove or block access to materials posted on a service provider's website." *Viacom II*, 676 F.3d at 38 (internal quotation marks omitted).

As in *Steinmetz*, "[t]he undisputed facts show that Defendant had no right to control the initial infringing conduct by the Contributor[s]. Defendant did not invite or request the Contributor[s] to upload." 629 F. Supp. 3d at 85. And while images are subject to review by Shutterstock before they are ingested into the platform, "Defendant cannot be precluded from safe harbor simply because it failed to reject [an] image when initially uploaded." *Id.*

### d. DMCA Agent

Finally, Defendant has complied with the requirement to "designate[] an agent to receive notifications of claimed infringement." 17 U.S.C. § 512(c)(2). Its "DMCA Policy identifies and provides the contact information for Shutterstock's designated agent for receiving takedown notices." Def. 56.1 ¶ 23. And its "designated agent has been registered with the U.S. Copyright Office and listed in the U.S. Copyright Office's public directory at all relevant times." *Id.* ¶ 24.[8]

---

[8] Plaintiff disputes both of these points on grounds that Shutterstock "does not name or identify a particular DMCA agent for Shutterstock" and instead designates its legal department as a whole. Pl. Counter 56.1 ¶ 23; *see also id.* ¶ 24 (same). That distinction is immaterial. *See Steinmetz*, 629 F. Supp. 3d at 85 (holding that, in designating its legal department, "Defendant has complied with the requirement that it have a designated DMCA agent and a process for receiving and responding to takedown notices").

**B.  False Copyright Management Information Claim**

    **1.  17 U.S.C. § 1202(a)**

Section 1202(a) provides that "[n]o person shall knowingly and with the intent to induce,

enable, facilitate, or conceal infringement (1) provide copyright management information that is

false, or (2) distribute or import for distribution copyright management that is false."  17 U.S.C.

§ 1202(a).  The requirements that "defendant knowingly provided false copyright information

*and* that the defendant did so with the intent to induce, enable, facilitate, or conceal an

infringement" is known as the "double scienter requirement."  *Krechmer v. Tantaros*, 747 F.

App'x 6, 9 (2d Cir. 2018).

Plaintiff argues that Defendant violated Section 1202(a) "by adding . . . a 'shutterstock'

watermark" to his images "and distributing multiple copies of those works."  Pl. Br. 16.

Plaintiff's false CMI claim pursuant to Section 1202(a) fails for the same reason such a claim

failed in *Steinmetz*: "neither required element is met."  *Steinmetz*, 629 F. Supp. 3d at 85.

> First, Defendant's use of a watermark does not constitute false CMI.  It identifies
> Defendant as the source of an image downloaded from its portfolio or platform.
> Second, Plaintiff cannot establish that Defendant had any scienter, let alone double
> scienter.  The evidence shows that Defendant incorporates or attaches its watermark
> to prevent, rather than to induce, enable, facilitate, or conceal, infringement.

*Id.*[9]

While Plaintiff claims that "Shutterstock adds the watermark bearing its logo . . . in order

to identify the images as Shutterstock's own intellectual property and to advertise its brand," Pl.

---

[9] In his opposition and his reply in further support of his cross-motion, Plaintiff directs the Court
to *Penske Media Corp. v. Shutterstock, Inc.*, which declined to dismiss a Section 1202(a) claim
premised on the addition of the Shutterstock watermark.  548 F. Supp. 3d 370, 382 (S.D.N.Y.
2021).  That case is inapposite because Defendant's motion was for dismissal under Federal Rule
of Civil Procedure 12(b)(6), not for summary judgment under Rule 56.  The *Penske* Court
merely held that the plaintiff had satisfied the pleading standard, a materially different legal
standard than the one applicable here.

Counter 56.1 ¶ 19, his evidence shows only that Shutterstock adds watermarks generally and does not support that Defendant adds its watermark to hold out a Contributor's image as its own, *see* Burroughs Decl. Ex. 28 (Shutterstock API Terms of Service) at 2 ("Any Content previewed by Users through the Platform . . . shall incorporate the Shutterstock watermark."); Shimmin Dep. Tr. 73:14 ("I know a watermark is generated[.]"); Maddrey Expert Report 15 ("Shutterstock appears to always add a large 'Shutterstock' watermark to each image selected for its library."). Defendant, in contrast, has offered evidence that it adds its watermark "in order to prevent third parties from using the images without a license" and that it "is intended and understood to identify Shutterstock as the source or distributor of the image, rather than as the author or copyright owner." Shimmin Decl. ¶ 17.

### 2.   17 U.S.C. § 1202(b)

Section 1202(b) makes it unlawful to "intentionally remove or alter any copyright management information" or to "distribute . . . copies of works . . . knowing that copyright management information has been removed or altered without authority of the copyright owner." 17 U.S.C. § 1202(b)(1), (3).  Section 1202(b) also contains a double scienter requirement:  A defendant must "know[], or . . . hav[e] reasonable grounds to know, that [its removal or alteration of CMI] will induce, enable, facilitate, or conceal an infringement." *Id.* § 1202(b).

Plaintiff claims that Defendant's removal of his metadata violates this provision. However, many of Plaintiff's 377 images contained no such metadata when they were uploaded to Shutterstock.  *See* Def. 56.1 ¶ 3.  Plaintiff's Section 1202(b) claim must fail as to those images.  As to the remaining images, Plaintiff has not adduced any evidence that Defendant removed his metadata "knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement." *Id.*  Accordingly, Plaintiff's Section 1202(b) claim regarding any images that did contain his metadata also fails. *See Stevens v. Corelogic,*

*Inc.*, 899 F.3d 666, 675 (9th Cir. 2018) ("[T]o satisfy the knowledge requirement, a plaintiff

bringing a Section 1202(b)(1) claim must . . . provide evidence from which one can infer that

future infringement is likely, albeit not certain, to occur as a result of the removal or alteration of

CMI."); *see also id.* at 674 & n.4 (that plaintiffs "have not offered any evidence to satisfy the

mental state requirement" "is a sufficient basis for concluding that [their] claims fail").

## C.  Motion to Exclude Expert Testimony

In addition to their motions on the merits, each party moves to exclude the other's expert.

*See* ECF Nos. 85 (Def. Mot. to Exclude), 99 (Pl. Mot. to Exclude).  Each party argues, among

other things, that the opposing party's expert is unqualified.  *See* ECF Nos. 86 (Def. Expert Br.)

at 11, 100 (Pl. Expert Br.) at 2.  However, "[b]ecause the Court does not rely on [either party's]

expert reports [or] opinions to decide the summary judgment motions, [both] motions [to exclude

are] denied as moot."  *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, No. 17 Civ. 855 (JPO), 2021

WL 4481598, at *7 (S.D.N.Y. Sept. 30, 2021).

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, ECF No. 91, is

GRANTED and Plaintiff's motion, ECF No. 88, is DENIED; both motions to exclude expert

testimony, ECF Nos. 85 and 99 are DENIED as moot; and Defendant's letter-motion for oral

argument, ECF No. 133, is DENIED as moot.  The Clerk of Court is respectfully directed to

terminate ECF Nos. 85, 88, 91, 99, and 133.

SO ORDERED.

Dated: September 30, 2023
       New York, New York

JENNIFER H. REARDEN
United States District Judge