UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELLIOT MCGUCKEN,

                   Plaintiff,

      -against-

SHUTTERSTOCK, INC.,

                  Defendant.

Case No. 1:22-cv-00905 (JHR)

# SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT SHUTTERSTOCK, INC.'S MOTION FOR SUMMARY JUDGMENT

MITCHELL SILBERBERG & KNUPP LLP
Eleanor M. Lackman (eml@msk.com)
Marissa B. Lewis (mbl@msk.com)
437 Madison Ave., 25th Floor
New York, New York 10022-7001
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

*Attorneys for Defendant Shutterstock, Inc.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT....................................................................................................................... 2

I. THE UNDISPUTED RECORD ESTABLISHES THAT THE ACCUSED IMAGES
APPEARED ON THE CONTRIBUTOR PLATFORM AT THE CONTRIBUTOR'S
DIRECTION ............................................................................................................. 2

    A.    Neutral Screening Does Not Displace User Direction..................................... 3

    B.    Plaintiff's Contrary Theory Conflates Screening with Curation..................... 5

II. NO REASONABLE FACTFINDER COULD FIND THAT SHUTTERSTOCK HAS
THE "RIGHT AND ABILITY TO CONTROL" ................................................................. 6

    A.    Shutterstock Does Not Engage in "Substantial Influence" as Defined in the Law. .......... 8

    B.    Plaintiff's Post-Upload Focus Is a Red Herring............................................. 9

CONCLUSION.................................................................................................................. 10

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*BWP Media USA, Inc. v. Clarity Digital Group, LLC*,
  820 F.3d 1175 (10th Cir. 2016) ........................................................................................4

*Capitol Records, LLC v. Vimeo, Inc.*,
  125 F.4th 409 (2d Cir. 2025) ...............................................................1, 3, 6, 7, 8, 9, 10

*Costar Grp. Inc. v. Loopnet, Inc.*,
  164 F. Supp. 2d 688 (D. Md. 2001) ..................................................................................4

*CoStar Grp., Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) ............................................................................................4

*Io Grp., Inc. v. Veoh Networks, Inc.*,
  586 F. Supp. 2d 1132 (N.D. Cal. 2008) ............................................................................8

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
  873 F.3d 1045 (9th Cir. 2017) ..........................................................................................4

*McGucken v. Shutterstock, Inc.*,
  166 F.4th 361 (2026)...........................................................................1, 2, 3, 5, 6, 8, 10

*McGucken v. Shutterstock, Inc.*,
  2023 WL 6390530 (S.D.N.Y. Oct. 2, 2023) ...................................................................1, 9

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) .............................................................................9

*Ventura Content, Ltd. v. Motherless, Inc.*,
  885 F.3d 597 (9th Cir. 2018) ...............................................................................1, 3, 4, 6, 9

*Wolk v. Kodak Imaging Network, Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012), *aff'd sub nom. Wolk v.
  Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014)....................................................8

### STATUTES

17 U.S.C. § 512
  (c) ......................................................................................................................................1
  (c)(1) .................................................................................................................................3
  (c)(1)(B) ............................................................................................................................1

ii

**PRELIMINARY STATEMENT**

Over two years ago, this Court granted summary judgment to defendant Shutterstock, Inc. ("Shutterstock") on a well-developed record, holding that there was no genuine dispute that Shutterstock qualifies for the Digital Millennium Copyright Act ("DMCA") safe harbor. *McGucken v. Shutterstock, Inc.*, 2023 WL 6390530 (S.D.N.Y. Oct. 2, 2023) ("MSJ Opinion"). The Second Circuit affirmed in all material respects and remanded for consideration of two discrete aspects of 17 U.S.C. § 512(c). *McGucken v. Shutterstock, Inc.*, 166 F.4th 361 (2026) ("Appellate Ruling"). Properly applied, the law cited in the Appellate Ruling—specifically, *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597 (9th Cir. 2018) ("*Motherless*"), and *Capitol Records, LLC v. Vimeo, Inc.*, 125 F.4th 409 (2d Cir. 2025) ("*Vimeo*")—confirms that this Court's prior ruling was correct.

As accurately appreciated, the remand does not introduce a new standard. It asks this Court to apply settled law to a record that already compelled summary judgment. The existing record, as detailed in the accompanying supplemental statement of undisputed facts, only reinforces that conclusion. Under the law, platforms like Shutterstock that apply neutral compliance screening to user-submitted content remain within the safe harbor, while those that exercise substantial influence over what users post do not. Shutterstock falls squarely in the former category. Indeed, uploads proceed automatically unless they trigger objective policy or technical violations. That limited screening—conducted in seconds per image across massive volumes—does not transform user-directed storage into platform-directed publication, and *Motherless* confirms as much.

