Docusign Envelope ID: E587EEDA-ED04-8E2F-816F-805EA318E7C5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELLIOT MCGUCKEN,<br><br>Plaintiff,<br><br>-against-<br><br>SHUTTERSTOCK, INC.,<br><br>Defendant. | Case No. 1:22-cv-00905-JHR |

## REPLY DECLARATION OF ALEXANDROS MARAGOUDAKIS

I, Alexandros Maragoudakis, declare as follows:

1.      I am a Senior Director and the Interim Head of Content Supply & Services at Shutterstock, Inc. ("Shutterstock").  I submit this declaration in further support of Shutterstock's supplemental briefing on its Motion for Summary Judgment pursuant to the Court's March 10, 2026 Order.  The statements made below are true and accurate based on my own personal knowledge and experience and review of Shutterstock's business records.  If called as a witness, I could and would testify competently to the facts stated below.

2.      I have been employed by Shutterstock since February 2022.  In my current role, I oversee the organization responsible for Shutterstock's contributor program, content standards, and the review of content submitted by contributors.  Through my role and experience at Shutterstock, I am familiar with Shutterstock's processes for contributor uploads and review of contributor submissions.

3.      I understand that the relevant time period for this declaration is 2018 through 2022.  The statements in this declaration concern that time period.  Although I did not work at Shutterstock until 2022, I am familiar with Shutterstock's processes for contributor uploads and

review of contributor submissions during the relevant time period based on my review of Shutterstock's business records maintained in the ordinary course of business, together with my knowledge of Shutterstock's systems and processes from my current role and experience.

4.     I understand that the plaintiff in this case ("Plaintiff") insists that the documents the Second Circuit Panel cited in its decision say that Shutterstock only accepts a small fraction of materials contributors submit, and that Shutterstock "curates" material.  This is not the case, at least not as to the contributor platform.  I have reviewed cited website excerpts, but they are irrelevant as noted below.  I also have reviewed various cited testimony from Heather Shimmin, and nothing she says is inconsistent with the fact that the contributor platform is not curated; the only way it would be so is if the context were fully ignored.

5.     Objectively, what Shutterstock does is nothing like "curation."  The common understanding of curation is going through extensive catalogs to pick only the best material.[1] This is not what we do.  Rather, we remove from upload obviously problematic material that appears to actually or be highly likely to violate our policies.

6.     It is true that contributors who submit content to Shutterstock want to see their content perform well on the platform, but general advice to contributors on how to improve performance after their content is on the site has nothing to do with actual performance or the policies we apply.[2]  In addition, while we—like every other online platform that wants to be a popular source for user-generated content—hope that contributors will supply content that the public views as high quality as opposed to spam or burdensome filler, the numbers show that our

---

[1] See also https://www.merriam-webster.com/dictionary/curation; https://dictionary.cambridge.org/us/dictionary/english/curation.

[2] By way of example, in this case, many of the images were never licensed at all, yet they got through; others were licensed, and there appears to be no visible difference among them.

2

gatekeeping is extremely minimal.  The various extraneous "rejection reasons," which Plaintiff continues to reference from irrelevant times, were designed to discourage submission of bad content than they are the actual standards that Shutterstock applied as gatekeeping measures at the relevant time.  The numbers tell the story: 93% of content from two million contributors made it from upload, through automatic processing and the required policy checks, to availability on the platform, where over 400 million images uploaded by contributors were stored.

7.      The task of reviewers is limited and straightforward:  to determine, very quickly, in very cursory fashion, whether submitted content appeared to clearly violate Shutterstock's technical, metadata, legal, release, and policy requirements.  Humans were used for this task during the relevant time period, but that is because certain questions could not be easily assessed by a machine.[3]  Reviewers have not been trained on, and never have been told to assess, anything like "licensability" or aesthetic or commercial value.  Their job is to protect Shutterstock and its users from obvious, visible risk.

8.      Due to the nature of human review, there naturally may be some subjectivity.  For example, on isolated occasions within the hundreds of thousands of images flooding in per day, it may be unclear whether one of our policies is being violated, such as whether an image looks technically improper but may not be so.  In those instances, we sometimes defer to allowing an image through even if it appears like it might violate our policies, because reasonable minds can differ whether an image has a technical problem or was simply intended to appear heavily distorted.  This is not a question of aesthetics, but instead one of determining compliance to eliminate obviously erroneous material of poor technical quality.  In fact, we have found that the

---

[3] Plaintiff also omits that at the time, Shutterstock would use automated processes  for certain gatekeeping, such as flagging and blocking material such as re-uploaded identical content that had already been removed for prior violations.

submission of technically poor images can be a red flag of spamming or other types of efforts to defraud Shutterstock or its users.

9.      As another example, at the time, we required human review of model releases to determine whether they appeared sufficient to avoid obvious publicity-rights violations that pertain to commercial use of people's likenesses without permission.  A human may see a visible watermark that a machine may not.  In sum, failure to use human reviewers, in our view, would put the platform and its users at greater risk.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 22.00, 2026, in   New York         ,   New York             .

DocuSigned by:

879F318DF76A418...

Alexandros Maragoudakis

4