Nor does Shutterstock exercise the "right and ability to control" under § 512(c)(1)(B). As *Vimeo* makes clear, that element requires "something more" than the ability to remove or block

1

content, namely, ***substantial influence over user activity***. The undisputed record shows no such

influence here: no content-specific direction, no pre-publication shaping of submissions, and no

intrusion into user autonomy beyond reinforcing neutral platform rules.

The same record that supported summary judgment before this Court continues to do so.

The Court should reaffirm its prior ruling.

<b><u>ARGUMENT</u></b>[1]

**I.    THE UNDISPUTED RECORD ESTABLISHES THAT THE ACCUSED IMAGES APPEARED ON THE CONTRIBUTOR PLATFORM AT THE CONTRIBUTOR'S DIRECTION**

As the Second Circuit observed, it is rare that the element of "at the direction of a user" is

disputed in lawsuits involving DMCA eligibility. That is because, as here, the online service

provider's ("OSP") task of review to keep its platform compliant with the platform's policies and

applicable law is generally considered permissible to prevent a platform from becoming a morass

of illegal and offensive content rather than to serve its ultimate purpose of legal distribution, as

Congress contemplated when enacting the DMCA. Citing *Motherless* and other rulings that

preceded it (which also were referenced in the *Motherless* case), all but one of which resulted in

the court granting summary judgment for the defendant, the Panel touched on various elements

---

[1] As noted in the parties' joint letter (ECF No. 165 at 2), the Panel did not rule on Plaintiff's case-in-chief on direct, contributory, or vicarious liability, or with respect to other issues including standing, fair use, or other points that were the subject of the cross-motions for summary judgment. Further, while noting that the element of the "right and ability to control" is conditioned on there being a direct financial benefit from infringement, the Panel decided to leave it to this Court to opine on that key and dispositive aspect. Appellate Ruling, 166 F.4th at 380 n.12. Shutterstock previously detailed that aspect in its prior briefing (ECF Nos. 98 at 17-18; 118 at 17-18; and 131 at 7), and Plaintiff has not introduced any evidence indicating that Shutterstock profits from infringing content—indeed, its value proposition is in supplying access to ***non-infringing*** content.

that it believed allowed it to draw a general rule. *See* Appellate Ruling, 166 F.4th at 375-76.[2] In

particular, the Panel concluded that where the appearance of the content on the platform is driven

by "aesthetic, editorial, or marketing judgment," then the existence on the platform is not "at the

direction of the user." *Id.* at 376. Accordingly, the Panel proposed a dichotomy: whether

Shutterstock was more aptly curating its own photo library or whether it was imposing minimum

policy standards to facilitate access to user content on the platform. *Id.* at 376. As this Court

correctly found, the record indisputably shows the latter.

### A.    Neutral Screening Does Not Displace User Direction.

The nuances of *Motherless* explain where to draw the line—and that the line can be

easily drawn on a motion for summary judgment as it has been many times before in the federal

courts' history of assessing DMCA cases, even in the rare instances where this element is

challenged. In *Motherless*, the Ninth Circuit rejected an argument that screening to eliminate

content that violates site rules does not mean that the platform "directs what is posted." 885 F.3d

at 605. To the contrary, it would be "counterintuitive" to deny safe harbor protection because a

provider excludes unlawful or objectionable material. *Id.*

Tagging, categorization, and promotion of content that is already permitted on the site is

a classic red herring. Per the Court in *Motherless*, "[t]he users post what they post, popular or

---

[2] The Appellate Ruling references *Vimeo* as part of its discussion, *see* 166 F.4th at 376, but the portion of the discussion it quotes comes from the *Vimeo* court's analysis of the "right and ability to control" element. *Id.* (citing *Vimeo*, 125 F.4th at 425-26). Nonetheless, the Panel cited *Vimeo* for the proposition that "service providers can review and screen user content before they store it on their platform without becoming ineligible for safe harbor, particularly where the ability to exert control over the content that appears on the platform is necessarily limited by the sheer volume of uploaded user content." *Id.* at 375-76. It further recognized that a service provider may engage in "rote and mechanical content screening, like excluding unlawful material, enforcing terms of service, or limiting uploads 'to selected categories of consumer preferences,' *Vimeo [ ]*, 125 F.4th at 425, without falling outside the ambit of § 512(c)(1)." *Id.* at 376. This issue is discussed further in the section relevant to the *Vimeo* case, which relates to the "right and ability to control" element.

3

not," even where the OSP encourages or incentivizes more-popular content. *Id.* at 606. *Motherless* expressly distinguished *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045 (9th Cir. 2017), because in that case, the website moderators reviewed user submissions for substance and published *only* those submissions that, in the moderators' subjective judgment, were "relevant to new and exciting celebrity news," resulting in rejections roughly 67% of the time. *Motherless*, 885 F.3d at 606; *compare* 56.1 Statement ¶ 107. In Motherless's case, while it took down an enormous amount of content, it left up anything that the owner did not consider violated its rules. *See id.* at 601, 607. To support its conclusion that Motherless met this element, the Circuit cited other cases that found that an OSP was clearly on the safe-harbor side of the line. *See id.* (citing *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 556 (4th Cir. 2004) (addressing OSP with human employee review))[3] and *BWP Media USA, Inc. v. Clarity Digital Group, LLC*, 820 F.3d 1175, 1181 (10th Cir. 2016) (safe harbor met even though the OSP instructed users on topics to write about and suggested that users include pictures or slide shows with their articles)). In the words of *BWP Media*, "if the infringing content has merely gone through a screening or automated process, the service provider will generally benefit from the safe harbor's protection." *Id.* (cleaned up).

The record here establishes user-driven uploads. Contributors independently select and upload content. 56.1 Statement ¶¶ 100-101. Shutterstock does not solicit, select, or direct those submissions. *Id.* ¶ 102. Uploads are processed automatically except for very brief (10-20 seconds), high-volume review, which is limited to objective compliance criteria, such as

---

[3] *See also Costar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 692 (D. Md. 2001) (even though photo "is not immediately available to the public," but first "reviewed by [an] employee" for the nature of the photo's content and to ensure "there is no obvious indication" that it "violat[es] [defendant's] terms and conditions"), *aff'd*, 373 F.3d 544 (4th Cir. 2004).

spamming; watermarks suggesting that material was pulled from a third-party site; obvious and objective technical issues such as issues with file format, indicia of blur due to camera shake or unintentional mistakes, camera or processing errors, and artifacts obscuring the main subject matter of the image (such as a blurred hand or finger in front of the subject or clear indicia of damage to the camera lens); problematic content such as pornography, hateful imagery, and images that would be offensive to most viewers; and indicia of potential third-party violations, such as the inclusion of third-party copyrighted materials, trademarks, and names and likenesses without an accompanying model release. *Id.* ¶¶ 105-107, 110-115. During this limited window of time, reviewers also had to read for the image's description, title, and keywords supplied by the uploader to ensure that the description, title, and keywords are reasonably accurate, not full of racist or offensive or otherwise improper content. *Id.* ¶ 116. And 93% of uploads nonetheless get onto the platform. *Id.* ¶ 107.

This is the opposite of the editorial gatekeeping at issue in cases like *Mavrix.* There, moderators exercised substantial subjective editorial judgment. Here, content proceeds unless it fails neutral rules.

### B.    Plaintiff's Contrary Theory Conflates Screening with Curation.

Plaintiff Elliott McGucken's ("Plaintiff") argument relies on collapsing a fundamental distinction: enforcing platform rules versus shaping user submissions. The record contains no evidence that Shutterstock conditions publication on any aesthetic or market-based judgments. Indeed, even the Second Circuit expressly noted the absence of any "marketability" criterion. Appellate Ruling, 166 F.4th at 378 n.10. Post-upload activity—such as featuring or promoting certain content—has no bearing on the relevant inquiry. *Motherless* and other courts consistently have treated such activity as distinct from the question of who determines what appears on the platform in the first place.

5

Plaintiff's purported "evidence" is not to the contrary. Plaintiff cannot rely on conflating other portions of Shutterstock's business (such as acquiring catalogs) with its contributor platform, and notably, the court in *Motherless* rejected any effort to do the same. 885 F.3d at 605 (rejecting consideration of category of self-uploaded pictures and videos, because there was no evidence that material in that category infringed on anyone's copyright). Likewise, the Panel's citation to Plaintiff's incomplete evidence overlooks that the timing of how quickly an incoming image may be checked for terms violations could be impacted by the sheer number of images coming in at any one time, as well as by automated technical operations in watermarking and accessibility configuration. *See* Appellate Ruling, 166 F.4th at 377; *see* 56.1 Statement ¶ 104. And, as *Motherless* noted, incentives or guidance to uploaders who want to see their already-uploaded content perform ***better*** are irrelevant to the question. Rather, Shutterstock's "review for infringement or other harmful material," Appellate Ruling, 166 F.4th at 376, makes no impact on this element. *Motherless*, 885 F.3d at 608 (because the users—not Motherless—decided what to post (but for the owner's exclusion of policy-violating content), the material was "posted at the direction of users.").

## II.     NO REASONABLE FACTFINDER COULD FIND THAT SHUTTERSTOCK HAS THE "RIGHT AND ABILITY TO CONTROL"

The Second Circuit's decision in *Vimeo* details the controlling framework—and it forecloses Plaintiff's theory. Having already concluded that third-party submissions on Vimeo's platform were done at the direction of the user and otherwise met the prerequisites of the DMCA, the *Vimeo* court analyzed the "right and ability to control" portion of the relevant prong of the DMCA test. 125 F.4th at 423-26. In doing so, it reaffirmed that the governing standard for this element requires "something more" than the ability to remove or block content. That "something more" is ***substantial influence over user activity***, assessed by reference to the degree

and frequency of the platform's intrusion into user autonomy. *Id.* at 425-26 (referring to the "coercive effect and frequency" of an OSP's "intrusions into user autonomy over their posts").

The facts in *Vimeo* are illuminating here. Vimeo set its own general policies regarding uploads, including policies prohibiting advertising videos, videos containing abusive or sexually-explicit content, real-estate walkthroughs, gameplay videos, movies, TV shows, and trailers. *Vimeo*, 125 F.4th at 416. Vimeo also implemented tools to assist its reviewers in flagging material that was at high risk of involving violation of their terms of service, and the reviewers would decide whether or not to remove such content. *Id.* Further, Vimeo employees engaged in some "moderation and curation," such as Vimeo employees posting "likes" or comments, creating groups or channels, and promoting certain user videos by placing them on Vimeo's own blog or "Staff Picks" channel. *Id.*

None of this—enforcement of content policies designed to avoid illegality or offensive material, screening submissions for compliance, promoting or demoting content after upload, or structuring a platform to appeal to particular audiences—is "substantial influence." Not even the plaintiffs indicated this was; they referred to it as "basic site maintenance," *id.* at 425 n.13, with the court recognizing core business-building functions. *See id.* (explaining that "restrictions imposed by a website operator that are designed to avoid illegality, alienation of users, or postings not compatible with the website's mission" do not cause "forfeiture of the safe harbor"). The *Vimeo* court stated that in "virtually all cases," OSPs have the "legal right" to select categories of content they will allow and to exclude those that do not conform. *Id.* at 423 (recognizing that Vimeo's policies were "in the nature of (i) avoiding illegality and the risk of offending viewers and (ii) designing a website that would be appealing to users with particular interests" and explaining that "[t]he creation of websites designed to satisfy consumer demands

7

appears to be precisely the sort of entrepreneurial activity that the safe harbor was intended to encourage."); *see also* Appellate Ruling, 166 F.4th at 378-79 (citing and quoting *Vimeo* at 425).

### A.    Shutterstock Does Not Engage in "Substantial Influence" as Defined in the Law.

Measured against the proper standard, the record shows no "substantial influence" by Shutterstock. Shutterstock does not instruct contributors what to create or upload. 56.1 Statement ¶¶ 101-102, 127. The record shows that reviewers applied objective criteria; they do not exercise subjective editorial judgment over what content should be published, and Plaintiff has no evidence that aesthetic or commercial merit was considered with respect to any of the uploads at any relevant time. *Id.* ¶¶ 110, 124, 136. Rather, uploads proceed unless they violate Shutterstock's general rules. *Id.* ¶¶ 119-120. Indeed, the scale of the platform underscores the point. With approximately 200,000 submissions per day and only seconds of review per image, Shutterstock lacks both the capacity and the practice of shaping user content in any meaningful way. *See Vimeo*, 125 F.4th at 416 (crediting fact of 43,000 videos arriving per day and only 74 employees for review); *see also id.* at 425-28 (distinguishing a situation where a party, like Vimeo, engages in "tiny influences" on user activities, such as "commenting on and promoting posted videos, and banning certain types of videos," from scenario where an operator plays a "large role in shaping the content of user posts"); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1153 (N.D. Cal. 2008) (no "right and ability to control" where defendant "received hundreds of thousands of video files from users"); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 748 (S.D.N.Y. 2012) (in context of flow of incoming content, "it is unlikely that [the] kind of prescreening [required to establish a 'right and ability to control'] is even feasible."), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014).

*Vimeo*'s analysis confirms that this case bears no resemblance to the "something more" scenarios that it was able to find—such as those imposing detailed content specifications, closely supervising submissions, or conditioning publication on compliance with subjective editorial criteria. *See* 125 F.4th at 425 (discussing *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1173 (C.D. Cal. 2002) (ruling on motion for preliminary injunction)); *id.* at 424 (distinguishing *Mavrix*, where review for **content** before submission and rejection of nearly two-thirds of all submitted posts "arguably"—not conclusively—involved "substantial influence" over user postings). Plaintiff has never identified evidence that Shutterstock directs the substance of user submissions, imposes aesthetic requirements, or engages in iterative editorial control over uploads. At most, Shutterstock excludes content that violates its rules. That is precisely the conduct *Vimeo* holds insufficient as a matter of law.

## B.    Plaintiff's Post-Upload Focus Is a Red Herring.

Plaintiff's arguments always have been improperly targeted to post-upload activity, such as promotion, featuring, or guidance regarding successful content. However, *Vimeo* specifically rejects the notion that such post-upload activity constitutes "substantial influence"—particularly where the platform does not control what content is uploaded in the first place. As the Second Circuit observed, Vimeo engaged in some "moderation and curation," such as employees posting "likes" or comments, creating groups or channels, and promoting certain user videos by placing them on Vimeo's own blog or "Staff Picks" channel. *Vimeo*, 125 F.4th at 416. But, as this Court noted, that is irrelevant. MSJ Opinion, 2023 WL 6390530, at *8; *see also Motherless*, 885 F.3d at 606 ("The users post what they post, popular or not. Motherless does not screen out material for relatively low popularity, and of course most postings do not fall within the "Most Popular" category. Yet there they are, up on the site, because the users put them there.").

Indeed, in affirming the grant of summary judgment, the *Vimeo* court expressly rejected an argument that a service provider's influence should be found "substantial" when the provider "exercises editorial judgment, such as by evaluating content for its merit," and rebuffed a claim that promotion and demotion of user posts based on their merit or appeal to others at least raised a jury question for safe harbor eligibility. *Id.* at 424-25. And even the Panel in this case noted, "where a service provider's control over user activities is limited to promoting or demoting certain material within its platform, rather than deciding which material to allow on the platform at all, its influence is much less substantial." Appellate Ruling, 166 F.4th at 378 (citing *Vimeo*, 125 F.4th at 424-25). Accordingly, on the actual record here, there is no issue of fact as to right and ability to control the allegedly infringing activity that Plaintiff claims, or any other activity—infringing or not—occurring on its platform as settled law defines that term in the context of the DMCA.

**CONCLUSION**

The Court should find, as it did previously, that there is no genuine dispute that Shutterstock meets all requirements of the DMCA safe harbor, including those the Second Circuit flagged. The Court should reaffirm its prior grant of summary judgment accordingly, and grant Shutterstock leave to renew its motion for attorneys' fees.

DATED:  New York, New York                  MITCHELL SILBERBERG & KNUPP LLP
          April 7, 2026


                                        By: /s/ Eleanor M. Lackman
                                            Eleanor M. Lackman (eml@msk.com)
                                            Marissa B. Lewis (mbl@msk.com)
                                            437 Madison Ave., 25th Floor
                                            New York, New York 10022-7001
                                            Telephone: (212) 509-3900
                                            Facsimile: (212) 509-7239

                                            *Attorneys for Defendant Shutterstock, Inc.*

11

## <u>CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION</u>

Pursuant to the Court's March 10, 2026 Order (ECF No. 167) and Local Civil Rule 7.1(c) of the United States District Court for the Southern District of New York, the undersigned certifies that the foregoing Memorandum of Law complies with the Court's 3,500-word limit because it contains 3,184 words, excluding the caption, table of contents, table of authorities, signature block, and this certificate.  The word count was prepared using the word-count function of the word-processing system used to prepare this document.

DATED:  New York, New York                MITCHELL SILBERBERG & KNUPP LLP
           April 7, 2026


By: /s/ Eleanor M. Lackman
     Eleanor M. Lackman (eml@msk.com)
     Marissa B. Lewis (mbl@msk.com)
     437 Madison Ave., 25th Floor
     New York, New York 10022-7001
     Telephone: (212) 509-3900
     Facsimile: (212) 509-7239

     *Attorneys for Defendant Shutterstock, Inc.*